## IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
### SECOND JUDICIAL DISTRICT

JOSHUA FOSTER, JESSICA FOSTER, AND
MAKAYLA FOSTER AND GABRIELLA FOSTER
MINORS, BY AND THROUGH THEIR NATURAL
GUARDIANS, JOSHUA AND JESSICA FOSTER                      **PLAINTIFFS**

**VERSUS**                                      CAUSE NO. A2402-2017-162

HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
HUNT MH PROPERTY MANAGEMENT, LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z        **DEFENDANTS**

### SUMMONS

THE STATE OF MISSISSIPPI
COUNTY OF HARRISON

TO:   **Hunt MH Property Management, LLC**
      **c/o Registered Agent**
      **Capitol Corporate Services, Inc.**
      **248 E. Capitol Street, Suite 840**
      **Jackson, Mississippi 39201**
      **OR WHEREEVER THEY MAY BE FOUND**

### NOTICE TO DEFENDANT(S)

**THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.**

You are required to mail or hand-deliver a copy of a written response to the Complaint to **Rushing & Guice, P. L. L. C.**, the attorneys for Plaintiffs, whose address is **Post Office Box 1925, Biloxi, Mississippi 39533-1925** and whose street address is **1000 Government Street, Suite E, 2nd Floor, Ocean Springs, Mississippi 39564.**   Your response must be mailed or delivered within thirty (30) days from the date of delivery of this Summons and Complaint or a Judgment by default will be entered against you for the money or other things demanded in the Complaint.

You must also file the original of your response with the Clerk of this Court within a reasonable time afterward.

Issued under my hand and the seal of said Court, on this the 22 day of Dec. , 2017.

Connie Ladner _____ Clerk

BY: _____ D.C.



EXHIBIT
A

IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT

JOSHUA FOSTER, JESSICA FOSTER AND
MAKAYLA FOSTER AND GABRIELLA FOSTER
MINORS, BY AND THROUGH THEIR NATURAL
GUARDIANS, JOSHUA AND JESSICA FOSTER                              **PLAINTIFFS**

**VERSUS**                                                CAUSE NO. A2402-2017-102

HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
HUNT MH PROPERTY MANAGEMENT, LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z          **DEFENDANTS**

## COMPLAINT

## JURY TRIAL REQUESTED

COME NOW Plaintiffs, Joshua Foster, Jessica Foster, and Makayla Foster and Gabriella

Foster, Minors, by and through their natural guardians, Joshua and Jessica Foster (Plaintiffs), by

and through their attorneys, Rushing & Guice, P.L.L.C., and file this their Complaint against

Hunt Southern Group, LLC fka Forest City Southern Group, LLC, Forest City Residential

Management, LLC, Hunt MH Property Management, LLC, Unknown John and Jane Does A

through M, and Other Unknown Corporate Entities N through Z (Defendants), and for good

cause of action, states unto the Court the following, to-wit:

### PARTIES

1.

Plaintiff, Joshua Foster ("Joshua"), is an adult citizen of Harrison County, Mississippi

residing at 145 McNarney Drive, Biloxi, Mississippi.

FILED

DEC 2 2 2017

CONNIE LADNER
CIRCUIT CLERK
BY:_____ D.C.

2.

Plaintiff, Jessica Foster ("Jessica"), is an adult citizen of Harrison County, Mississippi residing at 145 McNarney Drive, Biloxi, Mississippi.

3.

Plaintiff, Makayla Foster ("Makayla"), is the minor child of Joshua and Jessica, her natural guardians, born December 23, 2009, and is a resident of the State of Mississippi, residing at 145 McNarney Drive, Biloxi, Mississippi.

4.

Plaintiff, Gabriella Foster ("Gabriella"), is the minor child of Joshua and Jessica, her natural guardians, born January 1, 2017, and is a resident of the State of Mississippi, residing at 145 McNarney Drive, Biloxi, Mississippi.

5.

Defendant, Hunt Southern Group, LLC (Hunt Southern), formerly known as Forest City Southern Group, LLC (Forest City Southern) is a Delaware Limited Liability Company registered to do business in Mississippi. On March 18, 2016, Forest City Southern Group, LLC filed Articles/Certificate of Amendment with the Mississippi Secretary of State, changing its name to Hunt Southern Group, LLC. Hunt Southern fka Forest City Southern may be served through it registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840, Jackson, Mississippi 39201. Hunt Southern fka Forest City Southern is believed to be the owner of the property in issue.

6.

Defendant, Forest City Residential Management, LLC (Forest City Residential Management), is an Ohio Limited Liability Company, formally known as Forest City Residential

Management, Inc., whose registration in Mississippi was administratively dissolved on November 30, 2016. Forest City Residential Management may be served with process by serving its registered agent for process, FCE Statutory Agent, Inc., 50 Public Square, Suite 1360, Cleveland, Ohio 44113. Forest City Residential Management is listed as the agent for Forest City Southern Group on the lease for the property in issue.

7.

Defendant, Hunt MH Property Management, LLC (Hunt MH Property Management), is a Delaware Limited Liability Company, registered to do business in Mississippi and may be served through its registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840, Jackson, Mississippi 39201. Based on information and belief, Hunt MH Property Management is the agent of Hunt Southern and has been charged with the maintenance and upkeep of the property in issue.

8.

Other Unknown John and Jane Does A through M are unknown Defendants who may be seasonably supplemented after discovery.

9.

Other Unknown Corporate Entities N through Z are unknown Defendants who may be seasonably supplemented after discovery.

## JURISDICTION AND VENUE

10.

Jurisdiction is proper in this Court under Miss. Code Ann. § 9-7-81. Venue is proper in Harrison County as this is the location where the injuries were sustained, where the cause of action accrued and where Plaintiffs reside. Jurisdiction is also proper pursuant to Miss. Code

Ann. § 13-3-57 since Defendants were doing business within the State, made contracts with Plaintiffs, who are residents of Mississippi, those contracts were performed wholly within Harrison County, Mississippi, Second Judicial District, and the alleged tort was committed against Plaintiffs in Mississippi. Defendants, therefore, should be subjected to the jurisdiction of Mississippi courts.

## FACTS

### 11.

Joshua is a Technical Sergeant with the United States Air Force. In July of 2013 Joshua moved his family to Biloxi, Mississippi as part of a routine change of station. Like other military families moving to the area, the military housing assignment for Plaintiffs was controlled by Defendants.

### 12.

On or about July 12, 2013, Plaintiffs entered into a Military Lease Agreement for military housing in Thrower Park located at 145 McNarney Drive in Biloxi, Mississippi in the County of Harrison (Subject Property). See Lease Agreement attached hereto as **Exhibit "A."** Plaintiffs moved into the Subject Property in July of 2013. The Subject Property is located in the Thrower Park Neighborhood, which is privatized military housing comprised of approximately 100 homes and located near Keesler Air Force Base in Biloxi, Mississippi. At all times mentioned herein, the Subject Property was owned, controlled or managed by one of Defendants.

### 13.

At the time Plaintiffs entered into the Military Lease Agreement, Thrower Park was owned and operated by Forest City Southern and managed through Forest City Residential Management. In 2016, Thrower Park was acquired by Hunt Southern and operated or managed

through Hunt MH Property Management. Upon information and belief Forest City Southern and Hunt Southern exercised custody and control over Thrower Park and acted as the owners of Thrower Park through a fifty year lease initiated by the United States Department of Defense through a program called the Military Housing Privatization Initiative. Essentially, while Defendants own the improvements on the land and maintain custody and control of the property, the United States maintains an ownership interest in the land.

14.

While residing in the Subject Property, Plaintiffs repeatedly reported maintenance concerns involving mold and water damage. Despite Defendants' maintenance technicians reporting that the mold and leaks were resolved, it was learned that the air conditioner ductwork had a sweating problem and that the mold problem was more pervasive. This duct sweating, caused by poorly insulated ductwork, contributed to the mold and water damage throughout the house. Further it has been recently shown that Defendants have taken significant steps to replace the ductwork in many of the houses they operate.

15.

Plaintiffs' maintenance records show repeated requests for Defendants to address mold and leaking problems while they lived in the Subject Property. The maintenance records show that the mold was simply "cleaned with soap and water" instead of being removed. Fraudulent misrepresentations were made to Plaintiffs by Defendants regarding the removal of the mold. Plaintiffs were told that the mold problem had been rectified when in fact the cause of the water damage was not addressed. Throughout the entire time Plaintiffs resided in the Subject Property, Defendants never replaced the air conditioner filters. Plaintiffs replaced the filters on their own.

16.

Rather than addressing the cause of the leaks, Defendants' maintenance technicians cleaned the mold with soap and water. This allowed for the toxic mold to continue flourishing beneath the surface. Although Defendants learned that condensation coming from attic ductwork, nothing was done to repair the moisture problem.

17.

In June of 2016, Plaintiffs were placed in a vacant, but furnished house by Defendants so that Defendants could fix issues in the Subject Property's attic and repair a cracked wall. Despite these efforts, issues with mold continued. On or about September 14, 2016 Plaintiffs reported more mold in the bathroom, around the outlets in one of the bedrooms, and on the ceilings throughout the first floor of the Subject Property.

18.

On or about September 16, 2016, Defendants told Plaintiffs that mold could not be seen on the ceilings of the Subject Property but that the ductwork was sweating over the affected areas. Defendants again sprayed and wiped the ceilings with soap and water.

19.

On January 2, 2017, testing was performed on the Subject Property with Mold Test USA. Mold Test USA performed a 52 Point Visual Inspection and tested both outside and inside the Subject Property for mold spores. The reports showed high levels of Aspergillus inside the Subject Property with less being found outside the Subject Property. These elevated levels of toxic mold are well-known for causing serious health concerns. See Mold Test USA Mold Reports attached hereto as **Exhibits "B and C."**

20.

Plaintiffs have obtained information from other military housing families leading them to believe that mold issues such as those experienced in their home were commonplace, having occurred in other military housing owned and operated by Defendants including others in Thrower Park.

21.

Plaintiffs have been unable to afford to relocate and have not been offered a different unit that is not contaminated. Plaintiffs have suffered property loss due to the mold contamination without having been compensated for any of their losses.

22.

As a direct result of the continued exposure to toxic mold located in Plaintiffs' home, all of which was known to Defendants, Plaintiffs have suffered and continue to suffer physical injuries, medical expenses and property damage.

23.

The Subject Property is a water damaged building, a residential structure which has been subject to excessive water intrusion from both external and internal water leaks and moisture accumulation. The term "water damaged building" is also used in conjunction with a descriptive term now used by the National Academies of Science, the U.S. Centers for Disease Control, and the World Health Organization, i.e., "damp indoor spaces" and "mold related illness," all of which collectively describe a mixture of biologically generated contaminates known to cause adverse human health effects. Damp Indoor Spaces are now recognized by multiple federal and medical authorities as a public-health problem, contributing to tens of thousands of illnesses across the country and billions of dollars in medical costs.

24.

In this case, Plaintiffs had a certified mold investigator identify excessive mold growth and moisture inside the house, typical of a damp indoor space, both by sampling and visual observation. Aspergillus, known to be a powerful respiratory irritant, was found in the home during the air test. This spore is particularly dangerous, as it is well known to grow in excessive numbers in damp indoor spaces and to release mycotoxins and VOCs, and have toxic impacts of its own. The tests exceeded all bounds of sampling error and demonstrate the extremely dangerous conditions Plaintiffs are forced to live in.

25.

Defendants, as large, national managers and owners of thousands of apartment and residential units knew full well of the health risks associated with water damaged buildings and mold. Defendants failed to remediate mold in the Subject Property and caused serious injury and property loss to Plaintiffs as a result.

## COUNT I

## NEGLIGENCE

26.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 25.

27.

Defendants, as owners and/or managers of Thrower Park:

A.   Failed to provide a reasonably safe premises in accordance with the Military Lease Agreement, which amounted to a breach of the implied warranty of habitability;

B.   Negligently failed to pay for relocation expenses;

C. Failed to exercise reasonable care to repair dangerous defective conditions upon notice of their existence by Plaintiffs;

D. Negligently failed to maintain the air conditioning system and ducts in such a way allowing ideal conditions for toxic mold to grow in the Plaintiffs' house, including never replacing the air conditioner filters;

E. Negligently managed and maintained Thrower Park;

F. Negligently supervised their employees, agents and/or representatives;

G. Negligently trained and supervised their employees, agents and/or representatives;

H. Negligently inspected Thrower Park for dangerous and harmful conditions;

I. Negligently remediated the toxic mold contained in the Subject Property;

J. Knew or should have known that the house contained dangerous levels of toxic mold and did nothing to remedy the toxic mold infestation;

K. Failed to exercise reasonable care to repair dangerous defective conditions, which included the existence of mass amounts of toxic mold in the Subject Property, upon notice of their existence by Plaintiffs;

L. Negligently failed to promulgate warnings to their tenants about the existence of toxic mold and/or the possibility of the development of toxic mold; and

M. Failed to prevent any and all other acts of negligence which may be proven at trial by failing to fulfill its duties to Plaintiffs, thus causing damages which they have suffered.

28.

As a direct and proximate result of the negligence of Defendants, Plaintiffs sustained serious and painful personal injuries, extreme mental and physical pain and suffering, anxiety,

anguish and upset, losses and damage to their quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

## COUNT II

## GROSS NEGLIGENCE

29.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 28.

30.

At all times mentioned herein, Defendants acted with gross negligence in total disregard of the duties owed to Plaintiffs to the degree that said gross negligence constitutes an intentional act.

31.

As a direct and proximate result of the gross negligence of Defendants, Plaintiffs have suffered injuries as described herein.

## COUNT III

## BREACH OF CONTRACT

32.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 31.

33.

Defendants breached the Military Lease Agreement entered into with Plaintiffs on July 12, 2013. The contract was breached for the following reasons:

A.   Defendants violated the Implied Covenant of Good Faith and Fair Dealing when they failed to deal fairly and in good faith causing Plaintiffs to not benefit from the contract;

B.   Defendants violated the Implied Warranty of Habitability, which is implied in all residential leases, when they leased to Plaintiffs a house that was not fit for human habitation;

C.   The negligent management and maintenance of the property led to the moist environment, which is ideal for toxic mold growth;

D.   Defendants failed to successfully complete the annual physical maintenance inspection of the property to ensure the house was up to housing maintenance quality standards by finding and repairing moist conditions that existed in the house;

E.   Defendants' employees or agents physically inspected the Subject Property after the complaints about toxic mold were made to Defendants and nothing was done to properly remedy the toxic mold infestation;

F.   Toxic mold spores were visible in plain sight so that Defendants' employees were able or should have been able to witness toxic mold growing in the houses and still did nothing to remedy the toxic mold infestation; and

G.   Defendants failed to honor the lease provision which allows for relocation of the tenant in the event the housing becomes uninhabitable. Further the lease provides that "Owner shall pay the cost of the relocation."

34.

As a direct and proximate result of Defendants' breaching the contract with Plaintiffs and providing an unreasonably dangerous house, Plaintiffs sustained serious and painful, extreme mental and physical pain and suffering, anxiety, anguish and upset, losses and damage to their quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

## COUNT IV

## CIVIL CONSPIRACY

35.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 34.

36.

At all times mentioned herein, Defendants operated under an agreement between two or more persons or entities to accomplish the unlawful purpose of concealing dangerous conditions within the Subject Property. Additionally, each Defendant committed overt acts in furtherance of this conspiracy to conceal the dangerous condition causing damage to Plaintiffs.

## COUNT V

## ALTER EGO

37.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 36.

38.

At all times mentioned herein, Defendants, and each of them, inclusive of Unknown John and Jane Does A through M and Unknown Entities N through Z, were authorized and empowered by each other to act, and did so act, as agents of each other, and all of the things herein alleged to have been done by them were done in the capacity of such agency. Defendants disregarded corporate formalities and used the corporate form to commit the aforementioned malfeasance. Upon information and belief, all Defendants are responsible in some manner for the events described herein and liable to Plaintiffs for the damages they have incurred.

## COUNT VI

### FRAUDULENT CONCEALMENT

39.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 38.

40.

Defendants are guilty of fraudulent concealment which, in accordance with Miss. Code §15-1-67, results in Plaintiffs' cause of action accruing when "such fraud shall be, or with reasonable diligence might have been, first known or discovered." The fraudulent actions of Defendants are:

A.      Defendants took affirmative action designed or intended to prevent Plaintiffs from discovering the presence of toxic mold in their home, which affirmative action did in fact work to prevent them from discovering the toxic mold, until such time as action was taken by Plaintiffs to confirm the presence of the toxic mold;

B.      Defendants' maintenance technicians repeatedly reported that the toxic mold and leaks were located, repaired and removed when in fact they were not;

C.      Defendants did not disclose to Plaintiffs that they knew that toxic mold was a problem in the military housing they owned and managed;

D.      Defendants did not disclose to Plaintiffs that they knew that toxic mold had caused serious health problem to residents of military housing they owned and managed; and

E.      Defendants did not disclose to Plaintiffs that they knew the military housing they owned and managed suffered from serious construction defects that caused damp indoor spaces making the growth of toxic mold foreseeable.

## COUNT VII

## INTENTIONAL ENDANGERMENT

### 41.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 40.

### 42.

At all times mentioned herein, Defendants' actions were intentional and endangering to Plaintiffs. This included intentionally endangering Plaintiffs by allowing them to live in dangerous housing conditions, intentionally endangering Plaintiffs by allowing the dangerous conditions to persist, intentionally endangering Plaintiffs by failing to remedy the dangerous conditions, and intentionally endangering Plaintiffs by failing to relocate Plaintiffs after the dangerous conditions were discovered.

## DISCOVERY RULE

### 43.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 42.

44.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the discovery rule. Plaintiffs suffered from a latent injury, undiscoverable by reasonable means. Plaintiffs neither knew nor should have known that they had been harmed, much less that their harm was caused by the wrongful conduct of Defendants until such time that was within the limitations period applicable to the claims they have asserted.

## CONTINUING TORT

45.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 44.

46.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the continuing tort doctrine. Defendants inflicted injury upon Plaintiffs over a period of time by engaging in continuous wrongful conduct which has continued while Plaintiffs continue to live in the Subject Property.

## DISABILITY OF INFANCY

47.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 46.

48.

Makayla and Gabriella are minors, tolling the applicable statute of limitations in accordance with the minors savings clause. See Miss. Code Ann. § 15-1-59.

## DAMAGES

### 49.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 48.

### 50.

As a direct and proximate result of the Defendants' wrongful and negligent conduct, Plaintiffs sustained serious injuries, losses, and damages as follows:

A. Plaintiff, Joshua Foster, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for;

B. Plaintiff, Jessica Foster, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for;

C. Plaintiff, Makayla Foster, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for;

D. Plaintiff, Gabriella Foster, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses

and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for.

## PUNITIVE DAMAGES

### 51.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 50.

### 52.

At all times mentioned herein, Defendants acted with actual malice and/or gross negligence which evidenced a willful, wanton, or reckless disregard for others, or committed actual fraud, and such actions were so oppressive and overbearing that in order to punish the wrongdoer and deter similar misconduct in the future, Defendants should be subject to punitive damages consistent with the statutory scheme in the State of Mississippi. Specifically, after considering Defendants' financial condition and net worth, the nature and reprehensibility of Defendants' wrongdoing, Defendants' awareness of the amount of harm being caused, and Defendants' motivation in causing such harm, the duration of Defendants' misconduct and attempts to conceal such misconduct, and Miss. Code Ann. § 11-1-65, Defendants should be subject to punitive damages in an amount to be proven at trial and decided by the jury.

## ATTORNEYS' FEES

### 53.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 52.

### 54.

Defendants are liable for all reasonable attorneys' fees, costs, and expenses incurred in pursuit of this cause if found liable for punitive damages or fraud.

## PRAYER

WHEREFORE, Plaintiffs pray that after due proceedings are had that a Judgment be rendered in favor of Plaintiffs and against Defendants for damages in an amount to be proven at the trial of this cause, said damages including actual damages, compensatory damages and any other such damages to which Plaintiffs may be entitled and which may be proven at the trial of this cause, for a punitive damages amount based on Defendants' financial condition and net worth, for attorneys' fees, for post-judgment interest, or for such other amount consistent with the statutory scheme in Mississippi for the awarding of such damages, for all costs of this cause and for such other relief to which Plaintiffs may be entitled under the premises.

Respectfully submitted,

**JOSHUA FOSTER, JESSICA FOSTER,
AND MAKAYLA FOSTER AND
GABRIELLA FOSTER MINORS, BY AND
THROUGH THEIR NATURAL GUARDIANS,
JOSHUA AND JESSICA FOSTER
PLAINTIFFS**

BY: _____

**WILLIAM LEE GUICE III
MS BAR # 5059
MARIA MARTINEZ
MS BAR # 9951
RUSHING & GUICE, P.L.L.C.
P. O. BOX 1925
BILOXI, MS  39533
TELEPHONE: (228) 374-2313
FAX:  (228) 875-5987
ATTORNEYS FOR PLAINTIFFS**

# FORESTCITY
### RESIDENTIAL   **Military Housing - Rental Application**

21131420  Thrower Park (NDSU)
O145MCNA
m0063623

## APPLICANT

Service Member: Joshua Foster

Address: 145 Mcnarney Dr.

Biloxi, MS  39531

eMail: joshua.foster@cannon.af.mil

Dual Service Member? | No |

Duty Phone:

Home Phone: (575) 749-1777

Cell Phone:

## Other Resident Info

Duty Postal Code: 39534

Marital Status: Married

Military Branch: Air Force

Soc. Sec.#: 172627561

Pay Grade: E06

ADA Req?:

Unit/Org/Squadron: ~~KEES OTH~~

Rank: ~~Government~~

## Additional Info

Scheduled PCS Date:

1st pet type:

1st pet breed:

1st pet weight:

2nd pet type:

2nd pet breed:

2nd pet weight:

Date of Birth:

Child Dev. home:

Vehicle 1 Make:

Vehicle 1 Model:

Vehicle 1 Tag:

Vehicle 2 Make:

Vehicle 2 Model:

Vehicle 2 Tag:

## Dependent Info

| Name | SSN(Dual SVM only) | Relationship | Date of birth | PayGrade | Branch of Service |
|------|--------------------|--------------|---------------|----------|-------------------|
| Jessica Foster | 111111111 | Spouse | 26 Jun 1980 | | |
| Makayla Foster | 111111111 | Child | 23 Dec 2009 | | |

## IN CASE OF EMERGENCY: I hereby give consent to contact the individual(s) below:

Local Contact Name:
(Other than Household Member)

Address:

Relationship:

Phone No.:

## Acknowledgement and Agreement

Applicant agrees that Forest City Residential Management, Inc., (FCRMI) shall not be liable for any delay in the date said family home is ready for occupancy. Applicant represents that all the statements herein are true and authorizes FCRMI and/or its agents to verify the information contained herein. Applicant acknowledges that false information herein may constitute grounds for denial of this Application, terminating the right of occupancy, and may constitute a criminal offense under the laws of this state. Applicant agrees to notify FCRMI of any material change in the information provided on this Application. FCRMI may obtain investigative consumer reports from employers, landlords, law enfor_____ agencies or other applicable sources. Under 15

Applicant's Signature:

EXHIBIT
A

—

Installation: <u>Keesler Air Force Base</u>
Forest City Southern Group, LLC
Neighborhood Management Office
303 Patrick Drive
Biloxi, MS 39531
Harrison County
(228) 374-5336

## MILITARY LEASE AGREEMENT

| | |
|---|---|
| 1. Lease Agreement Date: July 12, 2013 | 6. Premises Address: 0145MCNA |
| 2. Resident(s) m0063623  Pay Grade: | 145 Mcnarney Dr. Biloxi, MS 39531 |
| Joshua Foster  E06 | 7. Monthly Rent: $1,332.00 |
| | 8. Partial Month Rent: 843.60 |
| 3. Other Occupants: | 9. Partial Month Rent Due Date: August 1, 2013 |
| Jessica Foster | 10. Security Deposit: 0 |
| Makayla Foster | 11. Late Charge: $50.00 as specified in Paragraph 5 |
| | 12. Returned Check: $35 as specified in Paragraph 5 |

4. Lease Term:
    a. Commencement Date:        July 12, 2013
    b. Expiration Date:          July 31, 2014
5. Neighborhood:   Thrower Park (NDSU)

Resident agrees to pay Rent to Owner by monthly electronic Allotment. Resident authorizes the Allotment to be initiated and changed as set forth in Paragraph 4 of this Lease Agreement. Authorization is also given to stop the Allotment at the time that the Lease Agreement is terminated.

This Lease Agreement is a legally binding contract. Owner and Resident agree that this Lease Agreement and the contractual relationship between the parties shall be construed in accordance with and shall be governed by the laws of the State of Mississippi and County of Harrison, except to the extent those laws may conflict with federal laws or regulations.

Owner and Resident accept the terms and conditions of the Lease Agreement. The Lease Agreement includes this Lease Agreement, the Community Handbook and any addenda, and sets forth all promises, agreements, and understandings between Owner and Resident. The terms and conditions of this Lease Agreement may only be changed if in writing and signed by both Owner and Resident. Oral changes or agreements are not permitted.

Forest City Residential Management, Inc., Agent for Owner, Forest City Southern Group, LLC.

By Authorized Representative: _____   7/12/13
                                                        Date

Resident: _____        Resident: _____
                    Date                                    Date

**Addenda:**
| | | | |
|---|---|---|---|
| ❑ | Community Handbook | ❑ | Other: |
| | Dated 09/11 | ❑ | Other: |
| ❑ | Mold Addendum | ❑ | Other: |
| ❑ | Third Party Allotment Addendum | ❑ | Other: |
| ❑ | Pet Addendum | ❑ | Other: |
| ❑ | Current Resident Addendum | | |

EQUAL HOUSING OPPORTUNITY

# THIRD PARTY ALLOTMENT ADDENDUM

This will serve as an Addendum to the Lease Agreement dated __7-12-13__
regarding property located at __145 McNosney Dr.__ (the "Premises"), between
Forest City Southern Group, LLC ("Owner") and __Joshua Foster__
(who is the highest ranking military member that will reside in the Premises, referred to in this
Addendum as "Resident").

1.  **Payment by Allotment.** Resident agrees to pay Monthly Rent to Owner for the Premises as
    determined in the Lease Agreement, to be paid by allotment and/or electronic transfer (the
    "Allotment").

2.  **Managing Agent.** Owner shall contract with a third party managing agent for the processing
    of all of Resident's Allotment-related starts, stops and changes. The third party managing
    agent is Military Assistance Company/Fort Knox National Company ("MAC").

3.  **Resident Consent and Authorization.** Resident hereby authorizes Owner to act on behalf
    of Resident to start, stop and change Resident's Allotment for Monthly Rent under the Lease
    Agreement. Changes may be made for any valid reason under the Lease Agreement to
    include, but not be limited to, annual rate adjustments. Resident acknowledges that he/she
    shall not attempt to make any changes to the Allotment, and agrees that the Allotment may
    not be canceled prior to the satisfaction of the final Monthly Rent payment due under the
    Lease Agreement. Any actual or attempted cancellation of the Allotment by Resident is
    grounds for Owner to terminate the Lease Agreement.

4.  **Documentation.** Resident agrees to execute any and all documents which are necessary to
    authorize Owner and/or MAC to control the Allotment. Resident understands that he/she
    may not be permitted to occupy the Premises until the appropriate Allotment documentation
    has been completed.


Resident:                                          Forest City Residential Management, Inc.
                                                   Agent for Owner

_____

_____            By: _Freddie L.J_____

Date: _____            Date: ____7/12/13_____

# RENT IN ARREARS ADDENDUM

This will serve as an Addendum to the Lease Agreement dated ___7-12-13___ (the "Lease Signature Date") between Forest City Southern Group, LLC ("Owner") and ___Joshua Foster___ ("Resident") regarding property located at ___1415 McOsney Dr___ (the "Premises").

Owner and Resident agree to the following amendment to the Lease Agreement:

The third paragraph, fourth sentence of Section 4 is amended to read: "Resident BAH allotments shall be payable on the first day of the month for the prior month's rent."

All other terms and conditions of the Lease Agreement shall remain in full force and effect.

Resident:

_____

_____

Date: _____

Forest City Residential Management, Inc.
Agent for Owner

By: _____

Date: ___7/12/13___

**Forest City Southern Group LLC**
**Neighborhood Management Office**
**303 Patrick Drive**
**Keesler, MS 39531**
**Harrison County**
**(228) 374-5336**

**RE: An Important Notice to Residents about Your Payments Paid by Check**

Please be advised that Forest City Southern Group LLC electronically processes your payments that are paid by check. Your checks will be converted into electronic transactions and processed through the Automated Clearing House (ACH) network—the same system commonly used for direct deposit payroll.

Simply pay by check as you would normally do—it's that easy. The receipt of your check will authorize us to electronically debit the bank account on which the check was written. Please note that your check can clear as early as the day it is scanned, and that you will not receive your check back from your financial institution.

Your electronic payments will appear on your bank statement as an electronic debit, showing the date of the debit, your check number if applicable, and on the payee line, "Forest City Southern Group LLC."

You may drop off your payment at the lock box or when visiting our offices, or you may mail your payment to the Management Office. When you provide a check as payment, your check will be converted into an electronic transaction and processed through the Automated Clearing House (ACH) network.

Sincerely,                                         Household Initials and Date:

                                                   _____

Jamie Seehafer                                     Address:

Forest City Southern Group LLC                     _145_ _McNorney_____

FMNH11.006A (07/11)

# MOLD ADDENDUM

This will serve as an Addendum to the Lease Agreement dated ___7-12-13___, between
Forest City Southern Group, LLC, Owner, and ___Joshua Foster___,
("Resident"), regarding property located at ___145 McDarney Dr.___,
(the "Premises").

Owner desires to maintain a quality living environment for Resident. To help achieve this goal, it is important for the Owner and Resident to work together to minimize any mold growth in the Premises. This Addendum contains information for Resident, and the responsibilities of both Resident and Owner.

1. **ABOUT MOLD:** Mold is found virtually everywhere in the environment – indoors and outdoors in new and old structures. When excess moisture is present inside a Premises, mold can grow. Appropriate precautions need to be taken to minimize the potential for mold growth in the Premises.

2. **PREVENTING MOLD:** In order to minimize the potential for mold growth, Owner recommends the Resident should do the following:

   a. Keep the Premises clean – particularly the kitchen, bathroom(s), carpets and floors. Regular dusting, vacuuming and mopping removes household dirt and debris that contribute to mold growth. Use environmentally safe household cleaners. A vacuum cleaner with a HEPA filter will help remove mold spores. Immediately throw away moldy food.

   b. Do not block or cover any heating, ventilation, or air conditioning ducts. Whenever possible, maintain a temperature of 50 to 80 degrees Fahrenheit in the Housing Unit.

   c. Remove visible moisture accumulation on countertops, windows, windowsills, walls, ceilings, floors, and other surfaces as soon as reasonably possible. Periodically clean and dry the walls and floors around the sink, bathtub, shower, toilet, windows, and patio doors using a common household disinfecting cleaner. Blot dry spills on carpeting.

   d. Look for leaks in washing machine hoses, faucets, and discharge lines, especially if the leak is large enough to infiltrate into nearby walls.

   e. Use the bathroom fan when bathing or showering and allow the fan to run until all excess moisture has been vented from the bathroom. Keep the shower curtain inside the tub or fully close the shower doors when showering. After taking a shower or bath: (i) wipe moisture off of shower walls, shower doors, the bathtub and the bathroom floor; (ii) leave bathroom door open until all moisture on the mirrors and bathroom walls and tile surfaces has dissipated; and (iii) hang towels and bath mats so they will completely dry out.

   f. Use the exhaust fan in the kitchen when cooking or while running the dishwasher and allow the fan to run until all excess moisture has been vented from the kitchen.

   g. Open windows and doors on days when the outdoor weather is warm and dry (humidity is below 50 percent) to help humid areas of the Premises dry out. Run the fan on the furnace to help circulate fresh air. Keep windows and doors closed in damp, humid, or rainy weather.

   h. Clean the lint filter in the clothes dryer after each use and promptly report any damage to the vent connection. If condensations forms in the area, wipe it dry. Dry damp clothing as quickly as possible.

Forest City Southern Group, LLC

Mold Addendum

    i.   Limit houseplants to a reasonable number to limit excess humidity and limit molds that could grow on the soil surface. Avoid over watering.

    j.   Do not overfill closets or storage areas. Overcrowding restricts airflow.

    k.   Promptly report to the Neighborhood Management Office:

        i.   Any leak, water damage, or signs of water infiltration;

        ii.   Any malfunction in the heating, ventilation, or air conditioning system;

        iii.   Windows or doors that do not open or close properly;

        iv.   Any areas of visible mold (except very small areas that respond to routine cleaning);

        v.   Musty or moldy odors;

        vi.   Health issues that Resident thinks may be linked to the air quality within the Premises;

        Owner will respond in accordance with this Lease to repair or remedy the situation as necessary.

3.  **EXISTING MOLD:**  If small areas of mold have already formed on non-porous surfaces (such as ceramic tile; Formica, vinyl flooring, metal, wood or plastic), the Environmental Protection Agency ("EPA") recommends cleaning the areas with soap or detergent and water, letting the surface dry, and then, within 24 hours, applying a pre-mixed, spray-on-type household biocide, such as Lysol Disinfectant®, Pine-Sol Disinfectant®, Tilex Mildew Remover®, or Clorox Cleanup. Tilex and Clorox contain bleach that can discolor or stain. **Follow the instructions on the container.** Applying biocides without first cleaning away the dirt and oils from the surface is like painting over old paint without first cleaning and preparing the surface. Always clean and apply a biocide to an area 5 or 6 times larger than any visible mold because mold may be in adjacent areas, but not yet visible to the naked eye. A vacuum cleaner with a high-efficiency particulate air ("HEPA") filter can be used to help remove mold products from porous items such as sofas, chairs, drapes and carpets -- provided fibers are completely dry. Machine washing or dry cleaning will remove mold from clothes.

4.  **DO NOT CLEAN OR APPLY HOUSEHOLD BIOCIDES TO:**  (a) visible mold on porous surfaces such as sheetrock walls or ceilings; or (b) large areas of visible mold on non-porous surfaces. Instead, notify Owner in writing; Owner will take appropriate action in compliance with applicable law.

5.  **COMPLIANCE:**  If Resident fails to comply with this Addendum, Resident may be held responsible for damage to the Premises and any health problems that may result.

Resident:

Forest City Residential Management, Inc.
Agent for Owner

_____

_____   By: _Freddi L. J_

Date: _____   Date: _7/13/13_

Forest City Southern Group, LLC

Mold Addendum



## WEAPON REGISTRATION FORM

The possession of personal firearms, government-owned arms and ammunition will be in accordance with the laws of the State of Mississippi and any local laws or ordinances. All firearms must be registered with the Neighborhood Management Office within three (3) days of occupancy or procurement of firearms. Firearms and ammunition must be stored separately in safe, locked locations. Loaded guns in the Premises are prohibited. Possessing a weapon prohibited by state/local ordinance or displaying or discharging a weapon in the Community is prohibited. Hand grenades, bombs and blasting explosives are prohibited. Failure to adhere to this provision is a material breach of the Lease Agreement.

| Weapon | Registration | How Stored |
|--------|--------------|------------|
|        |              |            |
|        |              |            |
|        |              |            |
|        |              |            |
|        |              |            |

Resident:

_____

Date: _____

Forest City Residential Management, Inc
Agent for Owner

By: _Freddi_ _L._ _J_

Date: _7/12/13_

FOREST CITY RESIDENTIAL MANAGEMENT, INC.        FMNH17.900A   (9/11)

# FLAG ADDENDUM

This will serve as an Addendum to the Lease Agreement dated ___7-12-13___ between Forest City Southern Group, LLC, Owner, and ___Joshua Foster___ ("Resident"), regarding property located at ___145 McDarney Dr___ (the "Premises").

Resident has requested permission to display and hang a United States Flag, a standard Military Service flag or other flags on or about the Premises. United States Flags are an expression of support and patriotism. Standards for handling and displaying the U.S. Flag are set forth by the United States Code, written into law by Congress in 1942. Owner is willing to permit the display and hanging of flags in accordance with the following terms to which Resident hereby agrees:

1.  A standard size United States flag and appropriate apparatus (pole and stanchion) must be mounted in an approved exterior area on the Premises for flying the flags. Stanchions and poles must be securely attached to the exterior of the residence. Stanchions and poles should be weather resistant and made of durable materials.

2.  Size and type of flags shall be approved by the Neighborhood Management Office before displaying and use.

3.  Resident may not damage or alter the Premises and may not drill holes through outside walls. Flags shall be located at a reasonable height that is within reach of the Resident without obstructing entrances or windows.

4.  The union of the U.S. Flag should be at the peak of the staff unless the flag is at flying at half staff.

5.  U.S. Flags shall normally only be displayed from sunrise to sunset, but may be displayed twenty-four a day if properly illuminated during the hours of darkness. If US. Flags are displayed after sunset, appropriate spot lighting controlled by an interior switch (inside the home) is required to ensure flags are illuminated at night. Lighting installation must comply with reasonable safety standards and not be connected to the electrical system or wiring of the Premises.

6.  U.S. Flags may be displayed every day, but especially on:
    a.  New Year's Day
    b.  Inauguration Day
    c.  Martin Luther King Jr. Birthday
    d.  Lincoln Birthday
    e.  Washington Birthday
    f.  Easter Sunday
    g.  Mother's Day
    h.  Armed Forces Day
    i.  Memorial Day

j.  Flag Day
k.  Father's Day
l.  Independence Day
m.  Labor Day
n.  Constitution Day
o.  Columbus Day
p.  Navy Day
q.  Veterans Day
r.  Thanksgiving Day
s.  Christmas Day
t.  State Birthdays
u.  State Holidays
v.  Other days proclaimed by the President of the United States

7.  No disrespect shall be shown to the flag of the United States of America. The flag should not be dipped to any person or thing.

8.  The U.S. flag should never touch anything beneath it, such as the ground, the floor, water, or merchandise.

9.  The U.S. flag should never be displayed with the union down, except as a signal of dire distress in instances of extreme danger to life or property.

Resident:                                        Forest City Residential Management, Inc.
                                                 Agent for Owner

_____

_____          By: _Freddi L. F_____

Date: _____          Date: ____7/12/13_____

# FORESTCITY
## RESIDENTIAL

### PERMISSION TO ENTER

COMMUNITY NAME: Thrower Park

ADDRESS: 145 Mc Darney Dr

## ROUTINE MAINTENANCE AND/OR SERVICE REPAIRS

☐    Permission is hereby given to Management to enter my home for maintenance and repairs as requested. It is understood that this permission covers service and repairs in my home by management personnel and/or their subcontractors.

☐    I prefer to make provisions to sign for permission to enter for _each_ service and/or repair requested

Resident's Signature: _____    Date: _____

Resident's Signature: _____    Date: _____

## DELIVERY AND/OR INDIVIDUAL PERMISSION TO ENTER

NOTE: Written permission from the resident must be given to Management to permit persons or companies to have access to their home for delivery or service. Management assumes no responsibility for damaged or missing items.

| DATE | REASON FOR ENTRY | PERSON/COMPANY TO ENTER | RESIDENT'S SIGNATURE |
|------|------------------|-------------------------|----------------------|
|      |                  |                         |                      |
|      |                  |                         |                      |
|      |                  |                         |                      |
|      |                  |                         |                      |
|      |                  |                         |                      |
|      |                  |                         |                      |
|      |                  |                         |                      |

### PERMISSION TO ENTER YOUR HOME IS NOT REQUIRED IN CASE OF AN EMERGENCY
Emergency situations include breaks in water/heating pipes, water leaks, smoke or fire, cause to believe a critical medical problem exists, or structural damage to your home.

DISTRIBUTION:     Resident's File

FOREST CITY RESIDENTIAL MANAGEMENT, INC.

FMNH9.000B   (5/04)

# ACCESS GATE ADDENDUM

This will serve as an Addendum to the Lease Agreement dated _7-12-13_, between Forest City Southern Group, LLC, ("Owner"), and

_Joshua Foster_ ("Resident"), regarding property located at _145 McKinney Dr._ (the premises)

1. The Neighborhood is equipped with electronically controlled access gates. The installation of access gates does not constitute an agreement by Owner to provide security to Resident, Resident's family, guests, occupants or visitors of the Premises. Resident acknowledges that the access gates are mechanical devices that could periodically malfunction, fail or be rendered inoperative, and that there is no absolute guarantee that the access gates if they properly function will in any way increase security or prevent theft, assault, vandalism or damage to the person or property of Resident. Resident agrees that Owner shall not be liable for any injury, damage, or loss to any person or property of Resident caused by any other person including but not limited to theft, burglary, trespass, assault, vandalism, or any other crime. Further, Resident agrees that Owner shall not be liable for any damage or loss of any motor vehicle or Resident which results from any of the access gates coming into contact with any such motor vehicle, irrespective of whether such contact is the result of some problems, defect, malfunctions or failure of the access gates.

2. Express disclaimer of warranty: Neither management, owner, owner's agents, employees nor representatives make any warrant express or implied, as to the condition of access gates for their fitness for any particular purpose, or the likelihood that the access gates will increase the security of the property.

3. Resident acknowledges and agrees that Owner does not distribute, sell, supply, repair, service, or install the access gates. Although Owner agrees to take reasonable steps to cause the gates to be repaired, resident agrees that Owner is not responsible for any problem, defect, malfunction or failure of the access gates. Neither contained in the addendum shall in any way impose any responsibility, duty or liability upon Owner of the installation and or operation of the access gates. Resident shall never take demand upon, look to or institute or prosecute suit against Owner for any damage costs, loss of personal property (including, but not necessarily limited to motor vehicles), or damage to or injury to their person as a result of arising out of, or incidental to any problem, defect malfunction or failure of the access to increase security or prevent theft, burglary, trespass, assault, vandalism, or any other crime. Resident understands that this is an express covenant not to sue, and Resident here by releases Owner, and all liabilities connected with the access gates. Resident agrees that if Resident or any guests, or any other person providing a service to

4. I acknowledge receipt of two electronically coded controlled-access gate card(s). I accept full responsibility for the protection and safeguarding of the access card(s). I agree not to loan the access card(s) to another. I acknowledge that the access card(s) is the property of the Owner and has been issued by Owner. I understand that Owner has the right to limit or restrict the use of the card and I agree to surrender the access card(s) upon demand. I agree to immediately notify the neighborhood management office should the access card(s) be lost, stolen, or misplaced. I agree to pay $10 per card should it become necessary to issue a replacement access card.

Resident:

_____

_____

Date: _____

Forest City Residential Management, Inc.
Agent for Owner

By: _____

Date: _____ 7/12/13

# *Quick Reference Guide*

- *Resident access is provided by means of cards and PIN codes. The system is only as secure as you make it. Please use discretion when sharing your guest code.*

- *Residents press # then 4 digit personal code*

- *Visitors (friends, mom, dad, pizza delivery guy) use the phone system to communicate with a resident who can grant or deny entry*
  - *Guests will look your name up in the directory*
  - *Next to your name is your Directory Code*
  - *When your guest enters this code, the system will place a call to you*
  - *To grant access to your guest, press 9 on your phone*
  - *To deny access, press the # key*

- *If you are on the phone when a guest tries to contact you, they will hear a busy signal and will have to wait for your call to end. To eliminate this problem, you can order call waiting from your phone provider.*

- *Guests can only contact you if your phone is turned on and you have a signal.*

- *If your card and/or PIN does not work:*
  - *Use the telephone entry system to call yourself and press 9.*
  - *If the gate fails to open, please move your car away from the gate to allow others to enter the neighborhood.*
  - *Contact the Forest City office at 228.374.5336.*

- *Only one car is permitted through the gate at a time.*

- *Gates are left open in the morning and afternoons to allow access for school buses and a smoother flow of traffic.*

- *Card replacement: $10*

- *To change the phone number your key cards are linked to, please come by the Management Office located at 303 Patrick Drive.*

- *In the event of a required evacuation, the gates will be opened allowing a clear exit path.*

- *Emergency personnel, FedEx, UPS, USPS all have access to the neighborhood*

# RECEPTION DEVICE ADDENDUM

This will serve as an Addendum to the Lease Agreement dated _7 - 12 - 13_ , between Forest City Southern Group, LLC, ("Owner"), _Joshua Foster_ , and ("Resident"), regarding property located at _145 McInerney Dr._ (the "Premises").

Resident may install a satellite dish or stick-type reception device (collectively and separately, the "Reception Device") on or about the Premises to receive direct broadcast satellite, fixed wireless signals via satellite, and commercially available analog or digital TV.  Resident hereby agrees to comply with the following:

1.  The Reception Device must be approximately 39.37 inches or less in diameter if a dish or less than 39.37 inches in length if a stick-type Reception Device.

2.  The Reception Device shall be installed safely and securely after all appropriate permits have been obtained.  The Reception Device shall be installed and operated in accordance with all applicable federal/state/local laws and regulations.  In the event the Resident is cited because the installation constitutes a building or fire code violation, the Resident is responsible for immediate correction and compliance with the building or fire codes. Resident shall be responsible for any interference caused or generated by the Reception Device.

3.  Installation must be in strict accordance with plans and specifications (the "Plans") submitted to Owner and approved by Owner in writing, which approval shall not be unreasonably withheld, delayed or conditioned.  The Plans must set forth the precise size, color, and weight of the Reception Device; the precise location where the Reception Device is to be located; and all wiring and other facilities to be installed.  Appropriate cable raceways and brackets must be set forth on the Plans.

4.  The Reception Device must be located entirely within the Resident's Premises and shall not be installed in any common area.  The Reception Device must not be installed on windows, firewalls, outside walls, glass, outside windowsills, roofs, or balconies.  The Reception Device cannot be mounted on the side of a building.

5.  Resident may not damage or alter the Premises to install the Reception Device.  No holes whatsoever may be drilled through outside walls, firewalls, glass, windows, roofs, balconies, balcony railings, or through anything else.  No holes may be drilled through walls or anything else to bring in wires.

6.  The Reception Device must not protrude or hang over any balcony or extend beyond the patio or balcony railing line.  The Reception Device must not be installed upon an overly elongated pole or any extension device that hangs out over a balcony.

Forest City Southern Group, LLC   Reception Device Addendum
2011

7.    Resident's installation: (a) must comply with reasonable safety standards; (b) may not interfere with the Neighborhood's cable, telephone or electrical systems or those of neighboring properties; (c) may not be connected to the Neighborhood's telecommunications systems; (d) may not be connected to the electrical system except by plugging into a 110-volt duplex receptacle, and (e) cannot be placed within unsafe distances from power lines. Owner may require reasonable screening of the Reception Device by plants, etc., so long as it does not impair reception.

8.    The Reception Device shall be installed and operated in accordance with all applicable laws and regulations.  Owner and/or Agent for Owner shall not be liable in any manner by reason of their approval of the Plans, and Resident assumes all such liability and is solely responsible for the Plans and the compliance of the Plans with all applicable laws and regulations.

10.    Resident will remove the Reception Device on or before the expiration or termination of the Lease Agreement.  Resident will repair all damage caused by the removal and will restore the Premises to its prior condition before the installation of the Reception Device.

Resident:                                                     Forest City Residential Management, Inc.
                                                              Agent for Owner

_____                    By: _____

Date: _____                    Date: _____7/12/13_____



## PET AGREEMENT
## ADDENDUM TO RENTAL AGREEMENT

This will serve as an Addendum to the Rental Agreement dated ___7-12-13___, between Forest City Residential Management, Inc., ("Landlord"), as Agent, and ___Joshua Foster___ ("Resident"), regarding property located at ___145 McBarney Dr___ (the "Home").

1. Resident is authorized by the Landlord to keep a pet, described as:

   **Type:** _____  **Size:** _____  **Color:** _____  **Name:** _____

   Attach photo.

   Landlord has the right to refuse certain breeds. Those breeds are identified in the Rules and Regulations of your Rental Agreement. All pets must be licensed in accordance with any applicable state/local laws and regulations. All dogs four months of age and older must be licensed by the City and County of Honolulu and wear a collar with the city and county dog tag attached. Licenses must be renewed on or before the expiration date of current tags. All cats are required to have an identification tag on their collar with the owner's name, address and telephone number.

   The pet(s) must have current inoculations and Resident shall submit records of inoculation upon Landlord's request. Rabies immunizations are required for dogs and cats and must be documented with shot tags on the pet's collar.

   Resident's liability includes, but is not limited to, property damages, cleaning, deodorization, flea extermination costs, carpet or other flooring replacement, and/or personal injuries. Resident will be liable for the entire amount of any injury to the person or property of others caused by such pet(s). Resident is encouraged to obtain liability insurance.

2. Resident agrees to comply with:

   A. The terms and conditions set forth herein;
   B. All applicable state/local laws and regulations, such as, but not limited to, licensing, inoculations, etc.; and
   C. Such rules and regulations as may be reasonably adopted from time-to-time by Landlord.

3. Resident acknowledges that the pet is housebroken and/or litter trained and/or cage trained and shall not permit the pet to cause any damage, discomfort, annoyance, nuisance or in any other way to inconvenience or cause complaints from any other Resident(s).

   Animal misbehavior (vicious or nuisance) or violence is prohibited. If, in the Landlord's opinion and judgment, the pet has disturbed or is disturbing other residents, and/or has caused or is causing damage to the Home or other property within the Community, Resident agrees to permanently remove the pet from the Home and Community within 10 days of receipt of written notice from Landlord.

Pet Agreement – Addendum to Rental Agreement

4. Landlord has the right to inspect your Home for possible damages incurred by the pet with a twenty-four (24) hour notice.

5. All animals except dogs and cats must be kept in cages or tanks at all times. Dogs must be confined to the Home or restrained by a leash or fence in the back yard of the Home. Restraint shall include leashing or chaining the animal to a stationary object to preclude the animal from running free or interfering with the normal flow of pedestrians and traffic. Dogs outside Resident's yard must be leashed at all times. Both dogs and cats must be appropriately and effectively restrained and under the control of the Resident or occupant while on the property. No pets are permitted in the community rooms, lounge, laundry rooms, offices, recreation areas, or other common room areas.

6. Resident is responsible for removing pet waste promptly from the Home yards and the Community common areas. Litter and droppings must be wrapped and sealed before being disposed of in the trash. Violation of this regulation will result in an automatic waste removal charge of $20.00 per occurrence. If available, the Community will have a common area set aside for pet exercise and relief, but it remains the Resident's responsibility to clean up any waste from their pet. Dogs are not permitted on children's playgrounds.

7. Resident agrees to have the Home professionally treated for fleas and ticks prior to vacating. Proof of treatment must be provided to Landlord.

8. Violation of the above terms will be considered a breach of the Rental Agreement, which may result in removal of the pet from the Home and/or termination of the Rental Agreement.

Resident:

Forest City Residential Management, Inc.

_____   By: _Freddi_ _L._ _J____

_____   Date: ___7/12/13___

_____

_____

Date: _____

**Keesler Community Center Agreement**

**300 Patrick Drive**

**Biloxi, MS 39531**

### PERMITTED USE

The Community Center is for use by Residents and occupants of Forest City Southern Group, LLC ("FCSG") homes, and authorized guests, service providers sponsored or approved by FCRM, and certain approved Air Force affiliated organizations. Equitable services will be provided for all programs and no program or user will receive preferential privileges. Rooms or spaces in the Community Center will not be designated for the exclusive use by any organization, nor used as an exclusive storage area by any organization. The Community Center may be used for social, recreational, educational and similar activities or functions. Retail sales activities, religious services, and political gatherings shall not be permitted. No one under the age of sixteen (16) is permitted without a parent or guardian at all times.

### INDEMNIFICATION AND HOLD HARMLESS

Neither FCRM nor FCSG, nor their principals, agents, and employees shall be liable for, nor does Resident/User of the Community Center waive, all claims for loss or damage sustained by FCRM or FCSG. Resident/User of the Community Center agrees to indemnify the following parties and hold them harmless: FCSG, management, agents, principals, and employees of FCRM (all of which parties are collectively referred to as "Indemnitors") from all claims, demands, actions, and causes of action, of whatever nature and including attorney fees, which arise in any way in connection with the provision of services by the Indemnitors or Indemnitors' agents or employees to provide such services to such Resident/Users; or in any way arising out of the provision of services, or failure to provide services, by the Indemnitors on the Community Center premises to any individual or individuals. Notwithstanding the foregoing, Resident/User will not hold Indemnitors harmless for any loss, damage, claims, demands, actions, or causes of action that result from the negligence or willful misconduct of the Indemnitors.

By signing this contract, the Resident/User certifies that:

Resident/User is a resident of a home in an FCRM managed Air Force Family Housing Community, or is otherwise authorized by FCRM to rent a Community Room, and all rent and fees due to FCRM are current and paid in full. Resident/User fully understands all terms of this rental agreement and will fully abide by this contract.

| | |
|---|---|
| Resident/User Signature | Date |
| *145 McNarney* | |
| Address | Phone Number |
| *Freddr L.* | *7/12/13* |
| FCRM Representative Signature | Date |

- There will be no exception to this policy and any violation will result in the immediate termination of the function, as well as the Resident/User's Community Center privileges being revoked.

## ADDITIONAL RULES AND POLICIES _____

- Resident/User is required to abide by local fire codes, and the number of guests at an event may not exceed the maximum posted occupancy of that particular facility.
- Noise levels emanating from the event must remain at such a level as not to create a disturbance or nuisance to residents in the surrounding community.
- Smoking is NOT permitted on the premises of the Community Center.
- No decorations or meeting materials may be taped, tacked, or affixed to walls, windows, doors, ceilings, or ceiling fans.
- Thumb tacks, nails, paint, crayons, ink or any other material that might damage the walls, floors or other furnishings of the Community Center are prohibited, and if utilized, the Resident/User will bear the cost of returning the Community Center to its original condition.
- Pets (except authorized, trained service animals), firearms, and weapons are not permitted in the Community Center at any time.
- Resident/User will supervise all activities of persons under the age of sixteen (16) with a suitable number of adults.
- Resident/User will be responsible for their own security throughout their use of the Community Center.
- FCRM shall have the right to access the Community Center at anytime during the Resident/User's use.
- Parking at the Community Center is allowed in "Designated Areas" only.

## CLEANING RESPONSIBLITIES _____

Resident/User is required to clean the Community Center and return it to its previous condition, prior to vacating the premises. Keep in mind that others may be using the facility after your event. Cleaning time should be anticipated by Resident/User and be concluded within the rental time as indicated above. Resident/User should refer to the cleaning checklist provided by FCRM prior to the event.

- All bathroom and kitchen facilities shall be cleaned and returned to the same condition as when the Resident/User entered the Community Center.
- Resident/User is responsible for removing all trash accumulated as a result of Resident/User's use of the Community Center, from the facility and the surrounding premises, upon completion of the event. Trash will be placed in garbage bags provided by FCRM and disposed of in the container in the adjacent, outside dumpster. The dumpster lid

## 52-Point Visual Inspection

**Prepared for** Rushing And Guice

**Site Address** 145 McArnnuey Dr.

**City** Biloxi  **State** Ms  **Zip** 39531

**Inspector** Ed Williams

**Date** 1/2/2017  **Time** 0900

This inspection for mold or fungi is performed for a fee to visually inspect for signs of a mold like substance, fungi or growth. It may also include air, swab or bulk tests to be performed with their associated lab fees.

A fee is charged per sample. All fees must be paid prior to sending in any samples. Sample tests should be considered at each area that visible evidence is present. Whether this report reveals mold in the building or not, the customer, building owner or potential buyer should consider:

1. Whether or not to have any sample tests performed at any area that was noted in the report.
   - We always suggest to have a Direct ID Sample for visible microbial growth.
   - If someone is sick in your home, we always suggest to have the areas they spend most of their time in to be tested.

2. Whether or not to hire a qualified mold remediation company or industrial hygienist for further consultation, inspection or corrective procedures, either now, before the lab tests results, or afterwards.

**Important**: If you do have mold and it must be removed, you are strongly encouraged to obtain the services of a qualified remediation contractor. If a homeowner or contractor unfamiliar with containment, removal and safety practices performs remediation activities, building occupants can be put at elevated health risks and mold may spread to areas that previously had no contamination. Failure to eliminate source(s) of moisture in the building that are allowing mold to flourish will render remediation efforts ineffective.

**Client Present**  **Age of Home**  **Weather**  **Exterior Temp**

Josh Foster  ≥ 7-10 yrs  Overcast  ~72°



EXHIBIT

B

 

# OUTSIDE

| | | | |
|---|---|---|---|
| 1 | Is there standing water in the yard? | Yes ☐ | No ☒ |
| 2 | Does the land slope towards the home or building? | Yes ☐ | No ☒ |
| 3 | Are gutters present? | Yes ☒ | No ☐ |
| 4 | Are downspouts present? | Yes ☒ | No ☐ |
| 5 | Is there vegetation against house or building? | Yes ☐ | No ☒ |

Comments: (Note anything visible)

③ - GUTTERS LEAKING ON LEFT front of house
④ Downspout Extensions missing
Microbial Grows thuisible on siding of back patio

## ROOF (Do not climb onto roof)

| | | | | |
|---|---|---|---|---|
| 6 | Are there missing or broken shingles? | How many? | Yes ☐ | No ☒ |
| 7 | Are the shingles older than 10 years? | | Yes ☐ | No ☒ |
| 8 | Are any flanges around the vents loose? | | Yes ☐ | No ☒ |
| 9 | Is any flashing loose? | | Yes ☐ | No ☒ |

Comments: (Note anything visible)

Nothing Noted

## Foundation Type

| 10 | Basement ☐ | Crawl ☐ | Slab ☒ |
|---|---|---|---|

## Basement

| | | | |
|---|---|---|---|
| 11 | Is there a dehumidifier in place? | Yes ☐ | No ☒ |
| 12 | Are there any carpeted areas? | Yes ☐ | No ☒ |
| 13 | Is there a sump pump? | Yes ☐ | No ☒ |

Comments:

No basement present.





## Crawl Space (Enter only if safe to do so)

| | | | |
|---|---|---|---|
| 14 | Are there any leaks? | Yes ☐ | No ☒ |
| 15 | Is there microbial growth? | Yes ☐ | No ☐ |
| 16 | Is there a vapor barrier? | Yes ☐ | No ☐ |
| 17 | Is the vapor barrier totally sealed and intact? | Yes ☐ | No ☐ |
| 18 | Is the crawl space totally encapsulated? | Yes ☐ | No ☐ |
| 19 | Is there room for you to crawl? | Yes ☐ | No ☐ |
| 20 | Is there any rot? | Yes ☐ | No ☐ |
| 21 | Is the insulation intact? | Yes ☐ | No ☐ |
| 22 | Is the insulation wet? | Yes ☐ | No ☐ |
| 23 | Is the duct work intact? | Yes ☐ | No ☐ |
| 24 | Any condensation around the ducts? | Yes ☐ | No ☐ |
| 25 | Are the floor joists intact? | Yes ☐ | No ☐ |
| 26 | Is there a dehumidifier in place? | Yes ☐ | No ☐ |
| 27 | Are any vents blocked off? | Yes ☐ | No ☒ |

Comments:

SLAB ON GRADE  NO CRAWLSPACE

 

# INSIDE

## Microbial Activity

| | | Yes | No |
|---|---|---|---|
| 30 | Any Microbial Activity? (e.g., carpet, drapes, walls, ceilings, cabinets, etc.) | ☒ | ☐ |
| 31 | Is there a musty odor present? | ☒ | ☐ |
| 32 | Are there any water marks? | ☒ | ☐ |

Comments:

30 a- AIR REGISTER IN KITCHEN
   b- AC UNIT DUCTING GARAGE
   c- UPSTAIRS HALL CLOSET - INSIDE LIGHT FIXTURE
   d- UPSTAIRS HALL CLOSET - Top of door Frame
   e- INSIDE FOYER LIGHT - TENANT STATED they have ATTEMPTED to
      CLEAN HALL WAY LIGHT.
31- MUSTY ODOR IN UPSTAIRS HALL CLOSET
32- GARAGE VENT - CEILING IS bubbling & PEALING PAINT.

## Attic

| | | Yes | No |
|---|---|---|---|
| 33 | Anything suspicious? (including lack of proper ventilation) | ☐ | ☐ |

**DUE TO LIABILITY, WE DO NOT GO INTO THE ATTIC UNLESS THERE IS A SUSPECTED AREA OF CONCERN.

Comments:

OPENED SKUTTLE AND VIEWED ATTIC From ACCESS. No visible
MicrobIAL Growth.

## Kitchen and Laundry

| | | Yes | No |
|---|---|---|---|
| 34 | Is the dryer ventilation intact? | ☒ | ☐ |
| 35 | Are there any leaks behind the washer? | ☐ | ☒ |
| 36 | Are there any leaks under or behind refrigerator? | ☐ | ☒ |
| 37 | Are there any leaks under kitchen sink? | ☐ | ☒ |

Comments:



52-Point Visual Inspection

## Bedroom/Office(s)

**Indicate Name of Bedroom/offices**

**R01 MSTR BR**

| | | |
|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐  No ☒ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐  No ☒ |
| 40 | Are HVAC vents clean? | Yes ☒  No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐  No ☒ |

**R02 BRZ CHLDS**

| | |
|---|---|
| Yes ☐  No ☒ |
| Yes ☐  No ☒ |
| Yes ☒  No ☐ |
| Yes ☐  No ☒ |

**Indicate Name of Bedroom/offices**

**R03 BR #3**

| | | |
|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐  No ☒ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐  No ☒ |
| 40 | Are HVAC vents clean? | Yes ☒  No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐  No ☒ |

**R04 HALL CLOSET**

| | |
|---|---|
| Yes ☐  No ☒ |
| Yes ☐  No ☒ |
| Yes ☒  No ☐ |
| Yes ☐  No ☒ |

**Indicate Name of Bedroom/offices**

**R05 GARAGE**

| | | |
|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐  No ☒ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐  No ☒ |
| 40 | Are HVAC vents clean? | Yes ☒  No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☒  No ☐ |

**R06 Living Room**

| | |
|---|---|
| Yes ☐  No ☒ |
| Yes ☐  No ☒ |
| Yes ☒  No ☐ |
| Yes ☐  No ☒ |

**Indicate Name of Bedroom/offices**

**R07 Dining**

| | | |
|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐  No ☒ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐  No ☒ |
| 40 | Are HVAC vents clean? | Yes ☒  No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐  No ☒ |

**R08**

| | |
|---|---|
| Yes ☐  No ☒ |
| Yes ☐  No ☒ |
| Yes ☐  No ☒ |
| Yes ☐  No ☒ |

**Indicate Name of Bedroom/offices**

**R09**

| | | |
|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐  No ☐ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐  No ☐ |
| 40 | Are HVAC vents clean? | Yes ☐  No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐  No ☐ |

**R10**

| | |
|---|---|
| Yes ☐  No ☐ |
| Yes ☐  No ☐ |
| Yes ☐  No ☐ |
| Yes ☐  No ☐ |

**Indicate Name of Bedroom/offices**

**R11**

| | | |
|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐  No ☐ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐  No ☐ |
| 40 | Are HVAC vents clean? | Yes ☐  No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐  No ☐ |

**R12**

| | |
|---|---|
| Yes ☐  No ☐ |
| Yes ☐  No ☐ |
| Yes ☐  No ☐ |
| Yes ☐  No ☐ |

Comments:

**52-Point Visual Inspection**

## Bathroom(s)

**If more than 2 bathrooms, please describe in comment section

| | | Bathroom 1 | Bathroom 2 |
|---|---|---|---|
| 42 | Exhaust fan(s) present and getting proper suction? | Yes ☒ No ☐ | Yes ☒ No ☐ |
| 43 | Any leaks under the sink? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 44 | Are all bathtub seals intact? | Yes ☒ No ☐ | Yes ☒ No ☐ |
| 45 | Are there any leaks around the bathtub? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 46 | Any leaks around hot the water heater? | Yes ☐ No ☒ | Yes ☐ No ☒ |

Comments:

1/2 bath

42  Yes
43  No
44  N/A
45  N/A
46  N/A

## HVAC

| | | | |
|---|---|---|---|
| 47 | Is there a return vent? | | Yes ☒ No ☐ |
| 48 | Is any furniture sitting on top or blocking HVAC registers? | | Yes ☐ No ☒ |

Comments: (Note condition of return and ducts)

Register in Kitchen has indications of active microbial growth.

## Relative Humidity Indoors

49. Readings /Comments:

62%

## Moisture Indoors

50. Readings /Comments:

WALLS- DOWNSTAIRS- >5%   UPSTAIRS  7-10%

FLOORS- DOWNSTAIRS- 68%-71%

UPSTAIRS  13%

© Mold Tes USA 2015

**PHCS USA** 52 Point Visual Inspection

Do You Recommend Remediation?   Yes ☐   No ☐   Possibly ☒

49. Explanation:

IF POSITIVE for mold in AREAS TESTED/SAMPLED (Active)

IF NOT, RECOMMEND treatment of HALL CLOSET, CLEANING of
AC SYSTEM, Light FIXTURES AND EXTERIOR of home.

**Issues of Concern**

50. Comments:

① Visible signs of microbial growth (Active) - Possibly
② PEELING PAINT ON GARAGE CEILING
③ Algae/Microbial growth on EXTERIOR
④ Missing DOWNSPOUTS EXTENSION - Should EXTEND 6' beyond
⑤ EXTERIOR of home.
⑥ Musty odor AND signs of microbial growth in ~~Entry~~ HALL, CLOSET

51. Recommended Preventative Measures:

AC distribution SYSTEM CLEANING
DOWNSPOUT/GUTTERS REPAIR
EXTERIOR CLEANING of home
Possible Addition of dehumidifier.

**Inspector Recommends These Areas to Test**

52. *We always recommend a Tape Lift Sample for anything visual that appears to be microbial.*

| | |
|---|---|
| FRONT LEFT EXTERIOR | LIGHT FIXTURE - Foyer |
| BACK PATIO Siding | LIGHT FIXTURE - HALL CLOSET |
| FRONT LEFT WINDOW | AC REGISTER - KITCHEN |
| GARAGE - AC DUCT | Top of DOORMOLDING - HALL CLOSET |





## THE NEXT STEPS IN OUR PROCESS

1. Your lab analysis and your 52 Point Inspection will be sent to your email within 3 to 5 business days. If you expedited your results, you will receive them within 1 to 2 business days.  *Weekends and holidays are excluded. If the job was on a late Thursday, Friday or on a Saturday, results will be available on Tuesday. FedEx does not deliver our mold sample packages to the lab on weekends or on holidays.

2. You will receive a call from Newton Microbial Laboratory within 1 to 2 business days after you receive your reports to go over your lab analysis.

3. You will receive a call from Mold Test USA for recommendations and to answer any questions you may have.
   **\*If you are left a message, do not receive your reports during this time period or have any questions, please call Mold Test USA. We thank you for your business!**

Please call the office before sampling. Thank you!
877-554-6653 (Office Hours 9am-7pm EST, MON-FRI)
Our customer spoke with ___CHRIS___ _____ at MTUSA.

**Please have Customer Initial the following:**

I agree to pay $ 575 for the inspection and testing. The inspector completed the 52 Point Inspection and I am satisfied with services rendered.                    Initial:

S.       ures

**Inspector Signature:**                                    **Date:**
                                                          1/2/2017

**Customer Signature:**                                    **Date:**
                                                          2 Jan 2017

Would you like Mold Test USA to recommend professionals to give you        Yes        No
estimates on needed repairs?

I do not wish to have a written protocol at this time. If I choose to have protocol written at a later date and it exceeds 7 days, Mold Test USA will need to retest in order to have a properly written protocol.

**Inspector Signature:**                                    **Date:**
                                                          1/2/2017

**Customer Signature:**                                    **Date:**

# Mold Test USA Customer Agreement

Property Address: 145 McNarney Drive Biloxi, Ms 39531

The inspector recommends, and you agree, that the following areas be sampled:

| Location of sample | Type of Sample (circle) | # of samples in area | PRICING Base Rate: $ 525 (includes 2 samples) Additional samples: $85 ea. |
|---|---|---|---|
| 1. Front Left Exterior | Air/Swab/Tape/bulk material | 1 | 85.00 |
| 2. Sidway back Patio ext | Air/Swab/Tape/bulk material | 1 | 85.00 |
| 3. Window Front Left ext. | Air/Swab/Tape/bulk material | 1 | 85.00 |
| 4. AC Duct - Garage | Air/Swab/Tape/bulk material | 1 | 85.00 |
| 5. Light Fixture - hall Closet | Air/Swab/Tape/bulk material | 1 | 85.00 |
| 6. Light Fixture - Foyer | Air/Swab/Tape/bulk material | 1 | 85.00 |
| 7. AC Register - Kitchen | Air/Swab/Tape/bulk material | 1 | 85.00 |
| 8. Living Room | Air/Swab/Tape/bulk material | 1 | |
| 9. Outside Backyard | Air/Swab/Tape/bulk material | | |
| 10. Inside Top Deck ms-pan | Air/Swab/Tape/bulk material | 1 | 85.00 |

The inspector suggested the following areas below to be tested in which you chose not to have tested.
HALL CLOSET

Customer Initials _____

EXPEDITED?   YES / NO (circle)   Waived Fee _____      Expedited Amount: $_____

### Total Price for services rendered:   $_____

Payment Method: _____      **Transaction ID:** _____

THE 52 POINT INSPECTION, CUSTOMER AGREEMENT, AND RESULTS  DO NOT CONSTITUTE A WARRANTY, AN INSURANCE POLICY, OR A  GUARANTEE OF ANY KIND; NOR DOES IT SUBSTITUTE FOR ANY DISCLOSURE STATEMENT AS MAY BE REQUIRED BY LAW.

Mold Test USA or the inspector is not anyway held responsible or liable for the results of the inspection and/or sampling. If you choose any form of litigation against Mold Test USA or the inspector, you hereby   agree the amount of our liability will not exceed the cost of the inspection and testing. Also, if you choose to write any negative reviews or slander Mold Test USA or the inspector in  anyway, we reserve the right to receive compensation for all damages incurred.

Mold Test USA only performs mold inspections and sampling. We do not write Protocol, nor do we perform remediation work.

Confidentiality: The inspection and testing is done for your benefit and use. The results analyst, a biologist from Newton Microbial Laboratory, will be calling you to go over the results and give you recommendations for your next step. If cleaning, removal or remediation is needed, Mold Test USA may be able to refer you to a certified, licensed and insured remediation company that follows proper protocol. All remediation companies are independent from Mold Test USA and does not reflect on Mold Test USA.  By initialing here, this allows Mold Test USA to release your results and information for you to have a free estimate for services suggested to no more than three companies.                    Customer Initials _____

Applicable Law. This Agreement, its validity, enforceability and the construction and interpretation of its terms and provisions shall all be in accordance with the   applicable laws of the State of South Carolina. No claim, demand, action, proceeding, arbitration, litigation, hearing, motion or lawsuit arising here from or with respect   to the rights and obligations created hereunder shall not be commenced or prosecuted in any jurisdiction other than the State of Carolina. The parties hereto hereby   consent and stipulate to the jurisdiction of the Circuit and County Courts of Richland County, South Carolina.

By signing below, you acknowledge that you have read, understand, and agree to the terms and conditions of this agreement, including (but not limited to) the limitations   of liability, arbitration clause and limitation period, and agree to pay the fee listed in the box above.

_____      _____      _____      1/2/2017
Customer's Signature      Date      Inspector's Signature      Date

**877-554-6653** admin@moldtestusa.com  **Mon-Fri 9am-7pm EST**

# MOLD TEST USA

# Receipt

Customer: Rushing and Gage

Date: 1/2/2017   Inspector: Ed Williams

Address: 145 McNarney Drive, Biloxi, Ms 39531

| Description of work: | Unit Price: | Subtotal: |
|---|---|---|
| Base rate (Includes mold inspection & two samples): | $225.00 | $525.00 |
| Additional Testing: | ($85.00 each) x __8__ samples | $680.00 |
| Expedited Fee: | ($50.00) | $1205.00 |
| Total amount due: | PAID IN FULL | $1,205.00 |

## THE NEXT STEPS IN OUR PROCESS

1. Your lab analysis and your 52 Point Inspection will be sent to your email within 3 to 5 business days. If you expedited your results, you will receive them within 1 to 2 business days.   *Weekends and holidays are excluded. If the job was on a late Thursday, Friday or on a Saturday, results will be available on Tuesday. FedEx does not deliver our mold sample packages to the lab on weekends or on holidays.

2. You will receive a call from Newton Microbial laboratory within 1 to 2 business days after you receive your reports to go over your lab analysis.

3. You will receive a call from Mold Test USA for recommendations and to answer any questions you may have.

   *If you are left a message, do not receive your reports during this time period or have any questions, please call Mold Test USA. We thank you for your business!

   877-554-6653 admin@moldtestusa.com Mon-Fri, 9am-7pm EST

Newton
Laboratory

# NML-20170104-Rushing and Guice

**Spore Analysis Completed for**



1101 1st Street South EXT. Suite B, Columbia, SC 29209
803-778-0562
admin@nmidtestusa.com

| | |
|---|---|
| Collected Date | 1/2/2017 |
| Collected Street Address | 145 McNarney Dr |
| Collected & Relinquished by | Ed Williams |
| # of Sample Sent | 4 |
| Received Date | 1/04/2017 |
| # of Sample Received & Accepted | 4 |
| Analyzed Date | 1/04/2017 |
| Accepted & Analyzed by | Janna Komorowski |
| Approved by | Crystal Hernandez |

Good morning, and Newton Microbial Laboratory...

**Spore Analysis Completed by**

Laboratory

1101 1st Street South EXT Suite C, Columbia SC 29209

**Janna Komorowski**
Laboratory Director, B.A. in Biological Sciences

**Crystal Hernandez**
Operations Director, B.A. in Biology

EXHIBIT
C

# Newton Laboratory

| Property/Customer Name | Rushing and Guice | Set Street Address | 145 McNamey Dr | Site City | Biloxi | Site State | MS |
|---|---|---|---|---|---|---|---|
| Company Email | | Company Phone Number | 803-776-0562 | Date Collected | 1/2/2017 | Date Received | 1/04/2017 |
| Company Address | 1101 1st Street South EXT. Suite B, Columbia, SC 29209 | Company Name | Mold TEST USA | Sample Collected by | Ed Williams | Date Reported | 1/04/2017 |

| | | | | | |
|---|---|---|---|---|---|
| Newton MLI.D Number | NMI-20170104-Rushing and Guice | NMI-20170104-Rushing and Guice | | | 1/04/2017 |
| Sample ID Number | SPC 0001 | SPC 0002 | | | |
| Sample Name/Location | Control/Outside | Living Room | | | |
| Volume (L) | 150 | 75 | | | |
| Background* | 2 | 2 | | | |
| Limit of Detection (Spore/M³) | 7 | 13 | | | |
| Sample Type | Spore Count | Spore Count | Spore Count | | |

| Organism | Counted | Cts/M³ | % of Total | Counted | Cts/M³ | % of Total | Counted | Cts/M³ | % of Total |
|---|---|---|---|---|---|---|---|---|---|
| Alternaria | Not Detected | | | Not Detected | | | | | |
| Ascospores | 2 | 13 | 13.33% | 1 | 13 | 14.29% | | | |
| Aspergillus\|Penicillium | 1 | 7 | 6.67% | 1 | 13 | 14.29% | | | |
| Basidiospores | 2 | 13 | 13.33% | Not Detected | | | | | |
| Bipolaris\|Drechslera | Not Detected | | | Not Detected | | | | | |
| Chaetomium | Not Detected | | | Not Detected | | | | | |
| Cladosporium | 6 | 40 | 40.00% | 1 | 13 | 14.29% | | | |
| Curvularia | Not Detected | | | Not Detected | | | | | |
| Epicoccum | Not Detected | | | Not Detected | | | | | |
| Fusarium | Not Detected | | | Not Detected | | | | | |
| Memnoniella | Not Detected | | | Not Detected | | | | | |
| Myxomycetes\|Smuts | 3 | 20 | 20.00% | 2 | 27 | 28.57% | | | |
| Pithomyces | Not Detected | | | Not Detected | | | | | |
| Stachybotrys | Not Detected | | | Not Detected | | | | | |
| Stemphylium | Not Detected | | | Not Detected | | | | | |
| Torula | Not Detected | | | Not Detected | | | | | |
| Trichoderma | Not Detected | | | Not Detected | | | | | |
| Ulocladium | Not Detected | | | Not Detected | | | | | |
| Unspecified Spore | 1 | 7 | 6.67% | 1 | 13 | 14.29% | | | |
| Total | 15 | 100 | 100.00% | 7 | 93 | 100.00% | | | |

| Hyphal Fragment | 7 | Not Detected | |
|---|---|---|---|
| Spore Ct + | Dander | na | na |
| | Fiber | na | na |
| | Pollen | na | na |
| Comments | | | |

| Color Code | Common Outdoor | Common Indoor | Water Damage Indicator | Elevated Counts |
|---|---|---|---|---|

©2013-2016 Newton Microbial Laboratory

Newton
Laboratory

Control/Outside   Living Room



| | 0 | 5 | 10 | 15 | 20 | 25 | 30 | 35 | 40 | 45 |
|---|---|---|---|---|---|---|---|---|---|---|
| Alternaria | | | | | | | | | | |
| Ascospores | | | | | | | | | | |
| Aspergillus\|Penicillium | | | | | | | | | | |
| Basidiospores | | | | | | | | | | |
| Bipolaris\|Drechslera | | | | | | | | | | |
| Chaetomium | | | | | | | | | | |
| Cladosporium | | | | | | | | | | |
| Curvularia | | | | | | | | | | |
| Epicoccum | | | | | | | | | | |
| Fusarium | | | | | | | | | | |
| Memnoniella | | | | | | | | | | |
| Myxomycetes\|Smuts | | | | | | | | | | |
| Pithomyces | | | | | | | | | | |
| Stachybotrys | | | | | | | | | | |
| Stemphylium | | | | | | | | | | |
| Torula | | | | | | | | | | |
| Trichoderma | | | | | | | | | | |
| Ulocladium | | | | | | | | | | |
| Unspecified Spore | | | | | | | | | | |

©2013-2016 Newton Microbial Laboratory

Newton Laboratory



## Spore Trap Count Explanation

**Volume**    Flow Rate * Flow Rate Minute

**Background**    None: Recollect
1: <5%
2: 5% ≤ Background Coverage < 25%
3: 25% ≤ Background Coverage < 70%
4: 70% ≤ Background Coverage < 90%
5: 90% ≤ Background Coverage < 100%, Recollect

**Cts/M³**    Spore Counts per Cubic Meter

**Hyphal Fragment**    Fragments of hyphae. Can be an additional indicator of possible mold presences

**Unspecified Spore**    Less commonly identified spore type

**Limit of Detection**    1 spore count per coverage examined area

**Sample Type**
Spore Count    Spore Trap Cassettes  Identification & Enumeration of Fungal Spores
Spore Count+    Spore Trap Cassettes  Identification & Enumeration of Fungal Spores
+ Total Dander, Fiber, and Pollen Count





©2013-2016 Newton Microbial Laboratory

# Newton Laboratory

| Site Name | Rushing and Guice | | Site City | Biloxi | Site State | MS | Site Zip | 39531 |
|---|---|---|---|---|---|---|---|---|
| Company Email | admin@moldtestusa.com | Site Address | 145 McNarney Dr | | | Date Received | 1/04/2017 | |
| Company Address | 1101 1st Street South EXT. Suite B, Columbia, SC 29209 | Company Phone Number | 803-776-0562 | | | Date Reported | 1/04/2017 | |
| | | Company Name | Mold TEST USA | Date Collected | 1/2/2017 | | | |
| Newton ML ID Number | NML-20170104-Rushing and Guice | NML-20170104-Rushing and Guice | | Sample Collected by | Ed Williams | | | |
| Sample ID Number | DIR 0001 | DIR 0002 | | | | | | |
| Sample Name | AC Duct - Garage | Inside Top Door Molding - Hall Closet | | | | | | |
| Sample Type | Direct ID - Tape | Direct ID - Tape | | | | | | |

| Organism | Trace 1-10 | Light 11-100 | Med 101-1000 | High 1001+ | Trace 1-10 | Light 11-100 | Med 101-1000 | High 1001+ | Trace 1-10 | Light 11-100 | Med 101-1000 | High 1001+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alternaria | ND | | | | ND | | | | | | | |
| Ascospores | | | | | ND | | | | | | | |
| Aspergillus\|Penicillium | ND | | | | ND | | | | | | | |
| Basidiospores | ND | | | | ND | | | | | | | |
| Bipolaris\|Drechslera | ND | | | | ND | | | | | | | |
| Chaetomium | ND | | | | ND | | | | | | | |
| Cladosporium | | | | | ND | | | | | | | |
| Curvularia | ND | | | | ND | | | | | | | |
| Epicoccum | ND | | | | ND | | | | | | | |
| Fusarium | ND | | | | ND | | | | | | | |
| Memnoniella | ND | | | | ND | | | | | | | |
| Myxomycetes\|Smuts | ND | | | | ND | | | | | | | |
| Pithomyces | ND | | | | ND | | | | | | | |
| Stachybotrys | ND | | | | ND | | | | | | | |
| Stemphylium | ND | | | | ND | | | | | | | |
| Torula | ND | | | | ND | | | | | | | |
| Trichoderma | ND | | | | ND | | | | | | | |
| Ulocladium | ND | | | | ND | | | | | | | |
| Unspecified Spore | | | | | ND | | | | | | | |

ND = Not Detected

| | Color Code | | Common Outdoor | Common Indoor | Water Damage Indicator | |
|---|---|---|---|---|---|---|
| Hyphal Fragment | | Heavy | | Moderate | | |
| Background Debris | | Light | | Light | | |
| Comments | | | | | | Color Code |

©2013-2016 Newton Microbial Laboratory



# Newton
# Laboratory



# Direct Identification Explanation

**Direct ID**

| | |
|---|---|
| Trace | Spore Count less than 10 |
| Light | Estimated Spore Counts between 11 and 100 |
| Medium | Estimated Spore Counts between 101 and 1000 |
| High | Estimated Spore Counts above 1000 |

**Hyphal Fragment/Background Debris**

| | |
|---|---|
| Not Detected | Not Found in the Sample |
| Light | Found Traces throughout the Sample |
| Moderate | Found Some throughout the Sample |
| Heavy | Found All throughtout the Sample |

**Unspecified Spore**   Less commonly identified spore type

**Sample Type**




| | | |
|---|---|---|
| Direct ID-Swab | Swab for ID only | ID and Quantitative Enumeration of Spores |
| Direct ID-Swab+ | Swab for ID + Spore Count | ID and Enumeration with Spore Count |
| Direct ID-Tape | Swab for ID only | ID and Quantitative Enumeration of Spores |
| Direct ID-Tape+ | Swab for ID + Spore Count | ID and Enumeration with Spore Count |
| Direct ID-Bulk | Swab for ID only | ID and Quantitative Enumeration of Spores |
| Direct ID-Bulk+ | Swab for ID + Spore Count | ID and Enumeration with Spore Count |
| Culture | Air Plate, Swab, Bulk | *Identification and Enumeration of Mold only* |

©2013-2016 Newton Microbial Laboratory

# Newton Laboratory

## Ascospores

**Growth and Distribution**

Ascospores refers to spores produced in a sac-like structure known as an ascus (plural asci). These spores are specific to fungi of the phylum Ascomycota. Ascomycota is a broad division containing a large number of genera and individual species. Identification of the genus and/or species based on spore morphology alone is not always possible, therefore these spores are often given the more general classification of "Ascospores" in microscopic analysis.

- Ascospores are found worldwide with prevalence and distribution depending on particular genus and species.
- **Outdoors:** Ascospores are found ubiquitously in outdoor environments; often found on dead and decaying plant material. Many types are known to have pathogenic or parasitic properties in plants.
- **Indoors:** Common substrates include damp building materials such as gypsum or lumber, carpeting, dust, and other organic materials.

**Health Effects**

- Allergen
  - Ascospores can be allergenic to sensitive individuals, most often producing Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis (Type III). (5)
  - Reactions due to spore inhalation may increase following rain or high humidity. (5)
  - Unlike some fungi which rely on air currents for spore dispersal, ascomycetes are capable of a more active form of spore dispersal that utilizes water droplets to catapult their spores into the air. Various species of Ascospores are known to use this method to liberate spores every single day, regardless of air flow. Subsequently, exposure to ascospores may be more consistent from day to day than exposure to other spores which are only dispersed with adequate air currents. For this reason these spores may be of particular interest in cases of chronic respiratory disease such as asthma and rhinitis (5).

- Pathogen
  - Some types can be pathogenic; dependent upon genus and species.

- Toxins\Metabolites
  - Vary greatly depending on genus and species.

Found in Sample(s)
AIR          •Control•Outside•Living Room•••••••••••
DIRECT     •AC Duct - Garage••••••••••••••••••

( List of references can be found at http://newtonlaboratory.com/glossary

©2013-2016 Newton Microbial Laboratory

Newton ML ID #
20170104 Rushing and Guice.xlsm

Newton Laboratory

# Aspergillus/Penicillium



**Growth & Distribution (7):**

– Aspergillus & Penicillium are incredibly adaptive and abundant organisms. Their distribution is world-wide with many species possessing abilities to tolerate environmental conditions that challenge other molds (i.e. extreme temperatures & pH levels, restricted water availability and exposure to radiation). Colony growth rates are rapid for many species. Mature colonies are capable of quickly producing large numbers of spores. Because of the morphological similarity of the spores, the two genera are typically grouped together as "Aspergillus-Penicillium."

- **Growth Rate:** Usually Rapid – Mature within 3-4 days; however, some species are slower(6).
- **Water Activity:** Aspergillus: 0.93-0.97 & Penicillium: 0.88 – 0.99 (33, 35)
- **Outdoors:** Both can be found outdoors on a variety of substrates - particularly plant materials such as cereals, grains, decaying wood, and soil (7).
- **Indoors:** Found indoors on organic materials such as wood, textiles, cellulose materials, carpeting, painted surfaces, and food stuffs such as cheeses, butter/margarine meats, breads, fruits and vegetables. Halotolerant species may be found growing on refrigerated foods (7). Penicillium is used in cheese production and is responsible for the veins in blue cheese.

**Health Effects**

- **Allergen:**

  Because these spores are so abundant, daily exposure to Aspergillus/Penicillium is very common in both indoor and outdoor environments. Often this exposure occurs without any noticeable reaction or symptoms. However, sensitivities may develop in some instances- especially with prolonged exposure to high spore concentrations. This can result in allergic responses.

  Spores may progress further into the respiratory system than other common spores due to their small aerodynamic diameter.

  Penicillium is the mold from which the antibiotic Penicillin was first derived. Penicillin is now made synthetically. It does not contain the mold Penicillium. Allergy to one does not necessarily imply allergy to the other.

- **Pathogen (6,7):**

  - There are approximately 175 species of Aspergillus, only about 20 of which are known to cause disease in humans.
  - Diseases caused by Aspergillus are known as aspergillosis and include invasive infection, colonization, & toxicosis.
  - Certain species of Penicillium are considered pathogens. Infection may occur in skin, blood, bone marrow, internal organs or lymph nodes. (6). In the immunocompromised (particularly HIV patients or those who have recently been in Southeast Asia) *P. marneffei* can cause severe infection capable of affecting respiratory, lymphatic, and nervous systems.

- **Toxins/Metabolites:**

  Different species of Aspergillus/Penicillium are associate with an array of mycotoxins and metabolites, some of which are medically significant in humans. The importance of these toxins can vary from species to species and depends largely on the prevalence of that species.

Found as Sample(s)
AIR          •Control/Outside•Living Room•••••••••••
DIRECT     •Inside Top Door Molding • Hall Closet•••••••••••••••

[ I List of references can be found at http://newtonlaboratory.com/glossary

©2013-2016 Newton Microbial Laboratory

# Newton Laboratory



# Basidiospores

**Growth & Distribution:**

- Basidiospores are spores produced by the division of Fungi known as Basidiomycota. These spores are unique for lacking septation, containing bilateral symmetry, and often having a visible pore at the site of detachment from the basidium (7). This is a large group of organisms consisting of a large number of individual genera & species. Distribution is world-wide with the prevalence in any given area varying for each genus and species. Like ascospores, basidiospores disperse using water droplets. Therefore, airborne spore concentrations are often higher following rain or high humidity. This division includes edible mushrooms.

- **Outdoors:** Basidiospores are found growing on plant material, organic debris, and soil. Many species of basidiospores are known to be plant pathogens.

- **Indoors:** Basidiospores may be found growing on damp materials. Colonies may grow given sufficient access to water (leaks, flooding, high humidity, or surrounding plumbing, heating /air conditioning components, appliances, house plants, etc.).

**Health Effects:**

- **Allergenic:**
  - Exposure to these spores is commonplace in both indoor and outdoor environments. Nonetheless they are also potentially allergenic. Allergic responses may occur following inhalation, ingestion, or direct contact. Reactions due to inhalation may be increased following rain or high humidity when spore concentrations are often elevated.
  - In sensitive individuals, typically manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogenic:**
  - Invasion is not typical but can occur, particularly in the immunocompromised or immunosuppressed. These infections can includes sinitus, keratitis, phaeohyphomycosis, & peritonitist.

- **Toxins\Metabolites:**
  - Mycotoxins vary depending on genus and species. They are especially relevant in edible fungi of this division such as mushrooms.
    - Common sources of mushroom poisoning include *Armita*, *Lepiota*, *Coprinus*, & *Psilocybe*

Found in Sample(s)
AIR          •Control/Outside••••••••••••••
DIRECT       ••••••••••••••••

[(List of references can be found at http://newtonlaboratory.com/glossary

©2013-2016 Newton Microbial Laboratory

Newton MLID #
20170104 Rushing and Guice.xlsm

Page 10 of 12

Newton Laboratory

# Cladosporium



**Growth & Distribution:**

– Cladosporium are found in air and soil worldwide. Cladosporium are among the most common airborne fungi (4). Spores are produced in abundance and easily disperse through the air. Extremely common on decaying organic matter. These mold are common plant pathogens. Molds of this genus are dematiaceous with over 40 named species (1).

– **Growth Rate:** Moderately Rapid – Mature within 7 days. (6)
– **Water Activity:** 0.85–0.88 (1)
– **Outdoors:** Cladosporium can be found on food sources such as cereals, fruit, vegetables. Commonly found on dead plants and shrubs in temperate regions. Halotolerant (salt tolerant) species exist. (7) The most common species isolated from plant materials & soils (C. cladosporioides) experiences peak airborne spore concentrations between June/July and September/October in temperate climates (2).

– **Indoors:** Cladosporium can be found on water damaged materials (i.e. plaster, paint, textiles, gypsum, wall paper, wood, moist window sills). May affect food sources such as cheeses, butter/margarine, vegetables, fruits and vegetables(7). Often found on the surface of fiberglass duct liners, in bathroom showers, and on basement walls (2). Some studies have reported Cladosporium in 70% of homes examined in the US & 100% of homes examined in Canada (1).

**Health Effects:**

– **Allergen:**

- Allergic reaction to airborne spores are of particular importance because these spores exist in in such high concentrations in the air. Symptoms may increase during peak concentrations from June–October. Sensitization may occur. (1)
- In sensitive individuals typically manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

– **Pathogen:**

- Is pathogenic in humans very rarely, reported cases include skin lesions, keratitis, onychomycosis, sinusitis, pulmonary infections (1).

– **Mycotoxins/Metabolites:**

- Cladosporic acid (1,2)
- Gibberellin (hormone influencing developmental processes in plants) & ergosterol (precursor to vitamin D2 which may have anti-tumor properties). (1)
- Toxic effects have been seen in animals (chicken embryos & horses) but not known to be reported in humans to date (1,2).

Found in Sample(s)
AIR      •Control/Outside•Living Room••••••••••••
DIRECT  •AC Duct •Garage••••••••••••••••

(1 list of references can be found at http://newtonlaboratory.com/glossary

©2013–2016 Newton Microbial Laboratory

Newton Laboratory

# Myxomycetes



## Growth & Distribution

- Myxomycetes is a large class with approximately 500 individual species and worldwide distribution (25). Interestingly, these organisms are no longer considered to be true fungi like other molds, but have been reclassified as protozoans. These organisms belong to group commonly called "slime molds" that exhibit an amoeba-like stage. Spores are common in both indoor and outdoor environments worldwide (15). Spores can be dispersed by air, arthropods and other animals due to their small size (4 – 20 μm)(25).

**Growth Rate:** Generally Rapid – Mature within 2 to 4 day; however, specific growth rate does depend on species (24).

- **Water Activity:** 0.80 (this is a generalized number for common molds)(26).

- **Outdoors**

  - Found in soil, decaying plant material (especially damp wood), and dung. Species of Myxomycetes are not as geographically constricted as most organisms; most Myxomycetes species can be found world wide. (15)

- **Indoors**

  - Can be found growing indoors on damp building materials such as cardboard, wallpaper, gypsum board, wood, etc.

## Health Effects:

- **Allergen:**

  - These spores are very common in both indoor and outdoor air. They are small, foreign particles which may be inhaled deep into the respiratory system and may cause allergic responses.

  - In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogen:**

  - Unknown

  - **Toxins/Metabolites:**

    - Unknown

Found in
AIR
Direct

•Control/Outside•Living Room••••••••••••

••••••••••••••••

(1)list of references can be found at http://newtonlabinc.com/glossary

©2013-2016 Newton Microbial Laboratory

Newton
Laboratory

# Ulocladium



**Growth & Distribution**

- Found worldwide. Generally has high water requirements for growth but can survive short dry periods (1).

**Growth Rate:** Rapid – Mature within 5 days (6)

**Water Activity:** 0.89-0.90 (1)

- **Outdoors**
  - Found in soil and decaying plants. Some species are pathogenic in plants such as nuts, beans, and cereals. (1)

- **Indoors**
  - Can be found on wood, paper, textiles, mattress dust, and in heating and air conditioning units and ductwork. Is often found in association with water damage or high humidity (1).

**Health Effects:**

- **Allergen:**
  - May induce irritation or inflammation (1).
  - Considered by some to be among the most common mold allergens in the US (1).
  - In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogen:**
  - Very occasionally involved in phaeohyphomycosis (infection of mycelia of dematiaceous fungi) in the immunocompromised (6)

- **Toxins/Metabolites (1):**
  - Can produce strong endometabolites that may be have a negative impact on indoor air quality.
  - No toxins known to be hazardous to humans.
  - Some metabolites that are active against fungi and plants.

Found in Sample(s)
AIR       ••Living Room•••••••••••
DIRECT    ••••••••••••••••••

(1 List of references can be found at http://newtonlaboratory.com/glossary

©2013-2016 Newton Microbial Laboratory

**IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI**
**SECOND JUDICIAL DISTRICT**

JOSHUA FOSTER, JESSICA FOSTER, AND
MAKAYLA FOSTER AND GABRIELLA FOSTER
MINORS, BY AND THROUGH THEIR NATURAL
GUARDIANS, JOSHUA AND JESSICA FOSTER                          **PLAINTIFFS**

**VERSUS**                                              CAUSE NO. A2402-2017-102

HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
HUNT MH PROPERTY MANAGEMENT, LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z           **DEFENDANTS**

<u>SUMMONS</u>

THE STATE OF MISSISSIPPI
COUNTY OF HARRISON

TO:    Hunt Southern Group, LLC fka Forest City Southern Group, LLC
       c/o Registered Agent
       Capitol Corporate Services, Inc.
       248 E. Capitol Street, Suite 840
       Jackson, Mississippi 39201
       OR WHEREEVER THEY MAY BE FOUND

<u>NOTICE TO DEFENDANT(S)</u>

**THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.**

You are required to mail or hand-deliver a copy of a written response to the Complaint to **Rushing & Guice, P. L. L. C.**, the attorneys for Plaintiffs, whose address is **Post Office Box 1925, Biloxi, Mississippi 39533-1925** and whose street address is **1000 Government Street, Suite E, 2nd Floor, Ocean Springs, Mississippi 39564**.  Your response must be mailed or delivered within thirty (30) days from the date of delivery of this Summons and Complaint or a Judgment by default will be entered against you for the money or other things demanded in the Complaint.

You must also file the original of your response with the Clerk of this Court within a reasonable time afterward.

Issued under my hand and the seal of said Court, on this the 22 day of Dec. , 2017.

                                        Annie Ladner     Clerk

                            BY: _____ D.C.

## IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
### SECOND JUDICIAL DISTRICT

**JOSHUA FOSTER, JESSICA FOSTER AND
MAKAYLA FOSTER AND GABRIELLA FOSTER
MINORS, BY AND THROUGH THEIR NATURAL
GUARDIANS, JOSHUA AND JESSICA FOSTER**                    **PLAINTIFFS**

**VERSUS**                                   CAUSE NO. A2402-2017-1142

**HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
HUNT MH PROPERTY MANAGEMENT, LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z**            **DEFENDANTS**

### COMPLAINT

### JURY TRIAL REQUESTED

COME NOW Plaintiffs, Joshua Foster, Jessica Foster, and Makayla Foster and Gabriella Foster, Minors, by and through their natural guardians, Joshua and Jessica Foster (Plaintiffs), by and through their attorneys, Rushing & Guice, P.L.L.C., and file this their Complaint against Hunt Southern Group, LLC fka Forest City Southern Group, LLC, Forest City Residential Management, LLC, Hunt MH Property Management, LLC, Unknown John and Jane Does A through M, and Other Unknown Corporate Entities N through Z (Defendants), and for good cause of action, states unto the Court the following, to-wit:

### PARTIES

1.

Plaintiff, Joshua Foster ("Joshua"), is an adult citizen of Harrison County, Mississippi residing at 145 McNarney Drive, Biloxi, Mississippi.



FILED
DEC 22 2017
CONNIE LADNER
CIRCUIT CLERK
BY:_____D.C.

2.

Plaintiff, Jessica Foster ("Jessica"), is an adult citizen of Harrison County, Mississippi residing at 145 McNarney Drive, Biloxi, Mississippi.

3.

Plaintiff, Makayla Foster ("Makayla"), is the minor child of Joshua and Jessica, her natural guardians, born December 23, 2009, and is a resident of the State of Mississippi, residing at 145 McNarney Drive, Biloxi, Mississippi.

4.

Plaintiff, Gabriella Foster ("Gabriella"), is the minor child of Joshua and Jessica, her natural guardians, born January 1, 2017, and is a resident of the State of Mississippi, residing at 145 McNarney Drive, Biloxi, Mississippi.

5.

Defendant, Hunt Southern Group, LLC (Hunt Southern), formerly known as Forest City Southern Group, LLC (Forest City Southern) is a Delaware Limited Liability Company registered to do business in Mississippi. On March 18, 2016, Forest City Southern Group, LLC filed Articles/Certificate of Amendment with the Mississippi Secretary of State, changing its name to Hunt Southern Group, LLC. Hunt Southern fka Forest City Southern may be served through it registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840, Jackson, Mississippi 39201. Hunt Southern fka Forest City Southern is believed to be the owner of the property in issue.

6.

Defendant, Forest City Residential Management, LLC (Forest City Residential Management), is an Ohio Limited Liability Company, formally known as Forest City Residential

Management, Inc., whose registration in Mississippi was administratively dissolved on November 30, 2016. Forest City Residential Management may be served with process by serving its registered agent for process, FCE Statutory Agent, Inc., 50 Public Square, Suite 1360, Cleveland, Ohio 44113. Forest City Residential Management is listed as the agent for Forest City Southern Group on the lease for the property in issue.

7.

Defendant, Hunt MH Property Management, LLC (Hunt MH Property Management), is a Delaware Limited Liability Company, registered to do business in Mississippi and may be served through its registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840, Jackson, Mississippi 39201. Based on information and belief, Hunt MH Property Management is the agent of Hunt Southern and has been charged with the maintenance and upkeep of the property in issue.

8.

Other Unknown John and Jane Does A through M are unknown Defendants who may be seasonably supplemented after discovery.

9.

Other Unknown Corporate Entities N through Z are unknown Defendants who may be seasonably supplemented after discovery.

## JURISDICTION AND VENUE

10.

Jurisdiction is proper in this Court under Miss. Code Ann. § 9-7-81. Venue is proper in Harrison County as this is the location where the injuries were sustained, where the cause of action accrued and where Plaintiffs reside. Jurisdiction is also proper pursuant to Miss. Code

Ann. § 13-3-57 since Defendants were doing business within the State, made contracts with Plaintiffs, who are residents of Mississippi, those contracts were performed wholly within Harrison County, Mississippi, Second Judicial District, and the alleged tort was committed against Plaintiffs in Mississippi. Defendants, therefore, should be subjected to the jurisdiction of Mississippi courts.

## FACTS

### 11.

Joshua is a Technical Sergeant with the United States Air Force. In July of 2013 Joshua moved his family to Biloxi, Mississippi as part of a routine change of station. Like other military families moving to the area, the military housing assignment for Plaintiffs was controlled by Defendants.

### 12.

On or about July 12, 2013, Plaintiffs entered into a Military Lease Agreement for military housing in Thrower Park located at 145 McNarney Drive in Biloxi, Mississippi in the County of Harrison (Subject Property). See Lease Agreement attached hereto as **Exhibit "A."** Plaintiffs moved into the Subject Property in July of 2013. The Subject Property is located in the Thrower Park Neighborhood, which is privatized military housing comprised of approximately 100 homes and located near Keesler Air Force Base in Biloxi, Mississippi. At all times mentioned herein, the Subject Property was owned, controlled or managed by one of Defendants.

### 13.

At the time Plaintiffs entered into the Military Lease Agreement, Thrower Park was owned and operated by Forest City Southern and managed through Forest City Residential Management. In 2016, Thrower Park was acquired by Hunt Southern and operated or managed

through Hunt MH Property Management. Upon information and belief Forest City Southern and Hunt Southern exercised custody and control over Thrower Park and acted as the owners of Thrower Park through a fifty year lease initiated by the United States Department of Defense through a program called the Military Housing Privatization Initiative. Essentially, while Defendants own the improvements on the land and maintain custody and control of the property, the United States maintains an ownership interest in the land.

14.

While residing in the Subject Property, Plaintiffs repeatedly reported maintenance concerns involving mold and water damage. Despite Defendants' maintenance technicians reporting that the mold and leaks were resolved, it was learned that the air conditioner ductwork had a sweating problem and that the mold problem was more pervasive. This duct sweating, caused by poorly insulated ductwork, contributed to the mold and water damage throughout the house. Further it has been recently shown that Defendants have taken significant steps to replace the ductwork in many of the houses they operate.

15.

Plaintiffs' maintenance records show repeated requests for Defendants to address mold and leaking problems while they lived in the Subject Property. The maintenance records show that the mold was simply "cleaned with soap and water" instead of being removed. Fraudulent misrepresentations were made to Plaintiffs by Defendants regarding the removal of the mold. Plaintiffs were told that the mold problem had been rectified when in fact the cause of the water damage was not addressed. Throughout the entire time Plaintiffs resided in the Subject Property, Defendants never replaced the air conditioner filters. Plaintiffs replaced the filters on their own.

16.

Rather than addressing the cause of the leaks, Defendants' maintenance technicians cleaned the mold with soap and water. This allowed for the toxic mold to continue flourishing beneath the surface. Although Defendants learned that condensation coming from attic ductwork, nothing was done to repair the moisture problem.

17.

In June of 2016, Plaintiffs were placed in a vacant, but furnished house by Defendants so that Defendants could fix issues in the Subject Property's attic and repair a cracked wall. Despite these efforts, issues with mold continued. On or about September 14, 2016 Plaintiffs reported more mold in the bathroom, around the outlets in one of the bedrooms, and on the ceilings throughout the first floor of the Subject Property.

18.

On or about September 16, 2016, Defendants told Plaintiffs that mold could not be seen on the ceilings of the Subject Property but that the ductwork was sweating over the affected areas. Defendants again sprayed and wiped the ceilings with soap and water.

19.

On January 2, 2017, testing was performed on the Subject Property with Mold Test USA. Mold Test USA performed a 52 Point Visual Inspection and tested both outside and inside the Subject Property for mold spores. The reports showed high levels of Aspergillus inside the Subject Property with less being found outside the Subject Property. These elevated levels of toxic mold are well-known for causing serious health concerns. See Mold Test USA Mold Reports attached hereto as **Exhibits "B and C."**

20.

Plaintiffs have obtained information from other military housing families leading them to believe that mold issues such as those experienced in their home were commonplace, having occurred in other military housing owned and operated by Defendants including others in Thrower Park.

21.

Plaintiffs have been unable to afford to relocate and have not been offered a different unit that is not contaminated. Plaintiffs have suffered property loss due to the mold contamination without having been compensated for any of their losses.

22.

As a direct result of the continued exposure to toxic mold located in Plaintiffs' home, all of which was known to Defendants, Plaintiffs have suffered and continue to suffer physical injuries, medical expenses and property damage.

23.

The Subject Property is a water damaged building, a residential structure which has been subject to excessive water intrusion from both external and internal water leaks and moisture accumulation. The term "water damaged building" is also used in conjunction with a descriptive term now used by the National Academies of Science, the U.S. Centers for Disease Control, and the World Health Organization, i.e., "damp indoor spaces" and "mold related illness," all of which collectively describe a mixture of biologically generated contaminates known to cause adverse human health effects. Damp Indoor Spaces are now recognized by multiple federal and medical authorities as a public-health problem, contributing to tens of thousands of illnesses across the country and billions of dollars in medical costs.

24.

In this case, Plaintiffs had a certified mold investigator identify excessive mold growth and moisture inside the house, typical of a damp indoor space, both by sampling and visual observation. Aspergillus, known to be a powerful respiratory irritant, was found in the home during the air test. This spore is particularly dangerous, as it is well known to grow in excessive numbers in damp indoor spaces and to release mycotoxins and VOCs, and have toxic impacts of its own. The tests exceeded all bounds of sampling error and demonstrate the extremely dangerous conditions Plaintiffs are forced to live in.

25.

Defendants, as large, national managers and owners of thousands of apartment and residential units knew full well of the health risks associated with water damaged buildings and mold. Defendants failed to remediate mold in the Subject Property and caused serious injury and property loss to Plaintiffs as a result.

## COUNT I

### NEGLIGENCE

26.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 25.

27.

Defendants, as owners and/or managers of Thrower Park:

A.    Failed to provide a reasonably safe premises in accordance with the Military Lease Agreement, which amounted to a breach of the implied warranty of habitability;

B.    Negligently failed to pay for relocation expenses;

C.      Failed to exercise reasonable care to repair dangerous defective conditions upon notice of their existence by Plaintiffs;

D.      Negligently failed to maintain the air conditioning system and ducts in such a way allowing ideal conditions for toxic mold to grow in the Plaintiffs' house, including never replacing the air conditioner filters;

E.      Negligently managed and maintained Thrower Park;

F.      Negligently supervised their employees, agents and/or representatives;

G.      Negligently trained and supervised their employees, agents and/or representatives;

H.      Negligently inspected Thrower Park for dangerous and harmful conditions;

I.      Negligently remediated the toxic mold contained in the Subject Property;

J.      Knew or should have known that the house contained dangerous levels of toxic mold and did nothing to remedy the toxic mold infestation;

K.      Failed to exercise reasonable care to repair dangerous defective conditions, which included the existence of mass amounts of toxic mold in the Subject Property, upon notice of their existence by Plaintiffs;

L.      Negligently failed to promulgate warnings to their tenants about the existence of toxic mold and/or the possibility of the development of toxic mold; and

M.      Failed to prevent any and all other acts of negligence which may be proven at trial by failing to fulfill its duties to Plaintiffs, thus causing damages which they have suffered.

28.

As a direct and proximate result of the negligence of Defendants, Plaintiffs sustained serious and painful personal injuries, extreme mental and physical pain and suffering, anxiety,

anguish and upset, losses and damage to their quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

## COUNT II

## GROSS NEGLIGENCE

29.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 28.

30.

At all times mentioned herein, Defendants acted with gross negligence in total disregard of the duties owed to Plaintiffs to the degree that said gross negligence constitutes an intentional act.

31.

As a direct and proximate result of the gross negligence of Defendants, Plaintiffs have suffered injuries as described herein.

## COUNT III

## BREACH OF CONTRACT

32.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 31.

33.

Defendants breached the Military Lease Agreement entered into with Plaintiffs on July 12, 2013. The contract was breached for the following reasons:

A.    Defendants violated the Implied Covenant of Good Faith and Fair Dealing when they failed to deal fairly and in good faith causing Plaintiffs to not benefit from the contract;

B.    Defendants violated the Implied Warranty of Habitability, which is implied in all residential leases, when they leased to Plaintiffs a house that was not fit for human habitation;

C.    The negligent management and maintenance of the property led to the moist environment, which is ideal for toxic mold growth;

D.    Defendants failed to successfully complete the annual physical maintenance inspection of the property to ensure the house was up to housing maintenance quality standards by finding and repairing moist conditions that existed in the house;

E.    Defendants' employees or agents physically inspected the Subject Property after the complaints about toxic mold were made to Defendants and nothing was done to properly remedy the toxic mold infestation;

F.    Toxic mold spores were visible in plain sight so that Defendants' employees were able or should have been able to witness toxic mold growing in the houses and still did nothing to remedy the toxic mold infestation; and

G.    Defendants failed to honor the lease provision which allows for relocation of the tenant in the event the housing becomes uninhabitable. Further the lease provides that "Owner shall pay the cost of the relocation."

34.

As a direct and proximate result of Defendants' breaching the contract with Plaintiffs and providing an unreasonably dangerous house, Plaintiffs sustained serious and painful, extreme mental and physical pain and suffering, anxiety, anguish and upset, losses and damage to their quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

## COUNT IV

## CIVIL CONSPIRACY

35.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 34.

36.

At all times mentioned herein, Defendants operated under an agreement between two or more persons or entities to accomplish the unlawful purpose of concealing dangerous conditions within the Subject Property. Additionally, each Defendant committed overt acts in furtherance of this conspiracy to conceal the dangerous condition causing damage to Plaintiffs.

## COUNT V

## ALTER EGO

37.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 36.

38.

At all times mentioned herein, Defendants, and each of them, inclusive of Unknown John and Jane Does A through M and Unknown Entities N through Z, were authorized and empowered by each other to act, and did so act, as agents of each other, and all of the things herein alleged to have been done by them were done in the capacity of such agency. Defendants disregarded corporate formalities and used the corporate form to commit the aforementioned malfeasance. Upon information and belief, all Defendants are responsible in some manner for the events described herein and liable to Plaintiffs for the damages they have incurred.

## COUNT VI

## FRAUDULENT CONCEALMENT

39.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 38.

40.

Defendants are guilty of fraudulent concealment which, in accordance with Miss. Code §15-1-67, results in Plaintiffs' cause of action accruing when "such fraud shall be, or with reasonable diligence might have been, first known or discovered." The fraudulent actions of Defendants are:

A.      Defendants took affirmative action designed or intended to prevent Plaintiffs from discovering the presence of toxic mold in their home, which affirmative action did in fact work to prevent them from discovering the toxic mold, until such time as action was taken by Plaintiffs to confirm the presence of the toxic mold;

B.      Defendants' maintenance technicians repeatedly reported that the toxic mold and leaks were located, repaired and removed when in fact they were not;

C.      Defendants did not disclose to Plaintiffs that they knew that toxic mold was a problem in the military housing they owned and managed;

D.      Defendants did not disclose to Plaintiffs that they knew that toxic mold had caused serious health problem to residents of military housing they owned and managed; and

E.      Defendants did not disclose to Plaintiffs that they knew the military housing they owned and managed suffered from serious construction defects that caused damp indoor spaces making the growth of toxic mold foreseeable.

## COUNT VII

## INTENTIONAL ENDANGERMENT

### 41.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 40.

### 42.

At all times mentioned herein, Defendants' actions were intentional and endangering to Plaintiffs. This included intentionally endangering Plaintiffs by allowing them to live in dangerous housing conditions, intentionally endangering Plaintiffs by allowing the dangerous conditions to persist, intentionally endangering Plaintiffs by failing to remedy the dangerous conditions, and intentionally endangering Plaintiffs by failing to relocate Plaintiffs after the dangerous conditions were discovered.

## DISCOVERY RULE

### 43.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 42.

44.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the discovery rule. Plaintiffs suffered from a latent injury, undiscoverable by reasonable means. Plaintiffs neither knew nor should have known that they had been harmed, much less that their harm was caused by the wrongful conduct of Defendants until such time that was within the limitations period applicable to the claims they have asserted.

## CONTINUING TORT

45.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 44.

46.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the continuing tort doctrine. Defendants inflicted injury upon Plaintiffs over a period of time by engaging in continuous wrongful conduct which has continued while Plaintiffs continue to live in the Subject Property.

## DISABILITY OF INFANCY

47.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 46.

48.

Makayla and Gabriella are minors, tolling the applicable statute of limitations in accordance with the minors savings clause. See Miss. Code Ann. § 15-1-59.

## DAMAGES

49.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 48.

50.

As a direct and proximate result of the Defendants' wrongful and negligent conduct, Plaintiffs sustained serious injuries, losses, and damages as follows:

A. Plaintiff, Joshua Foster, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for;

B. Plaintiff, Jessica Foster, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for;

C. Plaintiff, Makayla Foster, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for;

D. Plaintiff, Gabriella Foster, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses

and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for.

## PUNITIVE DAMAGES

### 51.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 50.

### 52.

At all times mentioned herein, Defendants acted with actual malice and/or gross negligence which evidenced a willful, wanton, or reckless disregard for others, or committed actual fraud, and such actions were so oppressive and overbearing that in order to punish the wrongdoer and deter similar misconduct in the future, Defendants should be subject to punitive damages consistent with the statutory scheme in the State of Mississippi. Specifically, after considering Defendants' financial condition and net worth, the nature and reprehensibility of Defendants' wrongdoing, Defendants' awareness of the amount of harm being caused, and Defendants' motivation in causing such harm, the duration of Defendants' misconduct and attempts to conceal such misconduct, and Miss. Code Ann. § 11-1-65, Defendants should be subject to punitive damages in an amount to be proven at trial and decided by the jury.

## ATTORNEYS' FEES

### 53.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 52.

### 54.

Defendants are liable for all reasonable attorneys' fees, costs, and expenses incurred in pursuit of this cause if found liable for punitive damages or fraud.

## PRAYER

WHEREFORE, Plaintiffs pray that after due proceedings are had that a Judgment be rendered in favor of Plaintiffs and against Defendants for damages in an amount to be proven at the trial of this cause, said damages including actual damages, compensatory damages and any other such damages to which Plaintiffs may be entitled and which may be proven at the trial of this cause, for a punitive damages amount based on Defendants' financial condition and net worth, for attorneys' fees, for post-judgment interest, or for such other amount consistent with the statutory scheme in Mississippi for the awarding of such damages, for all costs of this cause and for such other relief to which Plaintiffs may be entitled under the premises.

Respectfully submitted,

**JOSHUA FOSTER, JESSICA FOSTER,
AND MAKAYLA FOSTER AND
GABRIELLA FOSTER MINORS, BY AND
THROUGH THEIR NATURAL GUARDIANS,
JOSHUA AND JESSICA FOSTER
PLAINTIFFS**

**BY:** _____

**WILLIAM LEE GUICE III
MS BAR # 5059
MARIA MARTINEZ
MS BAR # 9951
RUSHING & GUICE, P.L.L.C.
P. O. BOX 1925
BILOXI, MS  39533
TELEPHONE: (228) 374-2313
FAX:  (228) 875-5987
ATTORNEYS FOR PLAINTIFFS**

# FORESTCITY
## RESIDENTIAL   Military Housing - Rental Application

21131420  Thrower **Park** (NDSU)
0145MCNA
rn0063623

## APPLICANT

Service Member: Joshua  Foster

Dual Service Member?   No

Address:  145 Mcnarney Dr.

Duty Phone:

Biloxi, MS  39531

Home Phone:  (575) 749-1777

eMail:  joshua.foster@cannon.af.mil

Cell Phone:

## Other Resident Info

Duty Postal Code:  39534

Pay Grade:  E06

Marital Status:  Married

ADA Req?:

Military Branch:  Air Force

Unit/Org/Squadron:  ~~KEES-OTH~~

Soc. Sec.#:  172627561

Rank:  ~~Government~~

## Additional Info

Scheduled PCS Date:

Date of Birth:

Child Dev. home:

1st pet type:

Vehicle 1 Make:

1st pet breed:

Vehicle 1 Model:

1st pet weight:

Vehicle 1 Tag:

2nd pet type:

Vehicle 2 Make:

2nd pet breed:

Vehicle 2 Model:

2nd pet weight:

Vehicle 2 Tag:

## Dependent Info

| Name | SSN(Dual SVM only) | Relationship | Date of birth | PayGrade | Branch of Service |
|---|---|---|---|---|---|
| Jessica Foster | 111111111 | Spouse | 26 Jun 1980 | | |
| Makayla Foster | 111111111 | Child | 23 Dec 2009 | | |

## IN CASE OF EMERGENCY:  I hereby give consent to contact the individual(s) below:

~~Local~~ Contact Name:
(Other than Household Member)

Relationship:

Address:

Phone No.:

## Acknowledgement and Agreement

Applicant agrees that Forest City Residential Management, Inc., (FCRMI) shall not be liable for any delay in the date said family home is ready for occupancy.
Applicant represents that all the statements herein are true and authorizes FCRMI and/or it agents to verify the information contained herein.  Applicant
acknowledges that false information herein may constitute grounds for denial of this Application, terminating the right of occupancy, and may constitute a
criminal offense under the laws of this state.  Applicant agrees to notify FCRMI of any material change in the information provided on this Application.  FCRMI
may obtain investigative consumer reports from employers, landlords, law enfor[...] agencies or other applicable sources.  Under 15

**EXHIBIT**

**A**

Applicant's Signature:

Installation: <u>Keesler Air Force Base</u>
Forest City Southern Group, LLC
Neighborhood Management Office
303 Patrick Drive
Biloxi, MS 39531
Harrison County
(228) 374-5336

## MILITARY LEASE AGREEMENT

| | | |
|---|---|---|
| 1. Lease Agreement Date: July 12, 2013 | 6. Premises Address: | 0145MCNA |
| 2. Resident(s)   m0063623   Pay Grade: | 145 Mcnarney Dr. | |
| Joshua Foster   E06 | Biloxi, MS 39531 | |
| | 7. Monthly Rent: | $1,332.00 |
| | 8. Partial Month Rent: | 843.60 |
| 3. Other Occupants: | 9. Partial Month Rent Due Date: | August 1, 2013 |
| Jessica Foster | 10. Security Deposit: | 0 |
| Makayla Foster | 11. Late Charge: $50.00 as specified in Paragraph 5 | |
| | 12. Returned Check: $35 as specified in Paragraph 5 | |

4. Lease Term:
   a. Commencement Date:       July 12, 2013
   b. Expiration Date:          July 31, 2014
5. Neighborhood:    Thrower Park (NDSU)

Resident agrees to pay Rent to Owner by monthly electronic Allotment. Resident authorizes the Allotment to be initiated and changed as set forth in Paragraph 4 of this Lease Agreement. Authorization is also given to stop the Allotment at the time that the Lease Agreement is terminated.

This Lease Agreement is a legally binding contract. Owner and Resident agree that this Lease Agreement and the contractual relationship between the parties shall be construed in accordance with and shall be governed by the laws of the State of Mississippi and County of Harrison, except to the extent those laws may conflict with federal laws or regulations.

Owner and Resident accept the terms and conditions of the Lease Agreement. The Lease Agreement includes this Lease Agreement, the Community Handbook and any addenda, and sets forth all promises, agreements, and understandings between Owner and Resident. The terms and conditions of this Lease Agreement may only be changed if in writing and signed by both Owner and Resident. Oral changes or agreements are not permitted.

Forest City Residential Management, Inc., Agent for Owner, Forest City Southern Group, LLC.

By Authorized Representative: _____     7/12/13
                                                              Date

Resident: _____     Resident: _____
                              Date                                       Date

**Addenda:**

| | | | |
|---|---|---|---|
| ❑ | Community Handbook | ❑ | Other: |
| | Dated 09/11 | ❑ | Other: |
| ❑ | Mold Addendum | ❑ | Other: |
| ❑ | Third Party Allotment Addendum | ❑ | Other: |
| ❑ | Pet Addendum | ❑ | Other: |
| ❑ | Current Resident Addendum | | |

**EQUAL HOUSING OPPORTUNITY**

# THIRD PARTY ALLOTMENT ADDENDUM

This will serve as an Addendum to the Lease Agreement dated _7 - 12 - 13_ regarding property located at __145 McNesney Dr__ (the "Premises"), between Forest City Southern Group, LLC ("Owner") and __Joshua Foster__ (who is the highest ranking military member that will reside in the Premises, referred to in this Addendum as "Resident").

1. **Payment by Allotment.** Resident agrees to pay Monthly Rent to Owner for the Premises as determined in the Lease Agreement, to be paid by allotment and/or electronic transfer (the "Allotment").

2. **Managing Agent.** Owner shall contract with a third party managing agent for the processing of all of Resident's Allotment-related starts, stops and changes. The third party managing agent is Military Assistance Company/Fort Knox National Company ("MAC").

3. **Resident Consent and Authorization.** Resident hereby authorizes Owner to act on behalf of Resident to start, stop and change Resident's Allotment for Monthly Rent under the Lease Agreement. Changes may be made for any valid reason under the Lease Agreement to include, but not be limited to, annual rate adjustments. Resident acknowledges that he/she shall not attempt to make any changes to the Allotment, and agrees that the Allotment may not be canceled prior to the satisfaction of the final Monthly Rent payment due under the Lease Agreement. Any actual or attempted cancellation of the Allotment by Resident is grounds for Owner to terminate the Lease Agreement.

4. **Documentation.** Resident agrees to execute any and all documents which are necessary to authorize Owner and/or MAC to control the Allotment. Resident understands that he/she may not be permitted to occupy the Premises until the appropriate Allotment documentation has been completed.

Resident:

_____

_____

Date: _____

Forest City Residential Management, Inc.
Agent for Owner

By: _Freddie L. F_____

Date: _7/12/13_

# RENT IN ARREARS ADDENDUM

This will serve as an Addendum to the Lease Agreement dated ___2-12-13___ (the "Lease Signature Date") between Forest City Southern Group, LLC ("Owner") and ___Joshua Foster___ ("Resident") regarding property located at ___145 McCrosBey___ (the "Premises").

Owner and Resident agree to the following amendment to the Lease Agreement:

The third paragraph, fourth sentence of Section 4 is amended to read: "Resident BAH allotments shall be payable on the first day of the month for the prior month's rent."

All other terms and conditions of the Lease Agreement shall remain in full force and effect.

Resident:

_____

_____

Date: _____

Forest City Residential Management, Inc.
Agent for Owner

By: _____

Date: _____7/12/13_____

Forest City Southern Group LLC
Neighborhood Management Office
303 Patrick Drive
Keesler, MS 39531
Harrison County
(228) 374-5336

RE: An Important Notice to Residents about Your Payments Paid by Check

Please be advised that Forest City Southern Group LLC electronically processes your payments that are paid by check. Your checks will be converted into electronic transactions and processed through the Automated Clearing House (ACH) network—the same system commonly used for direct deposit payroll.

Simply pay by check as you would normally do—it's that easy. The receipt of your check will authorize us to electronically debit the bank account on which the check was written. Please note that your check can clear as early as the day it is scanned, and that you will not receive your check back from your financial institution.

Your electronic payments will appear on your bank statement as an electronic debit, showing the date of the debit, your check number if applicable, and on the payee line, "Forest City Southern Group LLC."

You may drop off your payment at the lock box or when visiting our offices, or you may mail your payment to the Management Office. When you provide a check as payment, your check will be converted into an electronic transaction and processed through the Automated Clearing House (ACH) network.

Sincerely,                                           Household Initials and Date:


Jamie Seehafer                                       _____

Forest City Southern Group LLC                       Address:

                                                     145 McNorney

FMNH11.006A (07/11)

# MOLD ADDENDUM

This will serve as an Addendum to the Lease Agreement dated _7-12-13_, between Forest City Southern Group, LLC, Owner, and _Joshua Foster_ ("Resident"), regarding property located at _145 McNoeery Dr._ (the "Premises").

Owner desires to maintain a quality living environment for Resident. To help achieve this goal, it is important for the Owner and Resident to work together to minimize any mold growth in the Premises. This Addendum contains information for Resident, and the responsibilities of both Resident and Owner.

1. **ABOUT MOLD:** Mold is found virtually everywhere in the environment – indoors and outdoors in new and old structures. When excess moisture is present inside a Premises, mold can grow. Appropriate precautions need to be taken to minimize the potential for mold growth in the Premises.

2. **PREVENTING MOLD:** In order to minimize the potential for mold growth, Owner recommends the Resident should do the following:

   a. Keep the Premises clean – particularly the kitchen, bathroom(s), carpets and floors. Regular dusting, vacuuming and mopping removes household dirt and debris that contribute to mold growth. Use environmentally safe household cleaners. A vacuum cleaner with a HEPA filter will help remove mold spores. Immediately throw away moldy food.

   b. Do not block or cover any heating, ventilation, or air conditioning ducts. Whenever possible, maintain a temperature of 50 to 80 degrees Fahrenheit in the Housing Unit.

   c. Remove visible moisture accumulation on countertops, windows, windowsills, walls, ceilings, floors, and other surfaces as soon as reasonably possible. Periodically clean and dry the walls and floors around the sink, bathtub, shower, toilet, windows, and patio doors using a common household disinfecting cleaner. Blot dry spills on carpeting.

   d. Look for leaks in washing machine hoses, faucets, and discharge lines, especially if the leak is large enough to infiltrate into nearby walls.

   e. Use the bathroom fan when bathing or showering and allow the fan to run until all excess moisture has been vented from the bathroom. Keep the shower curtain inside the tub or fully close the shower doors when showering. After taking a shower or bath: (i) wipe moisture off of shower walls, shower doors, the bathtub and the bathroom floor; (ii) leave bathroom door open until all moisture on the mirrors and bathroom walls and tile surfaces has dissipated; and (iii) hang towels and bath mats so they will completely dry out.

   f. Use the exhaust fan in the kitchen when cooking or while running the dishwasher and allow the fan to run until all excess moisture has been vented from the kitchen.

   g. Open windows and doors on days when the outdoor weather is warm and dry (humidity is below 50 percent) to help humid areas of the Premises dry out. Run the fan on the furnace to help circulate fresh air. Keep windows and doors closed in damp, humid, or rainy weather.

   h. Clean the lint filter in the clothes dryer after each use and promptly report any damage to the vent connection. If condensations forms in the area, wipe it dry. Dry damp clothing as quickly as possible.

    i. Limit houseplants to a reasonable number to limit excess humidity and limit molds that could grow on the soil surface. Avoid over watering.

    j. Do not overfill closets or storage areas. Overcrowding restricts airflow.

    k. Promptly report to the Neighborhood Management Office:

        i. Any leak, water damage, or signs of water infiltration;

        ii. Any malfunction in the heating, ventilation, or air conditioning system;

        iii. Windows or doors that do not open or close properly;

        iv. Any areas of visible mold (except very small areas that respond to routine cleaning);

        v. Musty or moldy odors;

        vi. Health issues that Resident thinks may be linked to the air quality within the Premises;

        Owner will respond in accordance with this Lease to repair or remedy the situation as necessary.

3. **EXISTING MOLD:** If small areas of mold have already formed on non-porous surfaces (such as ceramic tile; Formica, vinyl flooring, metal, wood or plastic), the Environmental Protection Agency ("EPA") recommends cleaning the areas with soap or detergent and water, letting the surface dry, and then, within 24 hours, applying a pre-mixed, spray-on-type household biocide, such as Lysol Disinfectant®, Pine-Sol Disinfectant®, Tilex Mildew Remover®, or Clorox Cleanup. Tilex and Clorox contain bleach that can discolor or stain. **Follow the instructions on the container.** Applying biocides without first cleaning away the dirt and oils from the surface is like painting over old paint without first cleaning and preparing the surface. Always clean and apply a biocide to an area 5 or 6 times larger than any visible mold because mold may be in adjacent areas, but not yet visible to the naked eye. A vacuum cleaner with a high-efficiency particulate air ("HEPA") filter can be used to help remove mold products from porous items such as sofas, chairs, drapes and carpets – provided fibers are completely dry. Machine washing or dry cleaning will remove mold from clothes.

4. **DO NOT CLEAN OR APPLY HOUSEHOLD BIOCIDES TO:** (a) visible mold on porous surfaces such as sheetrock walls or ceilings; or (b) large areas of visible mold on non-porous surfaces. Instead, notify Owner in writing; Owner will take appropriate action in compliance with applicable law.

5. **COMPLIANCE:** If Resident fails to comply with this Addendum, Resident may be held responsible for damage to the Premises and any health problems that may result.

Resident:

_____

_____

Date:

Forest City Residential Management, Inc.
Agent for Owner

By: _Freddi L. J_

Date: _7/13/13_

# FORESTCITY
### RESIDENTIAL

## WEAPON REGISTRATION FORM

The possession of personal firearms, government-owned arms and ammunition will be in accordance with the laws of the State of Mississippi and any local laws or ordinances. All firearms must be registered with the Neighborhood Management Office within three (3) days of occupancy or procurement of firearms. Firearms and ammunition must be stored separately in safe, locked locations. Loaded guns in the Premises are prohibited. Possessing a weapon prohibited by state/local ordinance or displaying or discharging a weapon in the Community is prohibited. Hand grenades, bombs and blasting explosives are prohibited. Failure to adhere to this provision is a material breach of the Lease Agreement.

| Weapon | Registration | How Stored |
|--------|-------------|-----------|
| | | |
| | | |
| | | |
| | | |
| | | |

Resident:

_____

_____

Date: _____

Forest City Residential Management, Inc
Agent for Owner

By: _Freddie L. J_____

Date: _7/12/13_____

# FLAG ADDENDUM

This will serve as an Addendum to the Lease Agreement dated _7-12-13_ between Forest City Southern Group, LLC, Owner, and _Joshua Foster_ ("Resident"), regarding property located at _145 McDonney Dr_ (the "Premises").

Resident has requested permission to display and hang a United States Flag, a standard Military Service flag or other flags on or about the Premises. United States Flags are an expression of support and patriotism. Standards for handling and displaying the U.S. Flag are set forth by the United States Code, written into law by Congress in 1942. Owner is willing to permit the display and hanging of flags in accordance with the following terms to which Resident hereby agrees:

1.  A standard size United States flag and appropriate apparatus (pole and stanchion) must be mounted in an approved exterior area on the Premises for flying the flags. Stanchions and poles must be securely attached to the exterior of the residence. Stanchions and poles should be weather resistant and made of durable materials.

2.  Size and type of flags shall be approved by the Neighborhood Management Office before displaying and use.

3.  Resident may not damage or alter the Premises and may not drill holes through outside walls. Flags shall be located at a reasonable height that is within reach of the Resident without obstructing entrances or windows.

4.  The union of the U.S. Flag should be at the peak of the staff unless the flag is at flying at half staff.

5.  U.S. Flags shall normally only be displayed from sunrise to sunset, but may be displayed twenty-four a day if properly illuminated during the hours of darkness. If US. Flags are displayed after sunset, appropriate spot lighting controlled by an interior switch (inside the home) is required to ensure flags are illuminated at night. Lighting installation must comply with reasonable safety standards and not be connected to the electrical system or wiring of the Premises.

6.  U.S. Flags may be displayed every day, but especially on:
    a.  New Year's Day
    b.  Inauguration Day
    c.  Martin Luther King Jr. Birthday
    d.  Lincoln Birthday
    e.  Washington Birthday
    f.  Easter Sunday
    g.  Mother's Day
    h.  Armed Forces Day
    i.  Memorial Day

j.  Flag Day
k.  Father's Day
l.  Independence Day
m.  Labor Day
n.  Constitution Day
o.  Columbus Day
p.  Navy Day
q.  Veterans Day
r.  Thanksgiving Day
s.  Christmas Day
t.  State Birthdays
u.  State Holidays
v.  Other days proclaimed by the President of the United States

7.  No disrespect shall be shown to the flag of the United States of America. The flag should not be dipped to any person or thing.

8.  The U.S. flag should never touch anything beneath it, such as the ground, the floor, water, or merchandise.

9.  The U.S. flag should never be displayed with the union down, except as a signal of dire distress in instances of extreme danger to life or property.

Resident:                                          Forest City Residential Management, Inc.
                                                   Agent for Owner

_____

_____          By: _____

Date: _____             Date: _____

## FOREST CITY
### R E S I D E N T I A L

## PERMISSION TO ENTER

COMMUNITY NAME: _Thrower Park_

ADDRESS: _145 McDarney Dr_

## ROUTINE MAINTENANCE AND/OR SERVICE REPAIRS

☐ Permission is hereby given to Management to enter my home for maintenance and repairs as requested. It is understood that this permission covers service and repairs in my home by management personnel and/or their subcontractors.

☐ I prefer to make provisions to sign for permission to enter for _each_ service and/or repair requested

Resident's Signature: _____ Date: _____

Resident's Signature: _____ Date: _____

## DELIVERY AND/OR INDIVIDUAL PERMISSION TO ENTER

**NOTE:** Written permission from the resident must be given to Management to permit persons or companies to have access to their home for delivery or service. Management assumes no responsibility for damaged or missing items.

| DATE | REASON FOR ENTRY | PERSON/COMPANY TO ENTER | RESIDENT'S SIGNATURE |
|------|------------------|-------------------------|----------------------|
|      |                  |                         |                      |
|      |                  |                         |                      |
|      |                  |                         |                      |
|      |                  |                         |                      |
|      |                  |                         |                      |
|      |                  |                         |                      |
|      |                  |                         |                      |

*PERMISSION TO ENTER YOUR HOME IS NOT REQUIRED IN CASE OF AN EMERGENCY*
Emergency situations include breaks in water/heating pipes, water leaks, smoke or fire, cause to believe a critical medical problem exists, or structural damage to your home.

DISTRIBUTION:        Resident's File

FOREST CITY RESIDENTIAL MANAGEMENT, INC.          FMNH9.000B   (5/04)

# ACCESS GATE ADDENDUM

This will serve as an Addendum to the Lease Agreement dated ___7-12-13___, between
Forest City Southern Group, LLC, ("Owner"),
and

("Resident"), regarding property located at ___Joshua Foster___
(the premises) ___145 McRaney Dr.___

1. The Neighborhood is equipped with electronically controlled access gates. The installation of access gates does not constitute an agreement by Owner to provide security to Resident, Resident's family, guests, occupants or visitors of the Premises. Resident acknowledges that the access gates are mechanical devices that could periodically malfunction, fail or be rendered inoperative, and that there is no absolute guarantee that the access gates if they properly function will in any way increase security or prevent theft, assault, vandalism or damage to the person or property of Resident. Resident agrees that Owner shall not be liable for any injury, damage, or loss to any person or property of Resident caused by any other person including but not limited to theft, burglary, trespass, assault, vandalism, or any other crime. Further, Resident agrees that Owner shall not be liable for any damage or loss of any motor vehicle or Resident which results from any of the access gates coming into contact with any such motor vehicle, irrespective of whether such contact is the result of some problems, defect, malfunctions or failure of the access gates.

2. Express disclaimer of warranty: Neither management, owner, owner's agents, employees nor representatives make any warrant express or implied, as to the condition of access gates for their fitness for any particular purpose, or the likelihood that the access gates will increase the security of the property.

3. Resident acknowledges and agrees that Owner does not distribute, sell, supply, repair, service, or install the access gates. Although Owner agrees to take reasonable steps to cause the gates to be repaired, resident agrees that Owner is not responsible for any problem, defect, malfunction or failure of the access gates. Neither contained in the addendum shall in any way impose any responsibility, duty or liability upon Owner of the installation and or operation of the access gates. Resident shall never take demand upon, look to or institute or prosecute suit against Owner for any damage costs, loss of personal property (including, but not necessarily limited to motor vehicles), or damage to or injury to their person as a result of arising out of, or incidental to any problem, defect malfunction or failure of the access to increase security or prevent theft, burglary, trespass, assault, vandalism, or any other crime. Resident understands that this is an express covenant not to sue, and Resident here by releases Owner, and all liabilities connected with the access gates. Resident agrees that if Resident or any guests, or any other person providing a service to

4. I acknowledge receipt of two electronically coded controlled-access gate card(s). I accept full responsibility for the protection and safeguarding of the access card(s). I agree not to loan the access card(s) to another. I acknowledge that the access card(s) is the property of the Owner and has been issued by Owner. I understand that Owner has the right to limit or restrict the use of the card and I agree to surrender the access card(s) upon demand. I agree to immediately notify the neighborhood management office should the access card(s) be lost, stolen, or misplaced. I agree to pay $10 per card should it become necessary to issue a replacement access card.

Resident:

_____

_____

Date: _____

Forest City Residential Management, Inc.
Agent for Owner

By: _____

Date: _____ 7/12/13

# Quick Reference Guide

- *Resident access is provided by means of cards and PIN codes. The system is only as secure as you make it. Please use discretion when sharing your guest code.*

- *Residents press # then 4 digit personal code*

- *Visitors (friends, mom, dad, pizza delivery guy) use the phone system to communicate with a resident who can grant or deny entry*
    - *Guests will look your name up in the directory*
    - *Next to your name is your Directory Code*
    - *When your guest enters this code, the system will place a call to you*
    - *To grant access to your guest, press 9 on your phone*
    - *To deny access, press the # key*

- *If you are on the phone when a guest tries to contact you, they will hear a busy signal and will have to wait for your call to end. To eliminate this problem, you can order call waiting from your phone provider.*

- *Guests can only contact you if your phone is turned on and you have a signal.*

- *If your card and/or PIN does not work:*
    - *Use the telephone entry system to call yourself and press 9.*
    - *If the gate fails to open, please move your car away from the gate to allow others to enter the neighborhood.*
    - *Contact the Forest City office at 228.374.5336.*

- *Only one car is permitted through the gate at a time.*

- *Gates are left open in the morning and afternoons to allow access for school buses and a smoother flow of traffic.*

- *Card replacement: $10*

- *To change the phone number your key cards are linked to, please come by the Management Office located at 303 Patrick Drive.*

- *In the event of a required evacuation, the gates will be opened allowing a clear exit path.*

- *Emergency personnel, FedEx, UPS, USPS all have access to the neighborhood*

# RECEPTION DEVICE ADDENDUM

This will serve as an Addendum to the Lease Agreement dated ___7-12-13___ , between
Forest City Southern Group, LLC, ("Owner"), _____ ,
and
___Joshua Foster___
("Resident"), regarding property located at ___145 McDerney DC___
(the "Premises").

Resident may install a satellite dish or stick-type reception device (collectively and separately, the "Reception Device") on or about the Premises to receive direct broadcast satellite, fixed wireless signals via satellite, and commercially available analog or digital TV. Resident hereby agrees to comply with the following:

1.   The Reception Device must be approximately 39.37 inches or less in diameter if a dish or less than 39.37 inches in length if a stick-type Reception Device.

2.   The Reception Device shall be installed safely and securely after all appropriate permits have been obtained. The Reception Device shall be installed and operated in accordance with all applicable federal/state/local laws and regulations. In the event the Resident is cited because the installation constitutes a building or fire code violation, the Resident is responsible for immediate correction and compliance with the building or fire codes. Resident shall be responsible for any interference caused or generated by the Reception Device.

3.   Installation must be in strict accordance with plans and specifications (the "Plans") submitted to Owner and approved by Owner in writing, which approval shall not be unreasonably withheld, delayed or conditioned. The Plans must set forth the precise size, color, and weight of the Reception Device; the precise location where the Reception Device is to be located; and all wiring and other facilities to be installed. Appropriate cable raceways and brackets must be set forth on the Plans.

4.   The Reception Device must be located entirely within the Resident's Premises and shall not be installed in any common area. The Reception Device must not be installed on windows, firewalls, outside walls, glass, outside windowsills, roofs, or balconies. The Reception Device cannot be mounted on the side of a building.

5.   Resident may not damage or alter the Premises to install the Reception Device. No holes whatsoever may be drilled through outside walls, firewalls, glass, windows, roofs, balconies, balcony railings, or through anything else. No holes may be drilled through walls or anything else to bring in wires.

6.   The Reception Device must not protrude or hang over any balcony or extend beyond the patio or balcony railing line. The Reception Device must not be installed upon an overly elongated pole or any extension device that hangs out over a balcony.

7. Resident's installation: (a) must comply with reasonable safety standards; (b) may not interfere with the Neighborhood's cable, telephone or electrical systems or those of neighboring properties; (c) may not be connected to the Neighborhood's telecommunications systems; (d) may not be connected to the electrical system except by plugging into a 110-volt duplex receptacle, and (e) cannot be placed within unsafe distances from power lines. Owner may require reasonable screening of the Reception Device by plants, etc., so long as it does not impair reception.

8. The Reception Device shall be installed and operated in accordance with all applicable laws and regulations. Owner and/or Agent for Owner shall not be liable in any manner by reason of their approval of the Plans, and Resident assumes all such liability and is solely responsible for the Plans and the compliance of the Plans with all applicable laws and regulations.

10. Resident will remove the Reception Device on or before the expiration or termination of the Lease Agreement. Resident will repair all damage caused by the removal and will restore the Premises to its prior condition before the installation of the Reception Device.

Resident:

_____

_____

Date: _____

Forest City Residential Management, Inc.
Agent for Owner

By: _____

Date: _____  7/12/13



## PET AGREEMENT
## ADDENDUM TO RENTAL AGREEMENT

This will serve as an Addendum to the Rental Agreement dated _7-12-13_, between Forest City Residential Management, Inc., ("Landlord"), as Agent, and _Joshua Foster_ ("Resident"), regarding property located at _145 McSherry TX_, (the "Home").

1. Resident is authorized by the Landlord to keep a pet, described as:

| **Type:** | **Size:** | **Color:** | **Name:** |
|---|---|---|---|

Attach photo.

Landlord has the right to refuse certain breeds. Those breeds are identified in the Rules and Regulations of your Rental Agreement. All pets must be licensed in accordance with any applicable state/local laws and regulations. All dogs four months of age and older must be licensed by the City and County of Honolulu and wear a collar with the city and county dog tag attached. Licenses must be renewed on or before the expiration date of current tags. All cats are required to have an identification tag on their collar with the owner's name, address and telephone number.

The pet(s) must have current inoculations and Resident shall submit records of inoculation upon Landlord's request. Rabies immunizations are required for dogs and cats and must be documented with shot tags on the pet's collar.

Resident's liability includes, but is not limited to, property damages, cleaning, deodorization, flea extermination costs, carpet or other flooring replacement, and/or personal injuries. Resident will be liable for the entire amount of any injury to the person or property of others caused by such pet(s). Resident is encouraged to obtain liability insurance.

2. Resident agrees to comply with:

   A. The terms and conditions set forth herein;
   B. All applicable state/local laws and regulations, such as, but not limited to, licensing, inoculations, etc.; and
   C. Such rules and regulations as may be reasonably adopted from time-to-time by Landlord.

3. Resident acknowledges that the pet is housebroken and/or litter trained and/or cage trained and shall not permit the pet to cause any damage, discomfort, annoyance, nuisance or in any other way to inconvenience or cause complaints from any other Resident(s).

Animal misbehavior (vicious or nuisance) or violence is prohibited. If, in the Landlord's opinion and judgment, the pet has disturbed or is disturbing other residents, and/or has caused or is causing damage to the Home or other property within the Community, Resident agrees to permanently remove the pet from the Home and Community within 10 days of receipt of written notice from Landlord.

Pet Agreement – Addendum to Rental Agreement

4. Landlord has the right to inspect your Home for possible damages incurred by the pet with a twenty-four (24) hour notice.

5. All animals except dogs and cats must be kept in cages or tanks at all times. Dogs must be confined to the Home or restrained by a leash or fence in the back yard of the Home. Restraint shall include leashing or chaining the animal to a stationary object to preclude the animal from running free or interfering with the normal flow of pedestrians and traffic. Dogs outside Resident's yard must be leashed at all times. Both dogs and cats must be appropriately and effectively restrained and under the control of the Resident or occupant while on the property. No pets are permitted in the community rooms, lounge, laundry rooms, offices, recreation areas, or other common room areas.

6. Resident is responsible for removing pet waste promptly from the Home yards and the Community common areas. Litter and droppings must be wrapped and sealed before being disposed of in the trash. Violation of this regulation will result in an automatic waste removal charge of $20.00 per occurrence. If available, the Community will have a common area set aside for pet exercise and relief, but it remains the Resident's responsibility to clean up any waste from their pet. Dogs are not permitted on children's playgrounds.

7. Resident agrees to have the Home professionally treated for fleas and ticks prior to vacating. Proof of treatment must be provided to Landlord.

8. Violation of the above terms will be considered a breach of the Rental Agreement, which may result in removal of the pet from the Home and/or termination of the Rental Agreement.

Resident:                                         Forest City Residential Management, Inc.

_____     By: _____

_____     Date: _____7/12/13_____

_____

_____

Date: _____

**Keesler Community Center Agreement**
**300 Patrick Drive**
**Biloxi, MS 39531**

## PERMITTED USE

The Community Center is for use by Residents and occupants of Forest City Southern Group, LLC ("FCSG") homes, and authorized guests, service providers sponsored or approved by FCRM, and certain approved Air Force affiliated organizations. Equitable services will be provided for all programs and no program or user will receive preferential privileges. Rooms or spaces in the Community Center will not be designated for the exclusive use by any organization, nor used as an exclusive storage area by any organization. The Community Center may be used for social, recreational, educational and similar activities or functions. Retail sales activities, religious services, and political gatherings shall not be permitted. No one under the age of sixteen (16) is permitted without a parent or guardian at all times.

## INDEMNIFICATION AND HOLD HARMLESS

Neither FCRM nor FCSG, nor their principals, agents, and employees shall be liable for, nor does Resident/User of the Community Center waive, all claims for loss or damage sustained by FCRM or FCSG. Resident/User of the Community Center agrees to indemnify the following parties and hold them harmless: FCSG, management, agents, principals, and employees of FCRM (all of which parties are collectively referred to as "Indemnitors") from all claims, demands, actions, and causes of action, of whatever nature and including attorney fees, which arise in any way in connection with the provision of services by the Indemnitors or Indemnitors' agents or employees to provide such services to such Resident/Users; or in any way arising out of the provision of services, or failure to provide services, by the Indemnitors on the Community Center premises to any individual or individuals. Notwithstanding the foregoing, Resident/User will not hold Indemnitors harmless for any loss, damage, claims, demands, actions, or causes of action that result from the negligence or willful misconduct of the Indemnitors.

By signing this contract, the Resident/User certifies that:

Resident/User is a resident of a home in an FCRM managed Air Force Family Housing Community, or is otherwise authorized by FCRM to rent a Community Room, and all rent and fees due to FCRM are current and paid in full. Resident/User fully understands all terms of this rental agreement and will fully abide by this contract.

Resident/User Signature _____     Date _____

*145 McNarney*

Address _____     Phone Number _____

*Freddi L.*

FCRM Representative Signature _____     Date  *7/12/13*

- There will be no exception to this policy and any violation will result in the immediate termination of the function, as well as the Resident/User's Community Center privileges being revoked.

## ADDITIONAL RULES AND POLICIES _____

- Resident/User is required to abide by local fire codes, and the number of guests at an event may not exceed the maximum posted occupancy of that particular facility.
- Noise levels emanating from the event must remain at such a level as not to create a disturbance or nuisance to residents in the surrounding community.
- Smoking is NOT permitted on the premises of the Community Center.
- No decorations or meeting materials may be taped, tacked, or affixed to walls, windows, doors, ceilings, or ceiling fans.
- Thumb tacks, nails, paint, crayons, ink or any other material that might damage the walls, floors or other furnishings of the Community Center are prohibited, and if utilized, the Resident/User will bear the cost of returning the Community Center to its original condition.
- Pets (except authorized, trained service animals), firearms, and weapons are not permitted in the Community Center at any time.
- Resident/User will supervise all activities of persons under the age of sixteen (16) with a suitable number of adults.
- Resident/User will be responsible for their own security throughout their use of the Community Center.
- FCRM shall have the right to access the Community Center at anytime during the Resident/User's use.
- Parking at the Community Center is allowed in "Designated Areas" only.

## CLEANING RESPONSIBLITIES _____

Resident/User is required to clean the Community Center and return it to its previous condition, prior to vacating the premises. Keep in mind that others may be using the facility after your event. Cleaning time should be anticipated by Resident/User and be concluded within the rental time as indicated above. Resident/User should refer to the cleaning checklist provided by FCRM prior to the event.

- All bathroom and kitchen facilities shall be cleaned and returned to the same condition as when the Resident/User entered the Community Center.
- Resident/User is responsible for removing all trash accumulated as a result of Resident/User's use of the Community Center, from the facility and the surrounding premises, upon completion of the event. Trash will be placed in garbage bags provided by FCRM and disposed of in the container in the adjacent, outside dumpster. The dumpster lid

Report Visual Inspection

Prepared for       *Rushing and Guice*

Site Address       *145 McNamyey Dr*

City       *Biloxi*                State       *Ms*       Zip       *39531*

Inspector       *Ed Williams*

Date       *1/2/2017*                Time       *0900*

This inspection for mold or fungi is performed for a fee to visually inspect for signs of a mold like substance, fungi or growth. It may also include air, swab or bulk tests to be performed with their associated lab fees.

A fee is charged per sample. All fees must be paid prior to sending in any samples. Sample tests should be considered at each area that visible evidence is present. Whether this report reveals mold in the building or not, the customer, building owner or potential buyer should consider:

1. Whether or not to have any sample tests performed at any area that was noted in the report.
   * We always suggest to have a Direct ID Sample for visible microbial growth.
   * If someone is sick in your home, we always suggest to have the areas they spend most of their time in to be tested.

2. Whether or not to hire a qualified mold remediation company or industrial hygienist for further consultation, inspection or corrective procedures, either now, before the lab tests results, or afterwards.

Important: If you do have mold and it must be removed, you are strongly encouraged to obtain the services of a qualified remediation contractor. If a homeowner or contractor unfamiliar with containment, removal and safety practices performs remediation activities, building occupants can be put at elevated health risks and mold may spreed to areas that previously had no contamination. Failure to eliminate source(s) of moisture in the building that are allowing mold to flourish will render remediation efforts ineffective.

Client Present          Age of Home          Weather          Exterior Temp

*Josh Foster   ± 7-10 yrs   Overcast          ~72°*




EXHIBIT
B



# OUTSIDE

| | | | |
|---|---|---|---|
| 1 | Is there standing water in the yard? | Yes ☐ | No ☒ |
| 2 | Does the land slope towards the home or building? | Yes ☐ | No ☒ |
| 3 | Are gutters present? | Yes ☒ | No ☐ |
| 4 | Are downspouts present? | Yes ☒ | No ☐ |
| 5 | Is there vegetation against house or building? | Yes ☐ | No ☒ |

Comments: (Note anything visible)
③ - Gutters leaking on left front of house
④ Downspout Extensions missing
Microbial Growth visible on siding of back patio

## ROOF (Do not climb onto roof)

| | | | | |
|---|---|---|---|---|
| 6 | Are there missing or broken shingles? | How many? | Yes ☐ | No ☒ |
| 7 | Are the shingles older than 10 years? | | Yes ☐ | No ☒ |
| 8 | Are any flanges around the vents loose? | | Yes ☐ | No ☒ |
| 9 | Is any flashing loose? | | Yes ☐ | No ☒ |

Comments: (Note anything visible)
Nothing Noted

## Foundation Type

| 10 | Basement ☐ | Crawl ☐ | Slab ☒ |
|---|---|---|---|

## Basement

| | | | |
|---|---|---|---|
| 11 | Is there a dehumidifier in place? | Yes ☐ | No ☒ |
| 12 | Are there any carpeted areas? | Yes ☐ | No ☒ |
| 13 | Is there a sump pump? | Yes ☐ | No ☒ |

Comments:
No basement present



52 Point Visual Inspection

## Crawl Space (Enter only if safe to do so)

| | | | |
|---|---|---|---|
| 14 | Are there any leaks? | Yes ☐ | No ☒ |
| 15 | Is there microbial growth? | Yes ☐ | No ☐ |
| 16 | Is there a vapor barrier? | Yes ☐ | No ☐ |
| 17 | Is the vapor barrier totally sealed and intact? | Yes ☐ | No ☐ |
| 18 | Is the crawl space totally encapsulated? | Yes ☐ | No ☐ |
| 19 | Is there room for you to crawl? | Yes ☐ | No ☐ |
| 20 | Is there any rot? | Yes ☐ | No ☐ |
| 21 | Is the insulation intact? | Yes ☐ | No ☐ |
| 22 | Is the insulation wet? | Yes ☐ | No ☐ |
| 23 | Is the duct work intact? | Yes ☐ | No ☐ |
| 24 | Any condensation around the ducts? | Yes ☐ | No ☐ |
| 25 | Are the floor joists intact? | Yes ☐ | No ☐ |
| 26 | Is there a dehumidifier in place? | Yes ☐ | No ☐ |
| 27 | Are any vents blocked off? | Yes ☐ | No ☒ |

Comments:

SLAB ON GRADE   NO CRAWLSPACE




# INSIDE

## Microbial Activity

30    Any Microbial Activity? (e.g., carpet, drapes, walls, ceilings, cabinets, etc.)   Yes ☒   No ☐

31    Is there a musty odor present?   Yes ☒   No ☐

32    Are there any water marks?   Yes ☒   No ☐

Comments:
30 a- AIR REGISTER IN KITCHEN
   b- AC UNIT DUCTING, GARAGE
   c- UPSTAIRS HALL CLOSET - INSIDE LIGHT FIXTURE
   d- UPSTAIRS HALL CLOSET - Top of door FRAME
   e- INSIDE FOYER LIGHT - TENANT STATED THEY HAVE ATTEMPTED to
      CLEAN HALL WAY LIGHT.
31- MUSTY ODOR IN UPSTAIRS HALL CLOSET
32- GARAGE VENT - CEILING IS bubbling & PEALING PAINT.

## Attic

33    Anything suspicious? (including lack of proper ventilation)   Yes ☐   No ☐
** DUE TO LIABILITY, WE DO NOT GO INTO THE ATTIC UNLESS THERE IS A SUSPECTED AREA OF CONCERN.
Comments:
OPENED SKUTTLE AND VIEWED ATTIC FROM ACCESS. No VISIBLE
MICROBIAL GROWTH.

## Kitchen and Laundry

34    Is the dryer ventilation intact?   Yes ☒   No ☐

35    Are there any leaks behind the washer?   Yes ☐   No ☒

36    Are there any leaks under or behind refrigerator?   Yes ☐   No ☒

37    Are there any leaks under kitchen sink?   Yes ☐   No ☒

Comments:



**53 Point Visual Inspection**

## Bedroom/Office(s)

**\*\*Indicate Name of Bedroom/offices**

| | R01 MSTR BR | R02 BRZ CHLDS |
|---|---|---|
| 38  Any microbial activity around windows? | Yes ☐  No ☒ | Yes ☐  No ☒ |
| 39  Any water stains on ceiling/walls/carpets? | Yes ☐  No ☒ | Yes ☐  No ☒ |
| 40  Are HVAC vents clean? | Yes ☒  No ☐ | Yes ☒  No ☐ |
| 41  Is the paint or plaster cracking? | Yes ☐  No ☒ | Yes ☐  No ☒ |

**\*\*Indicate Name of Bedroom/offices**

| | R03 BR#3 | R04 HALL CLOSET |
|---|---|---|
| 38  Any microbial activity around windows? | Yes ☐  No ☒ | Yes ☐  No ☒ |
| 39  Any water stains on ceiling/walls/carpets? | Yes ☐  No ☒ | Yes ☐  No ☒ |
| 40  Are HVAC vents clean? | Yes ☒  No ☐ | Yes ☒  No ☐ |
| 41  Is the paint or plaster cracking? | Yes ☐  No ☒ | Yes ☐  No ☒ |

**\*\*Indicate Name of Bedroom/offices**

| | R05 GARAGE | R06 LIVING ROOM |
|---|---|---|
| 38  Any microbial activity around windows? | Yes ☐  No ☒ | Yes ☐  No ☒ |
| 39  Any water stains on ceiling/walls/carpets? | Yes ☐  No ☒ | Yes ☐  No ☒ |
| 40  Are HVAC vents clean? | Yes ☒  No ☐ | Yes ☒  No ☐ |
| 41  Is the paint or plaster cracking? | Yes ☒  No ☐ | Yes ☐  No ☒ |

**\*\*Indicate Name of Bedroom/offices**

| | R07 DINING | R08 |
|---|---|---|
| 38  Any microbial activity around windows? | Yes ☐  No ☒ | Yes ☐  No ☒ |
| 39  Any water stains on ceiling/walls/carpets? | Yes ☐  No ☒ | Yes ☐  No ☐ |
| 40  Are HVAC vents clean? | Yes ☒  No ☐ | Yes ☐  No ☐ |
| 41  Is the paint or plaster cracking? | Yes ☐  No ☒ | Yes ☐  No ☒ |

**\*\*Indicate Name of Bedroom/offices**

| | R09 | R10 |
|---|---|---|
| 38  Any microbial activity around windows? | Yes ☐  No ☐ | Yes ☐  No ☐ |
| 39  Any water stains on ceiling/walls/carpets? | Yes ☐  No ☐ | Yes ☐  No ☐ |
| 40  Are HVAC vents clean? | Yes ☐  No ☐ | Yes ☐  No ☐ |
| 41  Is the paint or plaster cracking? | Yes ☐  No ☐ | Yes ☐  No ☐ |

**\*\*Indicate Name of Bedroom/offices**

| | R11 | R12 |
|---|---|---|
| 38  Any microbial activity around windows? | Yes ☐  No ☐ | Yes ☐  No ☐ |
| 39  Any water stains on ceiling/walls/carpets? | Yes ☐  No ☐ | Yes ☐  No ☐ |
| 40  Are HVAC vents clean? | Yes ☐  No ☐ | Yes ☐  No ☐ |
| 41  Is the paint or plaster cracking? | Yes ☐  No ☐ | Yes ☐  No ☐ |

Comments:

## 52-Point Visual Inspection

### Bathroom(s)

**\*\*If more than 2 bathrooms, please describe in comment section**

| | | Bathroom 1 | Bathroom 2 |
|---|---|---|---|
| 42 | Exhaust fan(s) present and getting proper suction? | Yes ☒ No ☐ | Yes ☒ No ☐ |
| 43 | Any leaks under the sink? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 44 | Are all bathtub seals intact? | Yes ☒ No ☐ | Yes ☒ No ☐ |
| 45 | Are there any leaks around the bathtub? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 46 | Any leaks around hot the water heater? | Yes ☐ No ☒ | Yes ☐ No ☒ |

Comments:

1/2 bath

42  Yes
43  No
44  N/A
45  N/A
46  N/A

### HVAC

| | | | |
|---|---|---|---|
| 47 | Is there a return vent? | Yes ☒ | No ☐ |
| 48 | Is any furniture sitting on top or blocking HVAC registers? | Yes ☐ | No ☒ |

Comments: (Note condition of return and ducts)

Register in kitchen has indications of active microbial growth.

### Relative Humidity Indoors

49. Readings /Comments:

62%

### Moisture Indoors

50. Readings /Comments:

Walls- Downstairs- >5%   Upstairs 7-10%

Floors- Downstairs- 68%-71%

Upstairs- 15%



## 52 Point Visual Inspection

Do You Recommend Remediation?   Yes ___   No ___   Possibly [X]

49. Explanation:

IF Positive for mold in AREAS tested/sampled

IF NOT, Recommend treatment of hall closet, Cleaning of AC system, Light Fixtures AND exterior of home.

### Issues of Concern

50. Comments:

① Visible signs of microbial growth (Active)- Possibly

② Peeling Paint on GARAGE Ceiling

③ Algee/Microbial growth on EXTERIOR

④ Missing Downspout. Extension- Should extend 6' beyond

⑤ EXTERIOR of home.

⑥ Musty odor and signs of microbial growth in ~~Exit~~ HALL Closet

51. Recommended Preventative Measures:

AC distribution system Cleaning
Downspout/Gutters repair
Exterior cleaning of home
Possible Addition of dehumidifier.

### Inspector Recommends These Areas to Test

52. *We always recommend a Tape Lift Sample for anything visual that appears to be microbial.

| | |
|---|---|
| Front Left EXTERIOR | Light Fixture- Foyer |
| Back Patio Siding | Light Fixture- Hall Closet |
| Front Left Window | AC Register- Kitchen |
| GARAGE- AC Duct | Top of DOORMolding- Hall Closet |



**52-Point Mold Inspection**

## THE NEXT STEPS IN OUR PROCESS

1. Your lab analysis and your 52 Point Inspection will be sent to your email within 3 to 5 business days. If you expedited your results, you will receive them within 1 to 2 business days. *Weekends and holidays are excluded. If the job was on a late Thursday, Friday or on a Saturday, results will be available on Tuesday. FedEx does not deliver our mold sample packages to the lab on weekends or on holidays.

2. You will receive a call from Newton Microbial Laboratory within 1 to 2 business days after you receive your reports to go over your lab analysis.

3. You will receive a call from Mold Test USA for recommendations and to answer any questions you may have.
   *If you are left a message, do not receive your reports during this time period or have any questions, please call Mold Test USA. We thank you for your business!

Please call the office before sampling. Thank you!
877-554-6653 (Office Hours 9am-7pm EST, MON-FRI)
Our customer spoke with _____ at MTUSA.

**Please have Customer Initial the following:**

I agree to pay $575 for the inspection and testing. The inspector completed the 52 Point Inspection and I am satisfied with services rendered.

Initial:

Signatures

Inspector Signature:                    Date: 1/2/2018

Customer Signature:                     Date: 2 Jan 2017

Would you like Mold Test USA to recommend professionals to give you estimates on needed repairs?          Yes          No

I do not wish to have a written protocol at this time. If I choose to have protocol written at a later date and it exceeds 7 days, Mold Test USA will need to retest in order to have a properly written protocol.

Inspector Signature:                    Date: 1/2/2018

Customer Signature:                     Date:

© Mold Test USA 2016

# Mold Test USA Customer Agreement

Property Address: 145 McNarney Drive, Bloxi, Ms 39531

The inspector recommends, and you agree, that the following areas be sampled:

| Location of sample | Type of Sample (circle) | # of samples in area | PRICING Base Rate: $ 525 (includes 2 samples) Additional samples: $85 en. |
|---|---|---|---|
| 1. Front Left Exterior | Air/Swab/Tape/bulk material | 1 | 85.00 |
| 2. Sideway back Patio EXT | Air/Swab/Tape/bulk material | 1 | 85.00 |
| 3. Window front left ext. | Air/Swab/Tape/bulk material | 1 | 85.00 |
| 4. AC Duct - Garage | Air/Swab/Tape/bulk material | 1 | 85.00 |
| 5. Light Fixture - Hall Closet | Air/Swab/Tape/bulk material | 1 | 85.00 |
| 6. Light Fixture - Foyer | Air/Swab/Tape/bulk material | 1 | 85.00 |
| 7. AC Register - Kitchen | Air/Swab/Tape/bulk material | 1 | 85.00 |
| 8. Living Room | Air/Swab/Tape/bulk material | 1 | — |
| 9. Outside Back Yard | Air/Swab/Tape/bulk material | 1 | — |
| 10. Inside Top Door Moldings | Air/Swab/Tape/bulk material | 1 | 85.00 |

The inspector suggested the following areas below to be tested in which you chose not to have tested.
Hall Closet

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    Customer Initials _____

EXPEDITED?  YES / NO (circle)   Waived Fee        Expedited Amount: $

**Total Price for services rendered:**   $_____

Payment Method: _____    **Transaction ID:** _____

THE 52 POINT INSPECTION, CUSTOMER AGREEMENT, AND RESULTS DO NOT CONSTITUTE A WARRANTY, AN INSURANCE POLICY, OR A GUARANTEE OF ANY KIND; NOR DOES IT SUBSTUTUTE FOR ANY DISCLOSURE STATEMENT AS MAY BE REQUIRED BY LAW.

Mold Test USA or the inspector is not anyway held responsible or liable for the results of the inspection and/or sampling. If you choose any form of litigation against Mold Test USA or the inspector, you hereby   agree the amount of our liability will not exceed the cost of the inspection and testing. Also, if you choose to write any negative reviews or slander Mold Test USA or the inspector in  anyway, we reserve the right to receive compensation for all damages incurred.

Mold Test USA only performs mold inspections and sampling. We do not write Protocol, nor do we perform remediation work.

Confidentiality: The inspection and testing is done for your benefit and use. The results analyst, a biologist from Newton Microbial Laboratory, will be calling you to go over the results with you and give you recommendations for your next step. If cleaning, removal or remediation is needed, Mold Test USA may be able to refer you to a certified, licensed and insured remediation company that follows proper protocol. All remediation companies are independent from Mold Test USA and does not reflect on Mold Test USA.  By initialing here, this allows Mold Test USA to release your results and information for you to have a free estimate for services suggested to no more than three companies.          **Customer Initials** _____

Applicable Law. This Agreement, its validity, enforceability and the construction and interpretation of its terms and provisions shall all be in accordance with the  applicable laws of the State of South Carolina. No claim, demand, action, proceeding, arbitration, litigation, hearing, motion or lawsuit arising here from or with respect  to the rights and obligations created hereunder shall not be commenced or prosecuted in any jurisdiction other than the State of Carolina. The parties hereto hereby   consent and stipulate to the jurisdiction of the Circuit and County Courts of Richland County, South Carolina.

By signing below, you acknowledge that you have read, understand, and agree to the terms and conditions of this agreement, including (but not limited to) the limitations  of liability, arbitration clause and limitation period, and agree to pay the fee listed in the box above.

_____    _____    _____    1/2/2017
**Customer's Signature**    **Date**    **Inspector's Signature**    **Date**

877-554-6653 admin@moldtestusa.com  Mon-Fri 9am-7pm EST

## MOLD TEST USA

# Receipt

Customer: Rushing and Gault

Date: 1/2/2017    Inspector: Ed Williams

Address: 145 McNamey Drive, Biloxi, MS 39531

| Description of work: | Unit Price: | Subtotal: |
|---|---|---|
| Base rate (Includes mold inspection & two samples): | $525.00 | $525.00 |
| Additional Testing: | ($85.00 each) x 8 samples | $680.00 |
| Expedited Fee: | ($50.00) | $1205.00 |
| Total amount due: | PAID IN FULL | $1,205.00 |

## THE NEXT STEPS IN OUR PROCESS

1. Your lab analysis and your 52 Point Inspection will be sent to your email within 3 to 5 business days. If you expedited your results, you will receive them within 1 to 2 business days.   *Weekends and holidays are excluded. If the job was on a late Thursday, Friday or on a Saturday, results will be available on Tuesday. FedEx does not deliver our mold sample packages to the lab on weekends or on holidays.

2. You will receive a call from Newton Microbial laboratory within 1 to 2 business days after you receive your reports to go over your lab analysis.

3. You will receive a call from Mold Test USA for recommendations and to answer any questions you may have.

   *If you are left a message, do not receive your reports during this time period or have any questions, please call Mold Test USA. We thank you for your business!

   877-554-6653 admin@moldtestusa.com Mon-Fri, 9am-7pm EST

Newton ML ID #
Laboratory

# NML-20170104-Rushing and Guice

## Spore Analysis Completed for



1101 1st Street South EXT. Suite B, Columbia, SC 29209
803-776-0562
admin@moldtestusa.com

| | |
|---|---|
| Collected Date | 1/2/2017 |
| Collected Street Address | 145 McNarney Dr |
| Collected & Relinquished by | Ed Williams |
| # of Sample Sent | 6 |
| Received Date | 1/04/2017 |
| # of Sample Received & Accepted | 4 |
| Analyzed Date | 1/04/2017 |
| Accepted & Analyzed by | Janna Komorowski |
| Approved by | Crystal Hernandez |

Based on the data that Newton Microbial Laboratory receives, a sample analysis report is provided. [text largely illegible]

## Spore Analysis Completed by

**Janna Komorowski**
Laboratory Director; B.A. in Biological Sciences

Newton
Laboratory

1101 1st Street South EXT Suite C, Columbia SC 29209

**Crystal Hernandez**
Operations Director; B.A. in Biology

EXHIBIT

©2013-2016 Newton Microbial Laboratory

Newton Laboratory

Newton ML ID #
20170104 Rushing and Guice .lsm
Site Zip: 39531

| Field | Value |
|---|---|
| Property/Customer Name | Rushing and Guice |
| Company Email | |
| Company Address | 1101 1st Street South EXT, Suite B, Columbia, SC 29209 |
| Site Street Address | 145 McKinney Dr |
| Company Phone Number | 803-776-0562 |
| Company Name | Mold TEST USA |
| Site City | Biloxi |
| Site State | MS |
| Date Collected | 1/2/2017 |
| Date Received | 1/4/2017 |
| Sample Collected by | Ed Williams |
| Date Reported | 1/04/2017 |

| | | | |
|---|---|---|---|
| Newton ML ID Number | NML-20170104-Rushing and Guice | NML-20170104-Rushing and Guice | |
| Sample ID Number | SPC-0001 | SPC-0002 | |
| Sample Name/Location | Control/Outside | Living Room | |
| Volume (L) | 150 | 75 | |
| Background** | 2 | 2 | |
| Limit of Detection (Spore/M³) | 7 | 7 | |

| Organism | Counted | Cts/M³ | % of Total | Counted | Cts/M³ | % of Total | Counted | Cts/M³ | % of Total |
|---|---|---|---|---|---|---|---|---|---|
| Sample Type | Spore Count | | | Spore Count | | | | | |
| Alternaria | Not Detected | | | Not Detected | | | | | |
| Ascospores | 2 | 13 | 13.33% | 1 | 13 | 14.29% | | | |
| Aspergillus\|Penicillium | 1 | 7 | 6.67% | 1 | 13 | 14.29% | | | |
| Basidiospores | 2 | 13 | 13.33% | Not Detected | | | | | |
| Bipolaris\|Drechslera | Not Detected | | | Not Detected | | | | | |
| Chaetomium | Not Detected | | | Not Detected | | | | | |
| Cladosporium | 6 | 40 | 40.00% | 1 | 13 | 14.29% | | | |
| Curvularia | Not Detected | | | Not Detected | | | | | |
| Epicoccum | Not Detected | | | Not Detected | | | | | |
| Fusarium | Not Detected | | | Not Detected | | | | | |
| Memnoniella | Not Detected | | | Not Detected | | | | | |
| Myxomycetes\|Smuts | 3 | 20 | 20.00% | 2 | 27 | 28.57% | | | |
| Pithomyces | Not Detected | | | Not Detected | | | | | |
| Stachybotrys | Not Detected | | | Not Detected | | | | | |
| Stemphylium | Not Detected | | | Not Detected | | | | | |
| Torula | Not Detected | | | Not Detected | | | | | |
| Trichoderma | Not Detected | | | Not Detected | | | | | |
| Ulocladium | Not Detected | | | Not Detected | | | | | |
| Unspecified Spore | 1 | 7 | 6.67% | 1 | 13 | 14.29% | | | |
| Total | 15 | 100 | 100.00% | 7 | 93 | 100.00% | | | |

| | | | |
|---|---|---|---|
| Hyphal Fragment | 7 | Not Detected | |
| Spore Ct + — Dander | na | na | |
| Fiber | na | na | |
| Pollen | na | na | |

Color Code: Common Outdoor | Common Indoor | Water Damage Indicator | Elevated Counts

Comments

Newton
Laboratory

Control/Outside   Living Room

| | 0 | 5 | 10 | 15 | 20 | 25 | 30 | 35 | 40 | 45 |
|---|---|---|---|---|---|---|---|---|---|---|

Alternaria

Ascospores

Aspergillus|Penicillium

Basidiospores

Bipolaris|Drechslera

Chaetomium

Cladosporium

Curvularia

Epicoccum

Fusarium

Memnoniella

Myxomycete|Smuts

Pithomyces

Stachybotrys

Stemphylium

Torula

Trichoderma

Ulocladium

Unspecified Spore

©2013-2016 Newton Microbial Laboratory

Newton Laboratory



# Spore Trap Count Explanation

**Volume**         Flow Rate * Flow Rate Minute

**Background**      None: Recollect

1: <5%

2: 5% ≤ Background Coverage < 25%

3: 25% ≤ Background Coverage < 70%

4: 70% ≤ Background Coverage < 90%

5: 90% ≤ Background Coverage < 100%, Recollect

**Cts/M³**          Spore Counts per Cubic Meter

**Hyphal Fragment** Fragments of hyphae. Can be an additional indicator of possible mold presences

**Unspecified Spore** Less commonly identified spore type

**Limit of Detection** 1 spore count per coverage examined area

**Sample Type**

**Spore Count**     Spore Trap Cassettes  Identification & Enumeration of Fungal Spores

**Spore Count+**    Spore Trap Cassettes  Identification & Enumeration of Fungal Spores
                    + Total Dander, Fiber, and Pollen Count



©2013-2016 Newton Microbial Laboratory

# Newton Laboratory

Newton ML ID #
20170104-Rushing and Guice.nssn

| Field | Value |
|---|---|
| Site Name | Rushing and Guice |
| Company Email | admin@moldtestusa.com |
| Company Address | 1101 1st Street South EXT. Suite B, Columbia, SC 29209 |
| Newton ML ID Number | NML-20170104-Rushing and Guice |
| Site Address | 145 McNarney Dr |
| Company Phone Number | 803-776-0562 |
| Company Name | Mold TEST USA |
| Site City | Biloxi |
| Site State | MS |
| Site Zip | 39531 |
| Date Collected | 1/2/2017 |
| Date Received | 1/04/2017 |
| Date Reported | 1/04/2017 |
| Sample Collected by | Ed Williams |

| | Sample ID Number | Sample Name | Sample Type |
|---|---|---|---|
| | DIR 0001 | AC Duct - Garage | Direct ID - Tape |
| | DIR 0002 | Inside Top Door Molding - Hall Closet | Direct ID - Tape |

| Organism | Trace 1-10 | Light 11-100 | Med 101-1000 | High 1001+ | Trace 1-10 | Light 11-100 | Med 101-1000 | High 1001+ | Trace 1-10 | Light 11-100 | Med 101-1000 | High 1001+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alternaria | ND | | | | ND | | | | | | | |
| Ascospores | | | | | | | | | | | | |
| Aspergillus\|Penicillium | ND | | | | ND | | | | | | | |
| Basidiospores | ND | | | | ND | | | | | | | |
| Bipolaris\|Drechslera | ND | | | | ND | | | | | | | |
| Chaetomium | | | | | ND | | | | | | | |
| Cladosporium | | | | | ND | | | | | | | |
| Curvularia | ND | | | | ND | | | | | | | |
| Epicoccum | ND | | | | ND | | | | | | | |
| Fusarium | ND | | | | ND | | | | | | | |
| Memnoniella | ND | | | | ND | | | | | | | |
| Myxomycetes\|Smuts | ND | | | | ND | | | | | | | |
| Pithomyces | ND | | | | ND | | | | | | | |
| Stachybotrys | ND | | | | ND | | | | | | | |
| Stemphylium | ND | | | | ND | | | | | | | |
| Torula | ND | | | | ND | | | | | | | |
| Trichoderma | ND | | | | ND | | | | | | | |
| Ulocladium | ND | | | | ND | | | | | | | |
| Unspecified Spore | | | | | ND | | | | | | | |

ND = Not Detected

| | Color Code | Common Outdoor | | Common Indoor | | Water Damage Indicator | Color Code |
|---|---|---|---|---|---|---|---|
| Hyphal Fragment | | Heavy | | Moderate | | | |
| Background Debris | | Light | | Light | | | |

Comments

©2013-2016 Newton Microbial Laboratory

Newton
Laboratory



# Direct Identification Explanation

**Direct ID**

| | |
|---|---|
| Trace | Spore Count less than 10 |
| Light | Estimated Spore Counts between 11 and 100 |
| Medium | Estimated Spore Counts between 101 and 1000 |
| High | Estimated Spore Counts above 1000 |

**Hyphal Fragment/Background Debris**

| | |
|---|---|
| Not Detected | Not Found in the Sample |
| Light | Found Traces throughout the Sample |
| Moderate | Found Some throughout the Sample |
| Heavy | Found All throughout the Sample |

**Unspecified Spore** — Less commonly identified spore type

**Sample Type**

| | | |
|---|---|---|
| Direct ID-Swab | Swab for ID only | ID and Quantitative Enumeration of Spores |
| Direct ID-Swab+ | Swab for ID + Spore Count | ID and Enumeration with Spore Count |
| Direct ID-Tape | Swab for ID only | ID and Quantitative Enumeration of Spores |
| Direct ID-Tape+ | Swab for ID + Spore Count | ID and Enumeration with Spore Count |
| Direct ID-Bulk | Swab for ID only | ID and Quantitative Enumeration of Spores |
| Direct ID-Bulk+ | Swab for ID + Spore Count | ID and Enumeration with Spore Count |
| Culture | Air Plate, Swab, Bulk | Identification and Enumeration of Mold only |



©2013-2016 Newton Microbial Laboratory

Newton
Laboratory

# Ascospores



## Growth and Distribution

Ascospores refers to spores produced in a sac-like structure known as an ascus (plural asci). These spores are specific to fungi of the phylum Ascomycota. Ascomycota is a broad division containing a large number of genera and individual species. Identification of the genus and/or species based on spore morphology alone is not always possible, therefore these spores are often given the more general classification of "Ascospores" in microscopic analysis.

- Ascospores are found worldwide with prevalence and distribution depending on particular genus and species.
- **Outdoors:** Ascospores are found ubiquitously in outdoor environments; often found on dead and decaying plant material. Many types are known to have pathogenic or parasitic properties in plants.
- **Indoors:** Common substrates include damp building materials such as gypsum or lumber, carpeting, dust, and other organic materials.

## Health Effects

- Allergen
  - Ascospores can be allergenic to sensitive individuals, most often producing Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis (Type III). (5)
  - Reactions due to spore inhalation may increase following rain or high humidity. (5)
  - Unlike some fungi which rely on air currents for spore dispersal, ascomycetes are capable of a more active form of spore dispersal that utilizes water droplets to catapult their spores into the air. Various species of Ascospores are known to use this method to liberate spores every single day, regardless of air flow. Subsequently, exposure to ascospores may be more consistent from day to day than exposure to other spores which are only dispersed with adequate air currents. For this reason these spores may be of particular interest in cases of chronic respiratory disease such as asthma and rhinitis (5).

- Pathogen
  - Some types can be pathogenic; dependent upon genus and species.

- Toxins\Metabolites
  - Vary greatly depending on genus and species.

Found in Sample(s)
AIR
DIRECT

• Control/Outside+Living Room•••••••••••••
• AC Duct - Garage•••••••••••••••••

(1 list of references can be found at http://newtonlaboratory.com/glossary)

Newton
Laboratory



# Aspergillus/Penicillium

## Growth & Distribution (7):

- Aspergillus & Penicillium are incredibly adaptive and abundant organisms. Their distribution is world-wide with many species possessing abilities to tolerate environmental conditions that challenge other molds (i.e. extreme temperatures & pH levels, restricted water availability and exposure to radiation). Colony growth rates are rapid for many species. Mature colonies are capable of quickly producing large numbers of spores. Because of the morphological similarity of the spores, the two genera are typically grouped together as "Aspergillus-Penicillium."

- **Growth Rate:** Usually Rapid – Mature within 3-4 days; however, some species are slower(6).
- **Water Activity:** Aspergillus: 0.93-0.97 & Penicillium: 0.88 – 0.99 (33, 35)
- **Outdoors:** Both can be found outdoors on a variety of substrates- particularly plant materials such as cereals, grains, decaying wood, and soil (7).
- **Indoors:** Found indoors on organic materials such as wood, textiles, cellulose materials, carpeting, painted surfaces, and food stuffs such as cheeses, butter/margarine meats, breads, fruits and vegetables. Halotolerant species may be found growing on refrigerated foods (7). Penicillium is used in cheese production and is responsible for the veins in blue cheese.

## Health Effects

- **Allergen:**

  - Because these spores are so abundant, daily exposure to Aspergillus/Penicillium is very common in both indoor and outdoor environments. Often this exposure occurs without any noticeable reaction or symptoms. However, sensitivities may develop in some instances- especially with prolonged exposure to high spore concentrations. This can result in allergic responses.

  - Spores may progress further into the respiratory system than other common spores due to their small aerodynamic diameter.

  - Penicillium is the mold from which the antibiotic Penicillin was first derived. Penicillin is now made synthetically. It does not contain the mold Penicillium. Allergy to one does not necessarily imply allergy to the other.

- **Pathogen** (6,7):

  - There are approximately 175 species of Aspergillus, only about 20 of which are known to cause disease in humans.
  - Diseases caused by Aspergillus are known as aspergillosis and include invasive infection, colonization, & toxicosis.
  - Certain species of Penicillium are considered pathogens. Infection may occur in skin, blood, bone marrow, internal organs or lymph nodes, (6). In the immunocompromised (particularly HIV patients or those who have recently been in Southeast Asia) P. marnefei can cause severe infection capable of affecting respiratory, lymphatic, and nervous systems.

- **Toxins/Metabolites:**

  - Different species of Aspergillus/Penicillium are associate with an array of mycotoxins and metabolites, some of which are medically significant in humans. The importance of these toxins can vary from species to species and depends largely on the prevalence of that species.

(1 List of reference can be found at http://newtonlaboratory.com/january)

Found in Sample(s)

AIR

DIRECT

- Control/Outside-Living Room•••••••••••
- Inside Top Door Molding - Hall Closet•••••••••••••••

©2013-2016 Newton Microbial Laboratory

Newton
Laboratory

Revision: ML ID #
20170104 Rushing and Gunn- HSin

# Basidiospores



## Growth & Distribution:

- Basidiospores are spores produced by the division of Fungi known as Basidiomycota. These spores are unique for lacking septation, containing bilateral symmetry, and often having a visible pore at the site of detachment from the basidium (?). This is a large group of organisms consisting of a large number of individual genera & species. Distribution is world-wide with the prevalence in any given area varying for each genus and species. Like ascospores, basidiospores disperse using water droplets. Therefore, airborne spore concentrations are often higher following rain or high humidity. This division includes edible mushrooms.

- **Outdoors:** Basidiospores are found growing on plant material, organic debris, and soil. Many species of basidiospores are known to be plant pathogens.

- **Indoors:** Basidiospores may be found growing on damp materials. Colonies may grow given sufficient access to water (leaks, flooding, high humidity, or surrounding plumbing, heating/air conditioning components, appliances, house plants, etc.).

## Health Effects:

- **Allergenic:**
  - Exposure to these spores is commonplace in both indoor and outdoor environments. Nonetheless they are also potentially allergenic. Allergic responses may occur following inhalation, ingestion, or direct contact. Reactions due to inhalation may be increased following rain or high humidity when spore concentrations are often elevated.
  - In sensitive individuals, typically manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogenic:**
  - Invasion is not typical but can occur, particularly in the immunocompromised or immunosuppressed. These infections can includes sinitus, keratitis, phaeohyphomycosis, & peritonitist.

- **Toxins\Metabolites:**
  - Mycotoxins vary depending on genus and species. They are especially relevant in edible fungi of this division such as mushrooms.
    - Common sources of mushroom poisoning include *Amnita, Lepiota, Coprinus, & Psilocybe*

‡ List of references can be found at http://newtonlaboratory.com/glossary

Food in Sample(s)
AIR                 •Control/Outside••••••••••••••••
DIRECT              ••••••••••••••••

©2013-2016 Newton Microbial Laboratory

Newton MicLab Laboratory

# Cladosporium

## Growth & Distribution:

- Cladosporium are found in air and soil worldwide. Cladosporium are among the most common airborne fungi (4). Spores are produced in abundance and easily disperse through the air. Extremely common on decaying organic matter. These mold are common plant pathogens. Molds of this genus are dematiaceous with over 40 named species (1).
- Growth Rate: Moderately Rapid – Mature within 7 days. (6)
- Water Activity: 0.85-0.88 (1)
- Outdoors: Cladosporium can be found on food sources such as cereals, fruit, vegetables. Commonly found on dead plants and shrubs in temperate regions. Halotolerant (salt tolerant) species exist. (7) The most common species isolated from plant materials & soils (C. cladosporioides) experiences peak airborne spore concentrations between June/July and September/October in temperate climates (2).
- Indoors: Cladosporium can be found on water damaged materials (i.e. plaster, paint, textiles, gypsum, wall paper, wood, moist window sills). May affect food sources such as cheeses, butter/margarine, vegetables, fruits and vegetables(7). Often found on the surface of fiberglass duct liners, in bathroom showers, and on basement walls (2). Some studies have reported Cladosporium in 70% of homes examined in the US & 100% of homes examined in Canada (1).

## Health Effects:

- **Allergen:**
  - Allergic reaction to airborne spores are of particular importance because these spores exist in in such high concentrations in the air. Symptoms may increase during peak concentrations from June-October. Sensitization may occur. (1)
  - In sensitive individuals typically manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)
- **Pathogen:**
  - Is pathogenic in humans very rarely, reported cases include skin lesions, keratitis, onychomycosis, sinusitis, pulmonary infections (1).
- **Mycotoxins/Metabolites:**
  - Cladosporic acid (12)
  - Gibberellin (hormone influencing developmental processes in plants) & ergosterol (precursor to vitamin D2 which may have anti-tumor properties). (1)
  - Toxic effects have been seen in animals (chicken embryos & horses) but not known to be reported in humans to date (1,2).

Found in Sample(s)
AIR      •Control/Outside+Living Room••••••••••••
DIRECT   •AC Duct - Garage••••••••••••••••

(This list of references can be found at http://newtonlaboratories.com/glossary)

©2013-2016 Newton Microbial Laboratory

Newton Laboratory

Newton MLID #:
201701DK Rushing and Guice.xlsm

# Myxomycetes



## Growth & Distribution

- Myxomycetes is a large class with approximately 500 individual species and worldwide distribution (25). Interestingly, these organisms are no longer considered to be true fungi like other molds, but have been reclassified as protozoans. These organisms belong to group commonly called "slime molds" that exhibit an amoeba-like stage. Spores are common in both indoor and outdoor environments worldwide (15). Spores can be dispersed by air, arthropods and other animals due to their small size (4 – 20 µm)(25).
- **Growth Rate:** Generally Rapid – Mature within 2 to 4 day; however, specific growth rate does depend on species (24).
- **Water Activity:** 0.80 (this is a generalized number for common molds)(26).
- **Outdoors**
  - Found in soil, decaying plant material (especially damp wood), and dung. Species of Myxomycetes are not as geographically constricted as most organisms; most Myxomycetes species can be found world wide. (15)
- **Indoors**
  - Can be found growing indoors on damp building materials such as cardboard, wallpaper, gypsum board, wood, etc.

## Health Effects:

- **Allergen:**
  - These spores are very common in both indoor and outdoor air. They are small, foreign particles which may be inhaled deep into the respiratory system and may cause allergic responses.
  - In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives), or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)
- **Pathogen:**
  - Unknown
- **Toxins/Metabolites:**
  - Unknown

Sampled In
AIR
Direct



•Control•Outside•Living Room•••••••••••
•••••••••••••••••

(Link of references can be found at http://newtonlaboratory.com/references)

©2013-2016 Newton Microbial Laboratory

Newton
Laboratory

Newton #AL10.z
20170104 Rosberg and Guez.xlsm

# Ulocladium



**Growth & Distribution**

- Found worldwide. Generally has high water requirements for growth but can survive short dry periods (1).

- **Growth Rate**: Rapid – Mature within 5 days (6)

- **Water Activity**: 0.89–0.90 (1)

- **Outdoors**
  - Found in soil and decaying plants. Some species are pathogenic in plants such as nuts, beans, and cereals. (1)

- **Indoors**
  - Can be found on wood, paper, textiles, mattress dust, and in heating and air conditioning units and ductwork. Is often found in association with water damage or high humidity (1).

**Health Effects:**

- **Allergen:**
  - May induce irritation or inflammation (1).
  - Considered by some to be among the most common mold allergens in the US (1).
  - In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogen:**
  - Very occasionally involved in phaeohyphomycosis (infection of mycelia of dematiaceous fungi) in the immunocompromised (6)

- **Toxins/Metabolites (1):**
  - Can produce strong endometabolites that may be have a negative impact on indoor air quality.
  - No toxins known to be hazardous to humans.
  - Some metabolites that are active against fungi and plants.

Found in Sample(s)
AIR          ••Living Room••••••••••••
DIRECT    ••••••••••••••••

[List of references can be found at http://newtonlabinc.com/glossary](http://newtonlabinc.com/glossary)

©2013-2016 Newton Microbial Laboratory