**AIUNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| JOSHUA FOSTER, *et al*., | ) | Case No. 1:18-cv-50 HSO-JCG |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| HUNT SOUTHERN GROUP, LLC FKA | ) | |
| FOREST CITY SOUTHERN GROUP LLC, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT FOREST CITY RESIDENTIAL MANAGEMENT, LLC'S**
**MOTION FOR SUMMARY JUDGMENT**
**(ORAL ARGUMENT REQUESTED)**

---

**INTRODUCTION**

Plaintiffs  Jessica and Joshua Foster and their two minor children (collectively "Plaintiffs" or "the Fosters"), have brought this suit against Defendants alleging personal injuries and economic loss, which they allege, without any factual basis, resulted from mold in their leased residence located on Keesler Air Force Base ("Keesler AFB"), where the Fosters lived from July 2013 to June 2018.  Co-defendant Hunt Southern Group, LLC f/k/a Forest City Southern Group, LLC ("Southern Group") is the current owner of the residential homes at Keesler AFB.  Defendant Forest City Residential Management, LLC ("Forest City Residential Management" or "FCRM") served as property manager from October 2011 until February 22, 2016, when co-defendant Hunt MH Property Management, LLC ("Hunt MH") assumed the role of property manager.

The Court has repeatedly held that the relevant inquiry in this case is whether the Fosters were exposed to mold at their residence and, if so, whether such mold exposure caused their

claimed injuries.[1]  The simple answer to those questions is "No" – not during the time when FCRM managed the property or any time thereafter. During FCRM's management, any reports by the Fosters of mold immediately addressed by FCRM's maintenance team. There is no evidence that FCRM failed to respond to the Fosters' maintenance requests in a timely manner or that FCRM breached any duty as a property manager. FCRM was replaced as property manager in February 2016.  In the absence of a breach of any duty or resulting injury, FCRM is not liable to Plaintiffs with respect to any cause of action.

Plaintiffs have no expert who will testify that any of the medical conditions from which they allegedly suffered were caused by exposure to mold in their residence at any time, let alone during FCRM's management.  The undisputed material facts and the governing principles of Mississippi tort and contract law mandate the grant of summary judgment in favor of FCRM on all claims.

While the focus must be on the Foster residence, for context, when Southern Group[2] entered into a fifty-year ground lease of the privatized housing at Keesler AFB in 2011, it had some knowledge of certain pre-existing moisture issues affecting some of the structures, but had no clear knowledge of the extent or cause of the issues.  In light of these issues, Southern Group carried out a Moisture Remediation Project, under which all 1,000+ houses on the base eventually underwent varying degrees of retrofitting to resolve the moisture issues, which were determined after extensive investigation to mainly involve attic HVAC ducts and the methods used to seal duct penetration points.

---

[1]      The Court's ruling, that "The relevant inquiry in this case is whether the Cookseys were exposed to mold at their residence and whether the mold exposure caused them injuries," was later applied as an "admonition … to each of the Plaintiffs' claims of injury-causing mold exposure in their respective houses."  *See* ECF No. 184 (*Foster*).

[2]      To avoid confusion and given the name change, Defendant Hunt Southern Group, LLC f/k/a Forest City Southern Group, LLC is referred to as "Southern Group."

During the time that Southern Group was working to identify the extent and cause of the moisture issues, the indisputable facts establish that FCRM responded to maintenance calls from base residents, and carried out any interim repairs needed.  Notwithstanding the reams of data regarding the Moisture Remediation Project that is now part of the extensive record here, the focus is properly on the Fosters' residence and there is no evidence that the Fosters suffered any personal injury or property damage as a result of exposure to mold in their residence at any time, let alone FCRM's period of management.

## FACTUAL BACKGROUND

### Background

1.　　Keesler AFB, in Biloxi, Mississippi, was established as a federal enclave under the U.S. Constitution when the federal government acquired the base property from the State of Mississippi by condemnation between 1941 and 1950.  *United States v. State Tax Comm'n*, 412 U.S. 363,371-72 (1973).

2.　　Between 2007 and 2010, a joint venture between Hunt Building Company, Ltd. ("Hunt Building Co.") and Yates Construction Company built 1,028 single-family and multi-family residences on Keesler AFB, forming several residential subdivisions, including Bayridge, East and West Falcon, Thrower Park and Sandhill (the "Subdivisions").  (Resp. No. 24, FCRM's First Suppl. Resp. to Pls.' Combined Interrogs., served Sept. 28, 2018, att. as Ex. 30.)  FCRM had no involvement in designing or building any of the residences in the Subdivisions.  *Id*.

3.　　Keesler AFB is one of numerous Air Force installations to privatize residential housing units.  *See* 10 U.S.C. §§ 2871-2885 (West 2001) (codifying Military Housing Privatiza-

tion Initiative); *see also Community Handbook*, Keesler Air Force Base (Sept. 2011) ("Community Handbook") FCRM00000008-65 at 6, as Ex. 1.[3]

4.      In September 2011, under the statutory privatization program, the U.S. government leased the residential properties at Keesler AFB for fifty years to Southern Group.  (Air Force Lease of Property, ECF No. 1-7.)  FCRM, a separate legal entity from Southern Group, managed the residential properties at Keesler AFB as Southern Group's agent.  (Property Management Agreement, ECF No. 1-5 at p. 1); *see also* Community Handbook at 6 (identifying Southern Group as the "Owner" and FCRM as the "agent for Owner").

5.      A little over four years later, as of February 22, 2016, Southern Group was acquired by a Hunt entity and renamed Hunt Southern Group, LLC. FCRM's management of the residential properties at Keesler AFB, including the Fosters' residence, likewise terminated as of February 22, 2016.  (Deposition of Cynthia Ritenour ["Ritenour Depo."] at 60, relevant pages att. as Ex. 2.)[4]

***The Moisture Remediation Project at Keesler AFB***

6.      Partly because of the historic weather patterns in the Gulf region of Mississippi, moisture problems in residential structures and the resulting microbial growth are a common feature of life in the Biloxi area.[5]  In fact, the fungal spores from which mold grows are "ubiquitous" indoors and outdoors in all regions of the U.S.  *See* Expert Report of Allison L. Stock,

---

[3]      *See also* https://www.afcec.af.mil/Home/Housing/Privatization/ (website of U.S. Air Force Civil Engineer Center) (last visited Mar. 17, 2019) ("The [Military Housing Privatization Initiative] projects involve the Air Force leasing land and conveying housing and associated improvements to a private developer for the purpose of revitalizing, maintaining, and managing Air Force family housing communities for a period of 50 years.").

[4]      Cynthia Ritenour was deposed pursuant to Fed. Civ. R. 30(b)(6) as FCRM's designated corporate representative with respect to certain subjects.  (Ritenour Depo. at 15-16.)

[5]      *See, e.g.*, "Mold Article for Keesler News" by Major David Hunt, 81st Aerospace Medicine Squadron, FCRM-00001453-54 at 1 (att. as App'x as Ex. 3) ("As summer approaches and humid weather settles in, mold will make its annual appearance in homes and buildings.").

PhD, MPH and Jeff T. Cook, CIH, CSP dated Nov. 26, 2018 ("Stock/Cook Rept.") at 12 (att. as Ex. 4).

7.     Before Southern Group entered into the long-term lease, the Air Force disclosed that some of the units Hunt Building Co. had constructed at Keesler AFB had experienced moisture issues, and Hunt Building Co. had already partially implemented a repair plan for the recognized problems.  (Supp. Resp. No. 18, FCRM's First Suppl. Resp. to Pls.' Combined Interrogs., served Sept. 28, 2018, ECF No. 93; Deposition of John Hoyt ["Hoyt Depo."] at 27-30, relevant pages att. as Ex. 5.)

8.     The cause and extent of the moisture issues across the 1,028 residences was not known at the time; therefore, the Air Force and Southern Group reserved funds to investigate, and then carry out a Moisture Remediation Project. (Hoyt Depo. at 124-26.)

9.     Southern Group retained Liberty Building Forensics Group ("Liberty") in 2011 and Building Science Corporation ("Building Science") in 2012 to provide consulting services regarding the moisture issues at Keesler AFB.  Liberty and Building Sciences identified various issues, but two primary ones:  (1) excessive air change and depressurization, and (2) sweating sheet metal ducts.  Southern Group began pursuing a remediation plan in accordance with the consultants' recommendations and other findings.  (Supp. Resp. No. 18, FCRM's First Suppl. Resp. to Pls.' Combined Interrogs., served Sept. 28, 2018, ECF No. 93*; see also* Deposition of Henry Wayne "Hank" Topping ["Topping Depo."] at 33-35, relevant pages att. as Ex. 6.)

10.     To determine the best approach, thirty-two units were initially selected to receive prototype HVAC improvements.  The idea for the limited prototype remediation was to ensure that any subsequent work plan for more residences would eliminate moisture infiltration.  (*Id*.) *See also* Topping Depo. at 20, 24-26; Deposition of Michael Eddy ("Eddy Depo." at 171-72, relevant pages att. as Ex. 7 (discussing prototype remediation phase).

11.     In February 2013, Southern Group began the prototype plan.  (Supp. Resp. No. 18, FCRM's First Suppl. Resp. to Pls.' Combined Interrogs., served Sept. 28, 2018, ECF No. 93.)  Work on this phase was completed on April 16, 2013, and the units were monitored over two cooling seasons for energy consumption, water leaks and HVAC system performance.  (*Id.*)

12.     Based on the prototype testing results, a two-phase scope of work was developed to resolve the moisture issues in the four Subdivisions, with Phase I approved by base leadership and the Air Force Civil Engineer Center in December 2015.  (*Id.*)  Phase I of the Moisture Remediation Project, beginning around January 2016, included work on 144 housing units, selected based on maintenance calls reporting HVAC issues.  Phase I's initial scope of work included repairing or replacing HVAC duct trunks in the attics of units and related work.  (*Id.*)

13.     During FCRM's management, it responded to all maintenance calls, including those relating to mold, and any mold complaints were dealt with as maintenance issues while Southern Group determined the extent and reach of broader moisture issues.  (Eddy Depo. at 173; Hoyt Depo. at 182.)

14.     Phase I of the Moisture Remediation Project concluded in July 2016, five months after FCRM ceased being the property manager at Keesler AFB.  (Ritenour Depo. at 60.)[6]

***Information About Mold Made Available to Residents at Keesler AFB***

15.     All residents of Keesler AFB received the Community Handbook when they moved into their leased residences.  (Ritenour Depo. at 19.)  The Community Handbook identified FCRM's Neighborhood Management Office as the location of the maintenance team (*id.* at

---

[6]     Defendant Hunt Southern Group LLC continued the Moisture Remediation Project through subsequent phases, which covered the homes at Keesler AFB that were not covered by Phase I, addressed follow-up issues from previous phases, and sustained the work completed to date.  *See* Hunt Southern Group Resp. to Pls.' Interrog. Nos. 16, 18 served Aug. 10, 2018, relevant pages att. as Ex. 8.

6), and identified the process for making maintenance and service requests (*id*. at 27-30) as well as providing HVAC advice.  (*Id*. at 16.)

16.      In FCRM's Neighborhood Management Office, a brochure entitled "Mold Awareness for Residents of Our Apartment Community" was made available to all residents of Keesler AFB.  (Ritenour Depo. at 60-61; FCRM0000094-95, att. as Ex. 9.)  The brochure explained how molds grow and reproduce, and advised about housecleaning methods that can help remove mold spores.  (FCRM00000094.)  The brochure further advised that "Small amounts of mold or mildew growth on tiles and porcelain surfaces in the bathroom can and should be routinely cleaned up by residents using household products."  (*Id*. at FCRM00000095.)  The brochure also advised that: "[N]ot all molds are considered harmful, but it is not unusual for sensitive individuals to have an allergic reaction to mold.  The possible health effects resulting from mold exposure are currently being researched by the scientific and medical communities.  Currently there are no federal standards for airborne concentrations."  (*Id*.)  Residents were directed to report any non-shower related "mold or moisture problem to the Management office.  FCRM maintenance staff is trained to clean up areas with 10 sq. ft. or less of mold."  (*Id*.)  Last, residents were instructed to "Report Water Damage … Report Visible Mold Growth … Report Moldy Odors … [and] Report Signs of Hidden Mold."  (*Id*.)

17.      In addition to the "Mold Awareness" brochure, a "Mold Tip Sheet" was made available to residents, identifying ways to prevent mold growth indoors by keeping interior spaces and building materials clean and dry.  (FCRM00000091, att. as Ex. 10.)

18.      Each year, as summer approached, the Air Force placed an article regarding mold in the base newsletter, the *Keesler News*.  (Ritenour Depo. at 61-62.)  The article indicated that any resident who saw mold should "notify their building manager so he or she can take appropriate steps to remedy the situation.  If you live in base housing and wish to report mold, call

[FCRM] …The bottom line is that mold is all around in Southern Mississippi, but prevention and control can mitigate its effects."  (*Id.*; FCRM00001453-54, att. as Ex. 3.)

19.     The yearly article also referred readers to the websites of the U.S. EPA and the U.S. Centers for Disease Control for more information regarding mold.  (*Id.*)

***The Plaintiffs and the History of their Leased Residence at Keesler AFB***

20.     Plaintiff Joshua Foster is an active duty member of the United States Air Force, holding the rank of Master Sergeant; in July 2013, he moved with his family to Keesler AFB. (Amended Compl., ECF No. 195 at ¶ 12; Deposition of Joshua Foster ["Joshua Foster Depo."] at 11, 24-25, relevant pages att. as Ex. 12.)

21.     The Military Lease Agreement for the Fosters' residence was executed as of July 12, 2013 by Joshua Foster and "Forest City Residential Management, Inc., Agent for Owner, Forest City Southern Group, LLC."  (Foster-Hunt-Gen01-00005, att. as Ex. 13.)  The Lease Agreement included a "Mold Addendum," which Mr. Foster executed the same day.  (Foster-Hunt-Gen01-00009-10, att. as Ex. 14.)

22.     The two-page Mold Addendum provides that:

> Owner [i.e. Forest City Southern Group, LLC] desires to maintain a quality living environment for Resident.  To help achieve this goal, it is important for the Owner and resident to work together to minimize any mold growth in the Premises.

*Id.* at p. 36.

23.     The Mold Addendum notes: "Mold is found virtually everywhere in the environment – indoors and outdoors in new and old structures," and that "[a]ppropriate precautions need to be taken to minimize the potential for mold growth in the Premises."  (*Id.*)  The Mold Addendum contains several suggestions for "preventing mold" (*id.*), and advice for dealing with "existing mold":

> If small areas of mold have already formed on non-porous surfaces (such as ceramic tile, Formica, vinyl flooring, metal, wood or plastic), the Environmental Protection Agency recommends cleaning the areas with soap or detergent and water, letting the surface dry, and then, within 24 hours, applying a pre-mixed, spray-on type household biocide, such as Lysol Disinfectant®, Pine-Sol Disinfectant®, Tilex Mildew Remover®, or Clorox Cleanup®. … A vacuum cleaner with a high-efficiency particulate air ("HEPA") filter can be used to remove mold products from porous items such as sofas, chairs, drapes and carpets – provided fibers are completely dry.  Machine washing or dry cleaning will remove mold from clothes.

*Id.*

24.    The Fosters moved into the leased residence in July 2013.  (Joshua Foster Depo. at 11.) Before then, no prior occupant had made any maintenance call or complaint regarding mold in the unit.  (Defendant Hunt MP Property Management, LLC's Second Supplemental Responses to Plaintiffs' Combined Discovery, Interrogatory No. 8, Ex. 15, *see also* Prior Work Orders, Ex. 16)  After the prior occupants left the unit and before the Fosters moved in, the unit underwent the standard "Turns Maintenance" through which the unit, including the attic, was thoroughly inspected for any maintenance issues, including the presence of mold, and no mold was found at the Foster residence.  (Eddy Depo. at 154, 166-68; Deposition of Michael Eitutis ("April 30 Eitutis Depo.") at 19, 60-61, relevant pages att. as Ex. 17, Foster-Hunt-Gen02-00028-37, att. as Ex. 18.)  After "turns maintenance" was completed, the unit went through a quality assurance process where it was again inspected for its condition and cleanliness, including the presence of any mold.  (April 30 Eitutis Depo. at 59-61.)  Before they moved in, the Fosters also completed a walkthrough of the property and would have noted any mold; they did not.  (Move-In Unit Inspection, Foster-Hunt-Gen01-00034-35, att. as Ex. 19.)

25.    As reflected in the Work Order History database for their property, the reports received timely responses. (Corrigo Work Order History, Foster-Hunt-Gen02-00010-00013, att. as Ex. 20); Stock/Cook Rept. at 5-7.) During FCRM's management, the Fosters reported an in-

stance of mold on the ceiling of an upstairs water closet in the summer of 2013 that was immediately cleaned by FCRM's maintenance team. (*Id.*; Joshua Foster Depo. at 72-83.) The Fosters reported an instance of mold in the same location approximately one year later in the summer of 2014 that again was immediately cleaned by FCRM's maintenance team. (*Id.*; Joshua Foster Depo. at 83-91.) Mrs. Foster was satisfied with the response of FCRM's maintenance team to any maintenance request. (Jessica Foster Depo. at 275, 337 Ex. 29) As Ms. Foster testified, "[E]very time we called, they would come out and address whatever we had." (Jessica  Foster Depo. at 337.)

26.     Whenever the Fosters reported an instance of mold to FCRM, its maintenance crew addressed the problem. (Stock/Cook Rept. at 5-7; Corrigo Work Order History, Foster-Hunt-Gen02-00010-00013, att. as Ex. 20.)

27.     Although there are no specific guidelines for how quickly mold in residential areas should be addressed, the U.S. EPA indicates that action should be undertaken in a "timely" manner.[7]  FCRM's response to the Fosters' maintenance requests was timely.  (Stock/Cook Rept. at 5-7.)

28.     U.S. EPA guidelines indicate that mold growth less than ten feet square in size may appropriately be cleaned (including by residents themselves) using household products. (Stock/Cook Rept. at 5-7, citing *A Brief Guide to Mold, Moisture and Your Home*, EPA Office of Air & Radiation Indoor Environments Division (2012).) Based on an examination of contemporaneous photographs, the suspect mold growth that the Fosters reported in their living space while FCRM managed the property was much less than ten feet square.  (Stock/Cook Rept. at 6.) Accordingly, under the applicable guidelines, FCRM's maintenance response, consisting of cleaning and removal of the mold, was appropriate.  (*Id.* at 6-7.)

---

[7] Likewise, the Military Lease Agreement states that non-emergency "[r]epairs shall be made within a reasonable time following notification during normal business hours." (Ex. 13 at ¶ 14.)

29.     Mrs. Foster testified that she was satisfied with the response of FCRM's mainte-

nance team to any maintenance request. (Jessica Foster Depo. at 275, 337.) As Ms. Foster testi-

fied, "[E]very time we called, they would come out and address whatever we had." (Jessica  Fos-

ter Depo. at 337.)

***Events Post-Dating FCRM's Management at Keesler AFB***

30.     The following occurred after FCRM ceased managing the property at Keesler

AFB, including the Fosters' leased residence.  FCRM's information regarding the below is based

on discovery in the case, and is provided for the Court's background.

31.     The Fosters reported a suspected substance on September 14, 2016; January 26,

2017; August 17, 2017; and September 28, 2017. (Stock/Cook Rept. at 5-7; Corrigo Work Order

History, Foster-Hunt-Gen02-00010-00013, att. as Ex. 20.)

***Mold Tests at the Fosters' Leased Residence***

32.     The Fosters never had their home tested for mold while FCRM managed the

property.  More than 10 months later, on January 2, 2017, they did have it tested for mold

(Stock/Cook Rept. at 7-9; Amended Compl., ECF No. 195 at ¶ 20.)]  But, nevertheless, it is uni-

versally accepted and agreed by Plaintiffs' own testing laboratories that mold tests reflect only

the conditions at the time of the sample and do *not* reflect the conditions a day before the test, let

alone weeks or months before.  *See* Deposition of Michael Martin ("Martin Depo.") at 102-03,

relevant pages att. as Ex. 22 (air samples from homes demonstrated snapshot in time, not subject

to extrapolation to any other date).[8] Thus, there are no relevant mold tests that would relate to

conditions in the Fosters' residence during the period of FCRM's management.

***There is no Evidence that Plaintiffs' Claimed Medical Conditions are Causally Related
 to Alleged Mold in their Residence at Keesler AFB.***

---

[8]     Mr. Martin is the designated Rule 30(b)(6) representative for Newton Microbial Labora-
tory, the laboratory that analyzed air samples from the Fosters' residence.  (Martin Depo. at 11.)

33.     Although the Fosters initially alleged that two minor Foster children (Makayla and Gabriela) sustained serious and painful personal injuries, (Amended Compl. ¶ 69), the Fosters have since disclaimed any personal injuries to Makayla or Gabriela. (Joshua Foster Depo. at 301; Jessica Foster Depo. at 313.) Makayla tested negative for allergies, and Gabriela was too young for allergy testing. (Joshua Foster Depo. at 54, 252.) The Fosters claim that Makayla and Gabriela have a reduced quality of life related to Mrs. Foster's symptoms and that they have experienced stress and anxiety. (Joshua Foster Depo. at 301-303; Jessica Foster Depo. at 314-328.)

34.     Mr. and Mrs. Foster assert a wide variety of physical and mental injuries that they assert resulted from exposure to mold in the leased residence. Mr. Foster alleges that he experienced headaches, lethargy, post-nasal drip, and coughing, beginning in spring 2016 (after FCRM stopped managing the property) until early to middle 2017. (Joshua Foster Depo. at 215-16, 223-24, 325-36.) Mrs. Foster alleges that she experienced headaches, tiredness, runny nose, dizziness from 2014 or 2015 until 2018. (Jessica Foster Depo. at 314-328.)

35.     However, Plaintiffs have failed to identify *any* qualified expert (including any treating physician) who will provide the specific-causation opinion required under Mississippi law in order to entitle them to recover as against FCRM based on their asserted injuries – namely that exposure to mold in their leased residence caused their specific injuries. Further, each Plaintiff was examined by Dr. Dexter Walcott, an allergy medical specialist, pursuant to Rule 35. Dr. Dexter Walcott concludes that he does not believe to a reasonable degree of medical certainty that any of Plaintiff's reported symptoms were or are caused by exposure to mold in their residence at Keesler AFB.  See Reports of Dr. Walcott, att. as Ex. 23.

36.     Mr. Foster testified that he tested positive for allergies to grass, weeds, cat dander and dust mites and took no steps to control the presence of those allergens in his home. (Joshua Foster Depo. at 294-96.) Mr. Foster attributes the relief of his symptoms to weekly allergy shots.

(Joshua Foster at 218-19.) Mr. Foster's symptoms did not prevent him from running a marathon in September 2016, and he continues to run long distances. (Joshua Foster Depo. at 313-17.)

37.      No physician has ever diagnosed Mr. Foster's symptoms of headache, lethargy, post-nasal drip, or coughing as related to exposure to mold at his leased premises. (Joshua Foster Depo. at 226.)

38.      Mr. Foster has not seen a mental health professional regarding emotional distress, (Joshua Foster Depo. at 245-47),  and Mr. Foster makes no claim regarding his quality of life, (Joshua Foster Depo. at 253), or lost wages. (Joshua Foster Depo. at 261.)

39.      Mrs. Foster claims to have no memory of diagnoses related to upper respiratory infections, allergies, ear infections, vertigo, or sinusitis before she and her family moved to Keesler AFB, but she does not dispute the accuracy of her medical records. (Jessica Foster Depo. at 219-52.) No medical professional has ever told her that her headaches, tiredness, runny nose, or dizziness were due to mold exposure.  (*Id*. at 365.) Rather, Mrs. Foster is allergic to dust mites and receives allergy shots for dust mites. (*Id.* at 279-90, 296-97.)

40.      Mrs. Foster does not assert any claim regarding loss of consortium or lost wages. (Jessica Foster Depo. at 311-12.)

## LAW AND ARGUMENT

A party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Berry v. Armstrong Rubber Co.*, 780 F. Supp. 1097, 1099 (S.D. Miss. 1991).  A genuine issue of material fact exists only if, from the evidence produced, "a reasonable jury could return a verdict for the nonmoving party."  *McManaway v. KBR, Inc.*, 852 F.3d 444, 449 (5th Cir. 2017).  Conclusory allegations of a factual dispute cannot defeat a summary judgment motion.  *See Berry*, 780 F.

Supp. at 1099 (metaphysical doubt is insufficient).  After adequate time for discovery, if a party

fails to establish an essential element of the claim, the court must grant summary judgment.  *Id.*

An infirmity that infects all the claims here is the lack of any evidence of proximate

cause.  Each of Plaintiffs' claims requires them to establish causation.  *See Haley v. Ellis*, 414 F.

Supp. 2d 613, 617–18 (S.D. Miss. 2005) ("All three of plaintiff's causes of action[:] breach of

implied warranty of habitability, breach of contract, and negligence, require plaintiff to prove

harm and proximate causation."); *Mays v. Shoemaker Prop. Mgmt., LLC*, 246 So. 3d 72, 76

(Miss. Ct. App. 2018) (plaintiff "was unable to make a prima facie case of breach of the implied

warranty of habitability" because she was "[w]ithout expert testimony as to the causation of

fire"); *Sample v. Haga*, 824 So. 2d 627, 632 (Miss. Ct. App. 2001) (affirming summary judgment

on breach of implied warranty of habitability claim because plaintiffs could not establish proxi-

mate causation).  But Plaintiffs have no evidence establishing proximate causation as to any of

their claims.  This fatal defect by itself is sufficient to mandate judgment in favor of FCRM on

all claims.

After extensive discovery involving more than three dozen depositions and production of

thousands of pages of documents, Plaintiffs cannot show that any genuine issue of material fact

exists regarding any of the counts in their Amended Complaint as to FCRM.  FCRM is therefore

entitled to summary judgment in its favor.

I.    **FCRM IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM FOR NEGLIGENCE.**

"A plaintiff must establish by a preponderance of the evidence each of the elements of negligence:  duty, breach, causation and injury."  *Paz v. Brush Eng'd Materials, Inc*., 949 So. 2d 1, 3 (Miss. 2007).  Summary judgment is appropriate if a plaintiff's proof fails on any one of these essential elements.  *See, e.g., U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 338 (5th Cir. 2008) ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" and "mandates the entry of summary judgment" for the moving party).

A.    **Plaintiffs Lack the Expert Opinion Evidence Necessary to Establish the Applicable Standard of Care.**

Expert testimony is required when a case involves facts and issues that implicate "scientific, technical, or other specialized knowledge" such that no reasonable trier of fact could find for plaintiff "in the absence of … expert testimony."  *Mildemont, Inc. v. Ford Motor Co*., 2017 U.S. Dist. LEXIS 5353, *7-8 (S.D. Miss. Jan. 13, 2017); *see also Elmore v. Dixie Pipeline Co*., 245 So. 3d 500, 509 (Miss. Ct. App. 2017) (affirming grant of summary judgment in favor of defendant after trial court excluded proffered standard-of-care expert as unreliable; without expert opinion evidence on applicable duty and its breach, no genuine issue of material fact precluded summary judgment); *Smith ex rel. Smith v. Gilmore Mem. Hosp., Inc*., 952 So. 2d 177, 181 (Miss. 2007) (affirming grant of summary judgment in favor of defendant; jury could not evaluate medical professional's conduct "without being told what constituted the proper standard of care by an expert.").

Here, Plaintiffs' multi-pronged negligence claim involves numerous complex issues, none of which is supported by evidence.  Plaintiffs themselves identify at least four key issues inextricably linked to the requisite standard of care, including:  (1) whether the leased residence

was maintained as "reasonably safe"; (2) whether the leased residence was maintained in a way that allowed "toxic mold" to grow; (3) whether the remediation under the Moisture Remediation Project met proper standards up to February 22, 2016; and (4) whether the information about mold that Plaintiffs received from FCRM was sufficient.  (Amended Compl., ¶ 28(A)-(M).)  These standard-of-care issues involve scientific and technical issues, are beyond the common knowledge and experience of lay jurors, and require expert testimony.  *Mildemont*, 2017 U.S. Dist. LEXIS 5353, *7-8.  Yet, Plaintiffs have failed to identify any expert who will opine on the standard of care, let alone that FCRM's conduct did not meet that standard.  *See Shed v. Johnny Coleman Builders, Inc.*, 2017 U.S. Dist. LEXIS  134654, *6, *9 (N.D. Miss. Aug. 23, 2017) (plaintiffs failed to provide any expert opinion attributing mold growth in his rented premises to negligence on the part of defendant landlord; summary judgment granted), *aff'd*, 2019 U.S. App. LEXIS 6023, ___ F. App'x ___ (5th Cir. Feb. 28, 2019).

Plaintiffs have identified Joe Morgan, a claimed expert in construction, who concedes that his only opinions are the buildings at Keesler AFB have construction issues and that the Moisture Remediation Project in general took too long.  (Deposition of Joe Morgan ("Morgan Depo.") at 190-92, relevant pages att. as Ex. 24).  First, those opinions are subject to a Motion to Exclude filed contemporaneously herewith, but more important, they are not relevant to establishing any standard of care applicable to FCRM as the property manager, as FCRM did not construct or own Plaintiffs' residence.  Morgan concedes that he never inspected the Foster residence and he has no opinion as to whether any of those alleged construction issues caused excess moisture that led to mold or whether any maintenance repairs or responses were improper or inadequate.  (*Id*. at 23-24, 117, 142-43.)

Here, Plaintiffs' negligence allegations raise complex issues regarding whether FCRM met the standard of care required of a reasonable manager of privatized military housing on a

large Air Force base.  The issues involve HVAC repair methods, chemistry and toxicology, among other specialized sources of knowledge.  Yet, Plaintiffs have proffered no expert who could describe the requisite standard(s) of care, or any expert to opine that FCRM's conduct did not meet such standard(s).  This reason by itself is sufficient to require summary judgment in FCRM's favor on Count I of the Amended Complaint.

### B.    Plaintiffs Lack the Expert Opinion Evidence Necessary to Establish Causation.

The injuries that Plaintiffs assert here range from: headaches, lethargy, post-nasal drip, and coughing, beginning in spring 2016 (after FCRM stopped managing the property) until early to middle 2017 (Joshua Foster Depo. at 215-16, 223-24, 325-36); to headaches, tiredness, runny nose, dizziness from 2014 or 2015 until 2018. (Jessica Foster Depo. at 314-328.)

The causation issue central to this case – whether any claimed conduct by FCRM as the property manager until February 2016 proximately caused any Plaintiff's alleged personal injury – is a scientific and medical question that requires expert testimony.  To withstand summary judgment where exposure to a toxic substance is alleged, as here, a plaintiff must establish a genuine issue of material fact as to whether the exposure caused the claimed injury based on "reasonable medical probability and scientifically reliable evidence."  *McManaway*, 852 F.3d at 452.  *See also Knight v. Armstrong Rubber Co.*, 1991 U.S. Dist. LEXIS 11239, at *26-27 (S.D. Miss. Apr. 18, 1991) (granting summary judgment to defendant; "[T]he essential link of causation … is missing.  [Plaintiffs' proffered expert] opines a link between Plaintiffs' alleged injuries and chemicals in the Hampton Court area, for which no evidence exists at all.  This conclusion …failed to establish causation.").

Plaintiffs have no such evidence.  Without admissible expert opinion evidence to support a causal link between any alleged conduct of FCRM and any Plaintiff's claimed injury, Plaintiffs

cannot establish causation, a required element of any prong of their negligence claim.  Therefore, FCRM is entitled to summary judgment in its favor.

> **1.     The Court must exclude Plaintiffs' proffered medical causation experts because their opinions are irrelevant and scientifically unreliable.**

To withstand summary judgment in a toxic tort claim, plaintiffs must establish a genuine issue of material fact as to whether exposure to a toxic substance caused their injuries based on a reasonable medical probability and scientifically reliable evidence.  First, Plaintiffs must show that they were actually exposed to the alleged toxic substance.  *See Seaman v. Seacor Marine L.L.C.*, 326 F. App'x 721, 723 (5th Cir. 2009) ("Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case.") (quoting *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996)).  Here, Plaintiffs have no evidence that they were exposed to *any* mold, particularly during FCRM's management, let alone at a level that could cause injury.  The only two mold tests at their residence were conducted months after FCRM ceased managing the property.  The only reports of mold during FCRM's management were a small spot in the garage and a small spot in the laundry room.  Second, assuming they had some evidence of the requisite level of exposure (they do not), Plaintiffs must then show both that the substance is capable of causing their alleged injuries ("general causation") and that it did, in fact, cause their injuries ("specific causation").  *McManaway*, 852 F.3d at 447.  In particular, in order to prevail on their injury claims, they must demonstrate "by a reasonable medical probability through expert testimony that [their] alleged injuries were caused by mold exposure." *Smith v. ADT Security Servs.*, 2006 U.S. Dist. LEXIS 70109, *11 (S.D. Miss. Sept. 26, 2006) (quoting *Bryant v. Metric Prop. Mgmt.*, 2004 U.S. Dist. LEXIS 11214 (N.D. Tex. June 17, 2004)).

Here, even if Plaintiffs had admissible expert opinion evidence that mold exposure is *capable* of causing each of the symptoms or injuries claimed by the Fosters (there is no such admissible evidence), they still lack any admissible evidence that mold exposure was *in fact* the cause of their *specific* claimed injuries.

Plaintiffs have proffered Dr. Paul Goldstein as their medical causation expert.  However, Goldstein's general causation opinion is inadmissible under Fed. Evid. R. 702 and the *Daubert* standard.  (*See* Defendants' Memorandum Brief in Support of Motion to Exclude Expert Opinions of Dr. Paul Goldstein, filed contemporaneously.)  Goldstein fails to offer any relevant scientific studies that support his opinion that the numerous health effects claimed by Plaintiffs can be caused by mold.  Even if his general causation opinion were to be admitted, Goldstein conceded in his deposition that he cannot render a specific causation opinion as required in order to establish medical causation. He has no opinion that any particular plaintiff suffered any injury as a result of exposure to mold at his or her home and testified that he made no "personalized decisions on a plaintiff-by-plaintiff basis as to who was exposed to what, and whether that caused a particular symptom."  (Deposition of Paul Goldstein Vol. I at 242, relevant pages att. as Ex. 25.)  Goldstein admitted that the most he can say is that some molds can cause some medical symptoms and that some of the plaintiffs complained of some of those symptoms. (*Id.*, Vol. II at 331-32, 330 as Ex. 28.)  Regarding the cause of any individual plaintiff's symptoms, Goldstein testified that "You'd have to ask the treating physician."  (*Id.* at 351.) That is insufficient under Rule 702 and *Daubert* to establish the requisite specific causation.

> **2.     Absent the required expert opinion evidence establishing medical causation, the Court must grant summary judgment in favor of FCRM on Plaintiffs' negligence claims.**

It follows that without the necessary opinion evidence establishing specific causation, Plaintiffs cannot establish causation, a necessary element of their negligence claim on which they

bear the burden of proof.  Courts invariably grant summary judgment in just those circumstances.
For instance, in *Smith*, 2006 U.S. Dist. LEXIS 70109, the plaintiff alleged that negligent installa-
tion of an alarm system caused his roof to leak and to "become infested by mold," resulting in
claimed injuries including erectile dysfunction, bloody urine, diabetes and emotional distress.  *Id*.
at *11.  But, as the plaintiff admitted, "no medical expert … attributed his stated ailments to any
mold exposure."  *Id*.  In the absence of evidence to demonstrate "an essential element of his
claim, namely a causal connection between his alleged physical injuries and his alleged exposure
to mold," the court granted summary judgment in favor of defendant.  *Id*. at *12; *see also Jenkins
v. Slidella L.L.C*., 2008 U.S. Dist. LEXIS 49204 (E.D. La. June 27, 2008) (testimony of the les-
sees' medical causation expert excluded because he was unable to connect chronic respiratory
problems with claimed exposure to mold; in absence of admissible evidence going to causation,
summary judgment granted in defendant's favor), *aff'd*, 318 F. App'x 270 (5th Cir. 2009); *In-
gram v. GuideOne Mut. Ins. Co*., 2007 U.S. Dist. LEXIS 85421, *14 (S.D. Miss. Nov. 19, 2007
(without expert testimony to establish that plaintiffs' alleged physical injuries resulted from resi-
dential mold exposure, summary judgment granted in defendant's favor).  Likewise this Court
should summarily dispose of Plaintiffs' negligence claims.

     **C.**    **Plaintiffs Lack any Evidence of Additional Damages.**

     Moreover, to the extent Plaintiffs allege to have suffered real property damage, moving
expenses, or other costs as a result of FCRM's alleged negligence, such claims fail as a matter of
law.  Any alleged damages would have been incurred when Plaintiffs decided to move out of the
residence, more than two years after FCRM stopped managing it.  There is no evidence that any
such damages were incurred during a period of FCRM's management.

### D.    FCRM is Entitled to Judgment as a Matter of Law on Plaintiffs' Claim for the Alleged Breach of the Implied Warranty of Habitability.

Any implied warranty of habitability that would even arguably apply would run solely between Plaintiffs and the owner or landlord of the privatized military housing at Keesler AFB. *See* 49 Am Jur. 2d *Landlord and Tenant* § 442 ("The implied warranty of habitability creates for residential *landlords* a continuing duty during the lease term.") (emphasis added). The Military Lease Agreement between Plaintiffs and Southern Group clearly reflects that FCRM was not the owner or landlord of the leased property, and was solely an agent. *See* Foster-Hunt-Gen01-00005, Ex. 13 (execution by "Forest City Residential Management, Inc., Agent for Owner, Forest City Southern Group, LLC"). This by itself is a sufficient basis to entitle FCRM to judgment in its favor on Plaintiffs' claim for breach of the warranty of habitability, which they attempt to set out in Count I, ¶ 28(A) of the Amended Complaint.[9]

## II.   PLAINTIFFS' CLAIM FOR "GROSS NEGLIGENCE" FAILS BECAUSE IT IS NOT AN INDEPENDENT CAUSE OF ACTION.

In Count II, Plaintiffs assert a claim for "gross negligence." (Amended Compl. ¶¶ 30-32.) The claim fails as a matter of law because it is not an independent cause of action. *White v. Nelson*, 196 So. 3d 1039 (Miss. Ct. App. 2016). In *White*, the court of appeals found no abuse of discretion where the trial court refused to charge the jury with a separate cause of action for "gross negligence." *Id*. at 1049. Rather, the court held, "it is well established that 'gross negligence' … [is] simply [a] higher degree[] of negligence." *Id*. (citing *City of Laurel v. Williams*, 21 So. 3d 1170, 1174 (Miss. 2009)). As there is no independent cause of action for "gross negli-

---

[9]    Plaintiffs also assert a duplicative claim for violation of "the Implied Warranty of Habitability" in Count III of the Amended Complaint, for "Breach of Contract" at ¶ 34(B). As described below, as an agent for the property owner, FCRM was never a party to any contract with Plaintiffs, and accordingly has no contractual duty or liability to Plaintiffs. Nor does Plaintiffs' theory of "third party beneficiary breach of contract" alter this result.

gence" under Mississippi law, the Court should grant judgment in FCRM's favor on Count II of the Amended Complaint.

## III.   PLAINTIFFS' CLAIM FOR BREACH OF CONTRACT FAILS BECAUSE FCRM IS NOT A PARTY TO ANY CONTRACT WITH PLAINTIFFS.

In Count III of the Amended Complaint, Plaintiffs allege that FCRM breached contractual duties to them.  (Amended Compl. ¶¶ 33-35.)  The claim fails because the undisputed facts confirm that FCRM is not a party to any contract with Plaintiff Joshua Foster or any other Plaintiff.

It is an axiomatic contract law principle that only a party to the agreement may be sued for breach of contract, and "an action on a contract cannot be maintained against a person who is not a party to it."  *Mitchell v. Atlas Roofing Mfg. Co*., 246 Miss. 280, 293 (1963) (quoting 17 C.J.S. *Contracts* § 520 at 1143).  Rather, "[t]he obligation of contracts is in general limited to the parties making them.  Only those who are parties are liable for breach of a contract.  Parties to a contract cannot impose any liability upon a stranger to the contract under its terms."  *Id*. (quoting 12 Am. Jur., *Contracts*, § 265 at 812).

It is indisputable that FCRM executed the Military Lease Agreement with Mr. Foster solely in its capacity as the agent for Southern Group, the owner of the military housing.  *See* Foster-Hunt-Gen01-00005, Ex. 13 (executed by "Forest City Residential Management, Inc., *Agent for Owner*, Forest City Southern Group, LLC") (emphasis added).  But this exclusive agency capacity did not make FCRM a party to the Military Lease Agreement, or liable for any claimed breach.  Indeed, "[i]t is a longstanding [tenet] of agency law that an agent who discloses its principal cannot be held liable for the contract entered into with the principal. . . . *Although an agent enters into a contract on behalf of the principal, the agent does not become a party to the contract and is not responsible for its breach*."  *Culpepper Enters. v. Parker*, 2018 Miss. App. LEXIS 365, *30 (Miss. Ct. App. Aug. 7, 2018) (emphasis added; internal quotation and citations

omitted) (trial court erred in denying agents' motions for directed verdict and judgment notwith-

standing the verdict).  *See also* 3 Am. Jur 2d *Agency* § 273 ("[A]n agent is not liable for lawful

acts done within the scope of his or her authority for and on behalf of a disclosed principal.").

Here, the Military Lease Agreement that Mr. Foster executed identifies FCRM solely as

an agent, and discloses the principal, Southern Group.  Accordingly, settled principles of contract

and agency law mandate judgment in favor of FCRM on Plaintiffs' contract claims.

## IV.   PLAINTIFFS' CLAIM FOR FRAUDULENT CONCEALMENT FAILS BECAUSE IT IS NOT RECOGNIZED AS AN INDEPENDENT BASIS FOR RECOVERY.  EVEN IF CONSTRUED AS A FRAUD CLAIM, PLAINTIFFS HAVE NO EVIDENCE OF FRAUD.

In Count VI of the Amended Complaint, Plaintiffs allege that "Defendants" "took affirm-

ative action" to prevent Plaintiffs from discovering mold in their home; that technicians falsely

reported that mold conditions were "located, repaired and removed"; that it was not disclosed

that "toxic mold was a problem" at Keesler AFB; that "Defendants" knew that "toxic mold" had

caused "serious health problems" but failed to disclose that information; and that "Defendants"

failed to disclose known "construction defects" that made "toxic mold" growth foreseeable.  (*Id*.

at ¶ 41(A)-(E).) These allegations have no factual basis in the extensive record developed here.

First, "fraudulent concealment" is not a substantive claim under Mississippi law, but ra-

ther, a tolling doctrine determining when a claim of fraud accrues on a concealed cause of action.

*See* Miss. Code Ann. § 15-1-67; *Anderson v. City Fin. Co.*, 2003 U.S. Dist. LEXIS 25226, *9

(S.D. Miss. July 11, 2003) (discussing elements necessary to invoke tolling doctrine).  Further, in

*Coleman v. Conseco, Inc*., 238 F. Supp. 2d 804 (S.D. Miss. 2002), a panel of this court declined

to recognize a cause of action for fraudulent concealment under Mississippi law, holding that any

such cause of action falls under the "purview" of a fraud claim.  *Id*. at 813.

Even if Count VI is interpreted as a claim for fraud, Plaintiffs here cannot supply evi-

dence to meet the required elements, each of which must be proven by clear and convincing evi-

dence:  (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) intent that it should be acted on by the hearer; (6) the hearer's ignorance of its falsity; (7) reliance on its truth; (8) a right to rely thereon; and (9) consequent and proximate injury.  *McCord v. Healthcare Recoveries, Inc*., 960 So. 2d 399, 406 (Miss. 2007).

Despite the wide-ranging allegations in Count VI of the Amended Complaint, the Fosters have no evidence to meet these elements. The Fosters have no evidence that any defendant prevented discovery of mold (Joshua Foster Depo. at 308-09; Jessica Foster Depo. at 332) or that there was any conspiracy. (Joshua Foster Depo. at 309; Jessica Foster Depo. at 334.) Mrs. Foster agreed that she was satisfied with the response of FCRM's maintenance team to any maintenance request. (Jessica Foster Depo. at 275, 337.) As Ms. Foster testified, "[E]very time we called, they would come out and address whatever we had." (Jessica  Foster Depo. at 337.)

Liability for fraudulent concealment depends on a legal duty to disclose the allegedly concealed information.  *Guastella v. Wardell*, 198 So. 2d 227, 230 (Miss. 1967).  "Where a fiduciary relationship exists, silence may be fraud."  *Grand Legacy, LLP v. Gant*, 66 So. 3d 137, 145 (Miss. 2011).  However, "[t]he 'silence must relate to a material fact or matter known to the party and as to which *it is his legal duty* to communicate to the other contracting party.'"  *Id*. (emphasis added, internal citations omitted).  Here, it is not alleged that FCRM had any fiduciary or other duty to the Fosters.  Moreover, Plaintiffs have no expert to opine about the disclosures required of a reasonable property manager to residents of privatized military housing, or that FCRM was in breach of any such duty.

Accordingly, FCRM is entitled to summary judgment on Count VI of the Amended Complaint.

## V.    PLAINTIFFS' CLAIM FOR CONSPIRACY FAILS AS A MATTER OF LAW.

In Count IV, Plaintiffs assert a truncated one-paragraph claim for civil conspiracy, alleging that "Defendants operated under an agreement between two or more persons or entities" to "conceal[] dangerous conditions" at Plaintiffs' residence, and "committed overt acts in furtherance of the conspiracy."  (Amended Compl. ¶ 37.)  The claim fails for two independent reasons.  First, Plaintiffs have no evidence to meet the required elements of conspiracy.  Second, Plaintiffs lack any evidence of an underlying intentional tort to form the basis for a civil conspiracy claim.

### A.    Plaintiffs Have No Evidence to Meet the Elements of Conspiracy.

Mississippi law defines a "conspiracy" as "a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully."  *Levens v. Campbell*, 733 So. 2d 753, 761 (Miss. 1999).  But "[a] party may not cry 'conspiracy' and throw himself on the jury's mercy."  *Montgomery v. Hughes*, 716 F. Supp. 261, 264 (S.D. Miss. 1988).  Rather, to prove a conspiracy under Mississippi law, a plaintiff must in the first instance provide "substantial evidence supporting the conclusion that there was a 'combination' of entities for the purpose of accomplishing an unlawful purpose."  *Gallagher Bassett Servs., Inc. v. Jeffcoat*, 887 So. 2d 777, 786 (Miss. 2004).  Indeed, "it is elementary that a conspiracy requires an agreement between the co-conspirators."  *Id.*

Plaintiffs have no evidence of any conspiracy between FCRM and any other defendant or other entity.  In Defendants' First Supplemental Interrogatories, Plaintiffs were asked:  "With regard to your Civil Conspiracy claim … please state the factual basis for the claim and identify any documents that were used in formulating the claim."  In a vague and unspecified response, Plaintiffs say only that "*A civil conspiracy existed between Defendants*," to conceal knowledge of the severity of the moisture and toxic mold problem.  (Resp. No. 11, Pls.' Resps. to Defs.' First Set of Supp. Interrogs., served Sept. 21, 2018, att. as Ex. 26, emphasis added.)  The remain-

der of Plaintiffs' conclusory interrogatory response merely recites the elements of civil conspiracy. (*Id.*)  Plaintiffs' response fails to support their conspiracy claim with any evidence of an agreement between co-conspirators – and there is no other such evidence in the record.

In addition to an agreement, which Plaintiffs cannot show, Mississippi law also requires proof of "a meeting of the minds on the object or course of action; … [and] one or more unlawful overt acts." *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 459 (5th Cir. 2005) (quoting *Gallagher Bassett*, 887 So. 2d at 786).  Plaintiffs likewise have no evidence of these required elements.

**B.    Plaintiffs' Claim for Conspiracy Fails for Lack of the Required Underlying Intentional Tort.**

A civil conspiracy claim cannot stand alone, but must be based on an underlying tort. *Wells v. Shelter Gen. Ins. Co.*, 217 F. Supp. 2d 744, 755 (S.D. Miss. 2002).  Count IV is based on an alleged conspiracy to "conceal the dangerous condition," *i.e.* the claimed fraudulent concealment.  Therefore, if the Court dismisses the fraudulent concealment "claim," it should also dismiss the civil conspiracy claim.  *See id.* (civil conspiracy claim based on alleged statutory violation will not lie where claimant has no cause of action under the statute allegedly violated).  Here, none of Plaintiffs' claims can constitute the required underlying tort, as a matter of law.

**1.    Plaintiffs' fraud claim cannot constitute the required underlying tort.**

Only a legally *valid* intentional tort claim is sufficient to support a claim for conspiracy.  For the reasons stated above, Plaintiffs' fraud claim fails as a matter of law and thus cannot serve as the underlying tort for the conspiracy claim.

**2.    Plaintiffs' claims for "negligence" and "gross negligence" cannot constitute the required underlying tort.**

As explained above, Plaintiffs' claims for negligence (Count I) and gross negligence (Count II) fail as a matter of law.  Even if these claims survive summary judgment – which they

should not – they cannot serve as the basis for the conspiracy claim.  The "underlying tort" cannot be founded on negligence; instead, it must be founded on an *intentional* tort.  This follows from the rule that conspiracy requires an "agreement," *Gallagher Bassett*, 887 So. 2d at 786, and an agreement can only be reached with intent.  *See Ruth v. A.O. Smith Corp.,* 2005 U.S. Dist. LEXIS 23235, *11 (N.D. Ohio, Oct. 11, 2005) (applying Mississippi law and agreeing that conspiracy requires actionable underlying ***intentional*** tort).  Thus, non-intentional torts, such as negligence, cannot provide the requisite underlying tort for a conspiracy claim.  *See* 16 Am Jur. 2d, *Conspiracy* § 51 (1998) (conspiracy requires specific intent; "because negligence is … not an intentional wrong, the parties cannot engage in civil conspiracy to be negligent.").

In sum, the Court should grant summary judgment in FCRM's favor on Plaintiffs' conspiracy claims.

## VI.   PLAINTIFFS' CLAIM BASED ON "ALTER EGO" FAILS AS A MATTER OF LAW.

In Count V of the Amended Complaint, Plaintiffs attempt to assert a claim they call "Alter Ego."  (Amended Compl. ¶¶ 38-39.)  But Mississippi recognizes no such tort.  "'[A]lter ego' is not a substantive claim but merely a procedural argument that, if successful, allows a plaintiff to pierce the corporate veil and recover from a corporation's shareholders."  *EDW Invs., LLC v. Barnett*, 149 So. 3d 489, 492 (Miss. 2014).  "Alter-ego liability can be extended only to a corporation's shareholders," *id.*, and it is undisputed that FCRM is not, and was not, a shareholder of any of the other Defendants.  The Court should grant summary judgment for FCRM on this claim.

## VII.   PLAINTIFFS' CLAIM FOR "INTENTIONAL ENDANGERMENT" FAILS AS A MATTER OF LAW.

In Count VII, Plaintiffs' attempt to allege "Intentional Endangerment," a novel claim that no Mississippi court has even mentioned. let alone recognized. (Amended Compl. ¶¶ 42-43.)

A Massachusetts federal court, however, dismissed a claim for intentional endangerment, finding that Massachusetts did not recognize the claim. *See Langlois v. Pacheco*, 2017 U.S. Dist. LEXIS 93835, *20-21 (D. Mass. June 19, 2017) ("Massachusetts does not recognize a tort of intentional endangerment, and plaintiff may not invent one to circumvent the Massachusetts Tort Claims Act."). As in *Langlois*, Mississippi does not recognize a tort of intentional endangerment, and the Court should grant summary judgment on Count VII.

## VIII.   PLAINTIFFS' CLAIM FOR CONSTRUCTIVE EVICTION FAILS AS A MATTER OF LAW.

Plaintiffs attempt to set out a claim for constructive eviction in Count VIII of their Amended Complaint fails. Plaintiffs' claim rests on the allegation that "Defendants" failed to repair "dangerous defective conditions" at the leased residence. (Amended Compl. at ¶ 46.) In the first instance, there is no evidence that FCRM failed to repair any mold condition that the Fosters identified. Indeed, the evidence is that FCRM responded promptly to any maintenance call that the Fosters made during the time that FCRM managed the housing units at Keesler AFB, and remedied the situation in accord with standard procedures. (Corrigo Work Order History, Foster-Hunt-Gen02-00010-00013, att. as Ex. 20; Stock/Cook Rept. at 5-7.) Moreover, Mrs. Foster testified that she was satisfied with the response of FCRM's maintenance team to the reports of mold problems. (Jessica Foster Depo. at 274-75, 337.) The Fosters left their leased residence (which they did voluntarily) more than two years *after* FCRM managed the housing at Keesler AFB. The claim against FCRM for constructive eviction lacks any factual basis.

Second, "not every deprivation of the beneficial enjoyment of the premises necessarily amounts to a constructive eviction." *Perkins v. Blackledge*, 285 So. 2d 761, 764 (Miss. 1973). In order to establish a claim for constructive eviction, Plaintiffs must prove that the interference with their use and enjoyment must be "substantial, serious, effectual, material, fundamental, permanent, of a grave nature, and intentional." 52A C.J.S. *Landlord & Tenant* § 1052 (2019 &

supp.).  The undisputed facts here negate any claim for constructive eviction.  Years after
FCRM's management ceased, the Fosters left their leased residence voluntarily.

IX.   **PLAINTIFFS' CLAIM FOR VIOLATION OF THE SCRA FAILS AS A MATTER OF LAW.**

Plaintiffs assert a claim in Count IX of their Amended Complaint for violation of the
Servicemembers Civil Relief Act ("SCRA"), which mandates that landlords must obtain a court
order before evicting service members or their dependents.  Because Plaintiffs cannot assert any
plausible claim that FCRM actually evicted them, they assert, redundantly, that "Defendants"
violated the SCRA by constructively evicting them.  (Amended Compl. at ¶ 51.)

In the first instance, FCRM did not constructively evict Plaintiffs.  FCRM made timely
repairs of each mold condition that Plaintiffs identified; Plaintiff Jessica Foster testified that he
was satisfied by FCRM's response; and the Fosters left their leased residence voluntarily more
than two years after FCRM no longer managed the property.  There is no authority applying the
SCRA to a claim for constructive eviction.  Indeed, in interpreting the analogous provision of the
predecessor to the SCRA, the Soldiers' and Sailors' Civil Relief Act, it has been held that the
term "eviction" refers to dispossession of a tenant by a landlord, and "not to any disturbance of a
tenant's right to possession and quiet enjoyment of the premises by third party."  *Arkless v Kil-
stein*, 61 F. Supp. 886, 888 (E.D. Pa. 1944).  Thus, the SCRA does not apply to any alleged con-
duct by FCRM.

X.   **PLAINTIFFS' CLAIM FOR "BREACH OF AGREEMENT TO REPAIR" FAILS AS A MATTER
OF LAW.**

In Count X of their Amended Complaint, Plaintiffs allege that "Defendants" breached a
supposed "agreement to repair" by purportedly failing to make timely repairs of "dangerous de-
fective conditions."  (Amended Compl. at ¶ 53.)  Plaintiffs' claim fails because as detailed
above, the undisputed facts confirm that FCRM is not a party to any contract with Plaintiff Josh-
ua Foster or any other Plaintiff, and there is no evidence that FCRM failed to make "repairs"

within a reasonable time.  Rather, the evidence confirms that FCRM addressed each of the two mold-related concerns that the Fosters identified and did so in a timely way.

## XI.   PLAINTIFFS' CLAIM FOR "THIRD PARTY BENEFICIARY BREACH OF CONTRACT" FAILS AS A MATTER OF LAW.

In Count XI of their Amended Complaint, Plaintiffs attempt to assert a cause of action for "Third Party Beneficiary Breach of Contract."  In apparent recognition of the indisputable fact that none of the Fosters are a party to any agreement with FCRM, Plaintiffs cite a number of contracts to which they are strangers, and attempt to claim themselves as intended beneficiaries of those contracts.  (Amended Compl. at ¶¶ 54-61.)  However, both the law of Mississippi and the undisputed facts negate any such claim.

In order to be considered a third-party beneficiary, a claimant must prove that the contract between the original parties was entered for their benefit, or that the original parties at least contemplated such benefit as a direct result of their performance.  *Burns v. Washington Savings*, 251 Miss. 789, 796 (1965) (citing 17A C.J.S. *Contracts* § 519(4) (1963)).  If there is no direct benefit, the third-party theory fails.  *See Adams v. Greenpoint Credit, LLC*, 943 So. 2d 703, 709 (Miss. 2006) (individual who did not sign the contract, was not alluded to in the contract, and had received no benefits from the contract was not a third-party beneficiary); *Rein v. Benchmark Const. Co.*, 865 So. 2d 1134 (Miss. 2004) (affirming grant of summary judgment on third-party beneficiary claim; nursing home resident was not a third-party beneficiary of construction contract between nursing home and construction company).

None of the agreements that Plaintiffs cite in the Amended Complaint were entered into for their benefit (let alone their direct benefit), or in fact contemplated them at all.  Rather, the agreements specifically *disclaim* any intent to benefit *any* third party.[10]  Where the parties to an

---

[10]      The Master Development and Management Agreement, dated September 30, 2011 (relevant pages att. as Ex. 27) (cited in Amended Compl. at ¶ 55) is by and between the United States

agreement expressly exclude any intention to create any third-party rights, "[s]uch an unambiguous statement must be accepted as the intent of the parties and enforced as written." *Garrett Enters. Consol., Inc. v. Allen Utilities, LLC*, 176 So. 3d 800, 805-06 (Miss. Ct. App. 2015).  Given that "[t]he right of a third party beneficiary to maintain an action on the contract must 'spring' from the contract terms," *Burns*, 171 So. 2d at 325, such an express disclaimer of third-party contract rights axiomatically bars any claim under the contract by third parties.

Even if Plaintiffs could bootstrap themselves into the status of third-party beneficiaries of agreements they are strangers to, there is still no evidence that those agreements were breached – indeed, Plaintiffs fail to identify any specific provision that FCRM failed to fulfill in any of the agreements cited in Count XI; they merely allege vaguely that FCRM (and other Defendants) "breached provisions of these contracts" by "not maintaining the Subject Property in good repair."  (Amended Compl. at ¶ 60.)  Nor, as explained in detail above, is there any evidence that any health effects that the Fosters claim were proximately caused by exposure to mold at their leased residence or by any conduct of FCRM.

On all these bases, FCRM is entitled to summary judgment on Plaintiffs' claim for "third-party beneficiary breach of contract."

## XII.   PLAINTIFFS CANNOT RECOVER DAMAGES FOR THEIR CLAIMED MENTAL AND EMOTIONAL INJURIES.

Plaintiffs allege that they each "sustained serious and painful injuries, … extreme mental and physical pain, suffering, anxiety, anguish, and upset, losses and damages to quality of life,

---

Secretary of the Air Force and Southern Group.  (*Id*. at cover page.)  It expressly provides that "**there shall be no third party beneficiaries of this agreement**."  (*Id*. at § 10.15, emphasis added.)  Thus, the Project Operating Agreement (relevant pages att. as Ex. 21) (cited in Amended Compl. at ¶ 55), which was incorporated as part of the Master Development and Management Agreement (*id*. at § 3.1.2) likewise negates any third-party beneficiary claims.  Last, the Environmental Management Plan (relevant pages att. as Ex. 11) (cited in Amended Compl. at ¶¶ 55-56), by being incorporated as part of the Project Operating Agreement (*id*. at Attachment M), likewise negates any third-party beneficiary claims.

and mental and emotional wellbeing." (Amended Compl., ¶ 69.) Plaintiffs cannot, however, re-
cover damages for such injuries here, because they cannot prove any accompanying physical
manifestation of injury or demonstrable harm that is proximately related to any conduct of
FCRM.

Under Mississippi law, recovery for alleged negligent infliction of mental anguish and
emotional distress depends on proof of an accompanying "demonstrable physical injury" that
was reasonably foreseeable by the defendant. *See Gamble ex rel. Gamble v. Dollar General
Corp.*, 852 So. 2d 5, 5 (Miss. 2003) (no recovery for emotional distress damages without proof
of "physical manifestation of injury"); *Wilson v. General Motors Acceptance Corp.*, 883 So. 2d
56, 64 (Miss. 2004) (no recovery for mental anguish based on negligence without proof of de-
monstrable harm reasonably foreseeable to defendant); *Doughty v. Natchez-Adams Sch. Dist.*,
2017 U.S. Dist. LEXIS 158373, *9 (S.D. Miss. Sept. 27, 2017) (no possible recovery for mental
anguish under Mississippi law without showing of physical injury). Allegations that a defend-
ant's conduct caused "anxiety and stress" are insufficient to sustain damages or emotional dis-
tress without evidence of a proximate connection between the claimed conduct and the claimed
mental injury. *See Randolph v. Lambert*, 926 So. 2d 941, 946 (Miss. App. 2006) (granting sum-
mary judgment where plaintiff failed to produce evidence that stress of lawsuit caused increased
blood pressure, anxiety and depression).

Moreover, damages for emotional distress are precluded when the plaintiff receives no
medical treatment or professional counseling for the claimed mental injury. *See, e.g., Wilson*,
883 So. 2d at 64 (summary judgment affirmed where plaintiff did not seek or receive medical
treatment or professional counseling for sleeplessness claimed to have resulted from defendant's
conduct; prayer with pastor insufficient).

Here, the Fosters and their children have attributed a variety of alleged mental and emotional harm to their exposure to mold and FCRM's conduct in managing their leased residence. But there is no admissible evidence that the claimed mental and emotional injuries were foreseeable; and there is no admissible evidence that proximately connects these claimed injuries to any conduct of FCRM.  *See* Factual Background, above.

On these bases, Plaintiffs are not entitled to recover damages for their claimed emotional and mental injuries, and the Court should grant summary judgment on these claims.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should grant summary judgment in favor of FCRM on each of Plaintiffs' claims against it.

Respectfully submitted,

/s/ *Joshua J. Metcalf*
Joshua J. Metcalf, MSB #100340
Alison O'Neal McMinn, MSB #101232
FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200
Jackson, MS 39201
Telephone: (601) 960-8600
Facsimile: (601) 960-8613
Email: joshua.metcalf@formanwatkins.com
Email: alison.mcminn@formanwatkins.com

**-and-**

/s/ *William J. Hubbard*
William J. Hubbard (admitted *pro hac vice*)
Gregory P. Feldkamp (admitted *pro hac vice*)
Thompson Hine LLP
3900 Key Center, 127 Public Square
Cleveland, OH 44114
Telephone: (216) 566-5500
Facsimile: (216) 566-5800
Email: bill.hubbard@thompsonhine.com
Email: gregory.feldkamp@thompsonhine.com

***Attorneys for Forest City Residential Management, LLC***

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I, Joshua J. Metcalf, have this date electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all ECF participants.

THIS, the 10th day of May, 2019.

/s/ *Joshua J. Metcalf*
Joshua J. Metcalf, MSB #100340