**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**JOSHUA FOSTER, et al.,**                                          **PLAINTIFFS**

**V.**                                          **CIVIL ACTION NO. 1:18-cv-00050-HSO-JCG**

**HUNT SOUTHERN GROUP, et al.,**                                          **DEFENDANTS**

<u>**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Hunt Southern Group, LLC ("Hunt Southern") and Hunt MH Property Management, LLC ("Hunt MH") (collectively, the "Hunt Defendants") submit the following argument and authority in support of their Motion for Summary Judgment:

<u>**INTRODUCTION**</u>

The Plaintiffs[1] claim that dangerous levels of mold existed in their home on Keesler Air Force Base ("Keesler"), and that the mold proximately caused them damages, including personal injuries, property damage, and other contract and tort damages. The Plaintiffs couch this general claim as various causes of action including negligence, gross negligence, breach of the lease contract, civil conspiracy, constructive eviction, violation of the Service Members Civil Relief Act, and third-party beneficiary breach of contract. The Plaintiffs claim actual damages including personal injuries, property damage, and relocation costs. All of the Plaintiffs' claims fail for the same general reasons.

First and foremost, the Plaintiffs have no proof of any dangerous, excessive or unreasonable level of mold making their home "uninhabitable." This is an essential element of most, if not all, of the Plaintiffs' claims.

---

[1] The Plaintiffs in this case are Joshua Foster, his wife, Jessica Foster, and their minor children, Makayla and Gabriella.

Second, there is no proof of the breach of any standard of care by any Defendant. Assuming there was excessive or dangerous mold (and there was not), the Plaintiffs have come forward with no evidence of what the Hunt Defendants did or failed to do which violated any standard of care.

Third, the Plaintiffs have no testimony to establish that mold caused any of their damages. The Plaintiffs' only proffered expert on causation is Dr. Paul Goldstein, and his testimony should be stricken as unreliable under *Daubert* and Rule 702 for the reasons set forth in Defendants' separate motion on that subject. But even if allowed to testify, Dr. Goldstein refused to give any opinion on specific causation.

While the Plaintiffs have also proffered a "construction expert," Joe E. Morgan, who opined that there were certain construction defects in all Keesler residences and the Moisture Remediation Project ("MRP") should have been completed more quickly, those opinions are also subject to a separate *Daubert* motion. Once again, even if Morgan's opinions are admitted, Defendants are entitled to summary judgment as Morgan could not provide a causative opinion linking any construction defect with the advent of moisture.

Fourth, their claims for emotional distress are not recoverable under Mississippi law.

Finally, the Plaintiffs' evidence on other essential elements of their claims is insufficient as a matter of law.

For all these reasons, the Hunt Defendants are entitled to summary judgment.

## **STANDARD OF REVIEW**

This Court is familiar with the standard for consideration of a properly supported motion for summary judgment. Fed. R. Civ. P. 56(a). Plaintiffs bear the burden of showing that summary judgment should not be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25

(1986); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194-96 (5th Cir. 1986) (defendant "should be able to obtain summary judgment simply by disproving the existence of any essential element of the opposing party's claim or affirmative defense"). They may not rely on mere allegations or denials, but must show specific facts supporting the existence of a genuine, material issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986). Plaintiffs must do more than allege that they "might could" show certain facts at trial. *Howard v. City of Greenwood*, 783 F.2d 1311, 1315-16 (5th Cir. 1986). The evidence must not be "merely colorable" but must be "significantly probative." *Liberty Lobby*, 477 U.S. at 249. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient" to defeat summary judgment. *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### Background

1.      Following the devastation of Hurricane Katrina, the United States Air Force undertook to rebuild housing at Keesler Air Force Base ("Keesler"). The Air Force designed the homes, issued the requests for proposal and hired a contractor to build the homes, all under a military contract. During the build-out the Air Force issued certain changes in the design of the homes. None of the Defendants in this litigation was part of the construction of the house at 145 McNarney Drive, where the Fosters lived from July 2013 to June 2018, or any of the other houses on Keesler.

2.      Upon information and belief, the house at 145 McNarney Drive was part of the Phase I build of Keesler housing, and was accepted by the Air Force for housing on or about May 5, 2008.

3.     In 1996 Congress enacted the Military Housing Privatization Initiative ("MHPI") as part of the National Defense Authorization Act giving the Department of Defense certain authorities aimed at increasing and improving housing for military service members and their families.

4.     Forest City Southern Group, LLC n/k/a Hunt Southern Group, LLC was formed to respond to the Request for Qualifications issued by the Air Force which culminated in a land lease between Forest City Southern Group and the Air Force on September 30, 2011.

5.     Forest City Southern entered into a property management agreement with Forest City Residential Management wherein FCRM agreed to serve as the property manager for Forest City Southern, beginning on November 16, 2011.

6.     Defendants have searched their records and provided Plaintiffs with those dating back to November 16, 2011. Based on the maintenance records from November 16, 2011 until July 2013 (when the Fosters moved in), there no complaints of mold at 145 McNarney Drive. (Ex. 15; Ex. 1, Hunt MH Property Management, LLC's Second Supplemental Responses to Plaintiffs' Combined Discovery ¶ 10 (April 17, 2019.)

7.     The Foster residence underwent a maintenance "turn" and inspection on July 2, 2013, prior to the Fosters' move in.  (Ex. 15, Foster – Hunt – Gen 02 – 00014.)

**The Fosters' Move onto Keesler**

8.     The Fosters moved into the home at 145 McNarney Drive on July 2013. At the time the Fosters moved to Keesler, Mr. Foster was a technical sergeant in the United States Air Force. He has since been promoted (on August 1, 2018) to master sergeant. (Ex. 3, Joshua Foster Dep. 24:8-18.)

9.     Before they moved into the house on McNarney, the Fosters did a walk-through with Housing Manager Freddie Jordan (Ex. 2 at 72:19-73:4), during which they noted issues regarding the house on a move-in inspection form provided them by FCRM, the leasing agent for the property at the time.[2] They noted separation of linoleum in the kitchen and a cracked tile and carpet separation near the front door, but they did not note mold. (*Id.* at 73:5-21; Hunt MH Property Management, LLC's Second Supplemental Responses to Plaintiffs' Combined Discovery ¶ 10.)  The Fosters also completed the Move-In Move-Out Unit Inspection Report, and indicated no mold.  (Ex. 19)

### The Lease

10.     Following the walk-through and completion of the move-in/move-out form, the Fosters executed a Lease Agreement (Ex. 4, Foster-Hunt-Gen01-00110 through 00133) and various addenda to the Lease for the McNarney Drive house, including a Mold Addendum (Ex. 5, Foster-Hunt-Gen01-00009 through 00010.) The Lease contained two provisions that are relevant to the Defendants' motion for summary judgment: an "as is" provision found at paragraph 6.:

6.  **Condition of Premises upon Commencement Date**.  Resident has examined the Premises and is satisfied with its physical condition, order, and repair.  Resident accepts the Premises "as is" as of the Lease Commencement Date specified on Page 1 Number 4a.  Owner has inspected and inventoried the Premises and provided Resident with a Move-In/Move-Out Unit Inspection and Inventory Report (the "Inspection Report").  Within five (5) days of Lease Commencement Date, or upon occupancy by Resident, Resident shall complete and return to Owner the Inspection Report detailing any deficiencies noted with the Premises.  Owner and Resident will sign the Inspection Report and Owner will provide a copy to Resident.  If Resident does not return the Inspection Report to Owner, Resident accepts the Premises without exception.  Any additional damage or deficiency noted by Owner at move-out will be charged to Resident.

Ex. 4, Foster-Hunt-Gen01-00110, 00113.   And an optional relocation provision, found at paragraph 18.b:

---

[2] Forest City Southern entered into a Purchase Agreement with Hunt Southern Group on February 22, 2016. Thereafter, Hunt Southern Group entered into a property management agreement with Hunt MH for Hunt MH to serve as the property manager for Keesler housing.

b. If the Premises becomes uninhabitable for any reason not caused by Resident, then Owner may relocate Resident either temporarily or permanently. In either case, Owner shall be responsible for the cost of the relocation. If the relocation is temporary, then Resident can expect to move back into the Premises. If the relocation is permanent, Owner will attempt to offer Resident another Premises in the same Housing Category. If Resident accepts another Premises, then this Lease Agreement will continue and be amended as necessary for the new Premises. If Owner cannot provide a suitable Premises or Resident declines to remain on the Installation, then Resident shall be responsible for securing housing outside the Installation and Owner shall pay the cost of the relocation, whereupon this Lease Agreement will be terminated....

Ex. 4, Foster-Hunt-Gen01-00110, 00117.

## The Mold Addendum

11.　　The Mold Addendum, signed by the Fosters, advised Mr. and Mrs. Foster of the possibility that their home could develop mold, recommended steps they could take to prevent it or remedy it if found, and urged them to "promptly report" to Maintenance "any leak, water damage, or signs of water infiltration; any malfunction in the heating, ventilation, or air conditioning system; windows or doors that do not open or close properly; any areas of visible mold; musty or moldy odors; or health issues that Resident thinks may be linked to the air quality within the unit." (Ex. 5 at Foster-Hunt-Gen01-00009.) The Addendum specifically stated that "[i]f Resident fails to comply with this Addendum, Resident may be held responsible for damage to the Premises and any health problems that may result." (Ex. 5 at Foster-Hunt-Gen01-00009, 00010.)

## Alleged Mold at 145 McNarney Drive

12.　　The Fosters first noticed mold in the McNarney Drive house in 2013. (Ex. 3 at 72:4-24; Ex. 2 at 77:16-78:25.) According to maintenance records, the first report was July 16, 2013 with mold in the bathroom ceiling. Ex. 14, at Foster-Hunt-Gen02-00001.

13.　　Mrs. Foster contacted Hunt MH's Maintenance Department ("Maintenance") (Ex. 2 at 81:16-19), and a technician came to the house and cleaned the mold in about 10-15 minutes. (Ex. 3 at 81:8-82:1, 82:11-15.)

14.     In the late spring of 2016, Maintenance told Mr. Foster that it was going to take more aggressive steps to try alleviate the moisture in their home, and that the Fosters should move to a hospitality suite on base for a few days. (Ex. 3 at 90:21-91:9; Ex. 2 at 90:12-20.) The Fosters moved into a hospitality suite while the repairs were being done. (*Id.* at 94:11-95:7.) The repairs were finished a day early. (*Id.* at 94:24-95:7.)

16.     The Fosters confirmed that maintenance responded after each and every call and cleaned it each time it was reported. (Ex. 2 at 337:1-13 ("No, every time we called, they would come out and address whatever we had."))

17.     Responding to a maintenance call for suspected mold on January 30, 2017, the William Ainsworth, the maintenance man, reported that "[a]ll ducts registers [airhandler] all clean no sign of substance except in tub. Checked all registers ducts and air handler no sign of substance [except] in tub and little on surface of hall closet door frame on surface."  (Ex. 14, at Foster – Hunt – Gen 02- 00005.)

**The Fosters' Mold Test**

19.     The Fosters first contacted their attorneys in the fall of 2016. (Ex. 3 at 168:25-169:3.)

20.     The attorneys had the McNarney house tested for mold in January 2017. (*Id.* at 159:4-10; Ex. 3 at 177:21-180:4.) After a 52-point inspection conducted by Ed Williams of Mold Test USA and a thorough review of the ceilings, baseboards, molding, window sills, floors, closets, doors, drapes, carpets, furniture, cabinets, furniture, and the entire house, Mr. Williams saw five isolated examples of what he might consider potential microbial activity.  (Ex. 17, Ed Williams Depo., at 62-63). Mr. Williams even inspected the attic space, and found no evidence

of moisture or mold, no microbial growth on the insulation, and no condensation or sweating ducts. (*id*. at 67-68.)

21. Mr. Williams also took air samples for mold at the Foster home. The results of that test indicate a total spore count outside the Foster home of 100 spores, and an indoor spore count of 93 spores. (Ex. 16, Foster – Hunt – SUBP -0041). In other words, the Fosters were exposed to the same amount of mold outside their home as they were inside their home. Newton Microbial, the lab which analyzed the mold air samples, confirmed that these results did not pose an increased risk to anyone living in the home. (Ex. 17, Martin Depo., at 60:5 – 9) ("Q. And you would agree that if the air concentration is essentially the same, that would not indicate any kind of in – increase risk to anyone insider? A. Correct.").

## The Fosters' Move Out

22. Despite retaining an attorney in 2016 and conducting a mold test in January, 2017, the Fosters continued to live there until June 2018, when they moved to a new home off-base. (Ex. 2 at 170:18-171:1).

## The Fosters' Damages Claims

23. In this lawsuit, the Fosters seek compensatory damages for "serious and painful personal injuries, property damage, extreme mental and physical pain and suffering, anxiety, anguish and upset, losses and damage to their quality of life, and mental and emotional well-being, property damage, reasonable and necessary doctor, hospital, medical and related bills and expenses, [and] moving expenses. . . ." (Am. Compl. ¶ 69.) The Fosters also seek punitive damages. (*Id*. at 71.)

## The Fosters' Medical/Physical Injury Claims

24.     Not a single health care provider has opined that any medical/physical symptom that any of the Fosters exhibited was actually caused by mold exposure. (Ex. 2 at 365:10-22; Ex. 3 at 226:14-24.)

25.     Although their parents identified health issues that Makayla and Gabriella suffered while they lived at Keesler, the Fosters are not making any claims for medical or physical injury for their children. (Ex. 2 at 313:10-25; Ex. 3 at 301:15-20.) Mr. Foster testified that Makayla had expressed concern that she or her parents might develop illness later, but that Mrs. Foster has allayed her concerns. (Ex. 3 at 301:21-303:16.)

26.     Although Mr. and Mrs. Foster have each had health issues over the years, none of their treating physicians has told either of the Fosters that he or she was suffering from mold exposure. (Ex. 2 at 282:11-286:12, 365:10-22; Ex. 3 at 226:14-24.) The Fosters attribute a variety of medical/physical symptoms to mold exposure, but no physician has diagnosed either of the Fosters' symptoms as related to (much less caused by) mold. (Ex. 2 at 365:10-22; Ex. 3 at 226:14-24.)

**The Fosters' Claims for Emotional Distress**

27.     Neither Mr. nor Mrs. Foster has seen a mental health professional regarding mold exposure, or the stress they contend they suffered from dealing with it. (Ex. 2 at 276:5-8.) They worked through the stress by talking to one another (and for Mr. Foster, with other family members) about the situation. (Ex. 2 at 276:9-15; Ex. 3 at 245:6-247:11.) The mold that was allegedly found in the Fosters' house at McNarney has had no effect on Mr. Foster's quality of life. (Ex. 3 at 253:22-24.) Mrs. Foster testified that she did not feel well enough to do things while she lived at 145 McNarney Drive. (Ex. 2 at 310:23-311:13.) She acknowledges, though, that she has no medical evidence that her mental and emotional well-being have been adversely

affected by mold exposure or suffered from anxiety, anguish, or upset as a result of mold exposure, or that she has mental health issues as a result of mold exposure. (*Id.* at 312:6-313:3.)

**The Fosters' Property Damages Claims**

28.     The Fosters claim that the following personal property was damaged by mold in their former home at 145 McNarney Drive: a camera bag ($50), a laptop bag ($50), a suitcase ($100), and lettering on the wall in Makayla's former room (which spelled out her name and which they have not assigned a value). (Ex. 3 at 244:1-21.) They are concerned about whether other personal property they took with them has mold spores. (*Id.* at 243:11-25, 244:22-245:3.)

**The Fosters' Moving Expenses Claims**

29.     The Fosters claim $126 spent to extend Mrs. Foster's father's airline ticket so that he could stay to help Mr. and Mrs. Foster with the June 2018 move. (Ex. 2 at 190:23-191:14.) In addition, they claim $300 for truck rental, $350 advance to them for electricity, $170 for water, $30 for trash and sewer, and $350 for an inspection of the house they purchased and moved into. (Ex. 3 at 41:8-42:24.) The Fosters did not ask any of the Defendants to pay any of their moving expenses before filing their lawsuit. (*Id.* at 44:6-9.)

## <u>ARGUMENT</u>

**I.      The Plaintiffs have no proof of any level of mold making their home "dangerous," "unsafe," or "uninhabitable."**

Mold is everywhere, but the Plaintiffs have offered no evidence that their home contained any "dangerous" or "unsafe" levels of mold, making their home "uninhabitable."[3]

In this case, the only objective, scientific evidence of mold present in the Plaintiffs' home was the mold testing reports attached to Plaintiffs' Amended Complaint (Amended Complaint,

---

[3] Mold is everywhere, indoors and outdoors. "Molds are found in virtually every environment and can be detected, both indoors and outdoors, year round." https://www.cdc.gov/mold/faqs.htm#where. "Molds can be found almost anywhere; they can grow on virtually any substance, providing moisture is present." https://www.epa.gov/mold/ten-things-you-should-know-about-mold.

Ex. B), and the reports and testimony regarding the visible mold inspection undertaken by the mold inspector (Amended Complaint, Doc 195 at Ex. C.)  But those tests and mold inspections demonstrate the opposite of what Plaintiffs claim. The levels of mold found on that day were not "dangerous" or "unsafe" at all.  The Plaintiffs' mold tests demonstrate that the level of mold ***outside*** the home (in the control sample) was about the same as the level of mold ***inside*** the home.  As Defendants' experts Allison Stock and Jeff Cook[4] concluded, without dispute from anyone else, "these data indicate that the mold spore concentration inside the residence does not pose an increased risk of exposure to mold or an increased risk of mold-related adverse health effects relative to the outdoor environment."  (Ex. 6, Foster Rimkus Report, at 8.)  Moreover, the visible mold inspection report demonstrates that there was no abnormal moisture level in the Fosters' home, and only evidence of a handful of isolated microbial growth – the "dangerous mold infestation" alleged by the Fosters.

Maintenance records reflect certain reports and responses for microbial substance-related issues, but the Fosters have not offered, and cannot offer, any proof that any mold found was dangerous, excessive, or unreasonable.  Because of the ubiquitous nature of mold, the multitude of genus and species of mold, all of which have different characteristics, and the individualized responses to mold, there are no uniform standards, thresholds, or guidelines which set forth unacceptable, impermissible or excessive levels of mold.[5] In the absence of any standards setting forth excessive or impermissible levels of mold, the Plaintiffs have not come forward with any proof that the amount of mold found in the Plaintiffs posed an increased risk of harm, or was dangerous.

---

[4] Allison L. Stock, Ph.D., MPH, MS and Jeff T. Cook, CIH.
[5] "Standards for judging what is an acceptable, tolerable, or normal quantity of mold have not been established."  https://www.cdc.gov/mold/faqs.htm#where.    "[N]o EPA or other federal limits have been set for mold or mold spores . . ."  https://www.epa.gov/mold/mold-testing-or-sampling.

In fact, the only evidence regarding the levels of mold in the Plaintiffs' home confirms the opposite. Mr. Ed Williams found five isolated examples of potential microbial substances, and Newton Microbial Labs confirmed that the mold air results posed no increased risk to anyone inside the home. See Undisputed Facts, ¶¶ 20-21. Dr. Stock and Mr. Cook examined the scientific literature and case documents and concluded that there is no "support that the residence . . . posed an increased level of risk from alleged mold contamination." (Ex. 6 Rimkus Report at 4.) Even Plaintiffs' expert, Dr. Paul Goldstein, admits that, to reach his conclusions (unreliable as they are), he never looked at any photos or testing data.

The Plaintiffs' complete lack of proof of any harmful mold is fatal to all of their claims as each requires proof that mold was present in their home at "unsafe" or "dangerous" levels. In fact, the Plaintiffs' own pleadings acknowledge they must prove the existence of "dangerous levels of toxic mold:"

- **Count I Negligence**: failure to provide a "reasonably *safe* premises" (Amended Complaint ¶ 32(a)); failure to repair "*dangerous* defective conditions" (*Id*. at ¶ 32 (j)); defendants knew or should have known of "*dangerous levels* of toxic mold" (*Id*. at ¶ 32(j) emphasis added);
- **Count II Breach of Contract**: *See* Amended Complaint ¶ 38(e) and (f) (nothing done by defendants to remedy "*toxic mold infestation*");
- **Count III Civil Conspiracy**: *See* Amended Complaint ¶ 41 (defendants concealing "*dangerous* conditions")
- **Count VIII Constructive Eviction**: Amended Complaint ¶ 50 (failed to repair "*dangerous* defective condition")
- **Count IX SCRA**: Amended Complaint ¶ 55 (failed to repair "*dangerous* defective condition")
- **Count X Breach of Agreement to Repair**: ¶ 57 (failed to repair "*dangerous* defective condition")

The law recognizes the same standard. *Lee v. Keller Williams Realty*, 247 So. 3d 293, 298 (Miss. Ct. App. 2017) (explaining that a landlord has a duty to provide a "reasonably safe premises" at the beginning of a lease and to repair "dangerous defective conditions upon notice of their existence")

The Plaintiffs cannot make this required showing without expert testimony. Mississippi law recognizes that some conditions—a second-floor door to nowhere, for example—are within the ordinary understanding of lay persons and, thus, no expert testimony is required to assess their dangerousness. See *Joiner v. Haley*, 777 So.2d 50, 52 (Miss.Ct.App.2000) (question "whether the existence of a second-floor door opening into thin air over a ground-level concrete patio was an unreasonably dangerous condition affecting the habitability of the premises" was legitimate jury question). But when understanding the dangerousness of a condition requires specialized training or knowledge, expert testimony is required. *See Shed v. Johnny Coleman Builders, Inc.*, No. 3:16CV171-NBB-RP, 2017 WL 3624240, at *3 (N.D. Miss. Aug. 23, 2017), *aff'd*, — F. App'x —, 2019 WL 994032, at *2 (5th Cir. Feb. 28, 2019) (concluding that expert testimony was needed to prove claims involving toxic mold).

Here, there is no dispute that mold is found everywhere, which means the mere presence of mold cannot be enough to sustain the Plaintiffs' claims. Without expert testimony, a jury would be left to guess about how much mold was in the Plaintiffs' home, and whether that amount was, in fact, dangerous. Mississippi law simply does not allow such speculation. *See, e.g.*, *Mildemont, Inc. v. Ford Motor Co.*, No. 1:15-CV204-HSO-JCG, 2017 WL 151400, at *3 (S.D. Miss. Jan. 13, 2017) (expert testimony required to show defect); *Crocker v. Sears, Roebuck & Co.*, 346 So. 2d 921, 924 (Miss. 1977) (holding that it was "it [is] improper to allow the jury to guess" about possible causes of the plaintiffs' injuries). This makes logical sense as well. Otherwise, every time any mold—however slight—appeared in any leased premises, the landlord would be liable to the tenant for the creation of a "dangerous" and "unsafe" condition. Because the Plaintiffs have no proof that any excessive or dangerous level of mold was in their home , their claim must fail.

260585.2

**II.     The Plaintiffs cannot establish a breach of the standard of care, which is a necessary element for many of their claims.**

Expert testimony is required to establish what the standard of care is and a breach of that standard whenever "the nature of Plaintiff's claim . . . implicates scientific, technical, or other specialized knowledge." *Mildemont*, 2017 WL 151400, at *3. In *Mildemont, Inc. v. Ford Motor Co.*, the plaintiff alleged a defective switch in a Ford truck caused a fire. *Id.* The district court granted summary judgment to the defendant because the plaintiff lacked expert testimony showing the switch was defective. The court explained that, because the claims "implicate[d] scientific, technical, or other specialized knowledge, . . . no reasonable trier of fact could find for Plaintiff on its product liability claim ***in the absence of . . . expert testimony***." *Id.* (emphasis added). *Mildemont* is just one example; there are many, many others.[6]

This case is no different. To prevail, the Plaintiffs must establish the standard of care for a reasonable landlord or property manager and that the Hunt Defendants breached that standard. To do that, the Plaintiffs must show Hunt Southern knew the mold in their home was dangerous and needed to be remediated and that Hunt Southern failed to act reasonably thereafter. A lay jury will not have experience with determining whether mold is dangerous, or determining how that mold should be remediated. Thus, expert testimony is required to establish the standard of care and the breach of that standard of care. *See, e.g.*, *Mildemont*, 2017 WL 151400, at *3. Because the Plaintiffs have no evidence regarding the standard of care owed by a property owner or property manager (much less a breach of that standard), their claims fail as a matter of law.

---

[6] *See, e.g.*, *Elmore v. Dixie Pipeline Co.*, 245 So. 3d 500, 509 (Miss. Ct. App. 2017); *Smith ex rel. Smith v. Gilmore Memorial Hospital, Inc.*, 952 So. 2d 177, 181 (Miss. 2007); *Robinson v. Robinson Property Group Corp.*, No. 2013-CA-01838-COA, — So. 3d —, 2019 WL 125624, at *4 (Miss. Ct. App. Jan. 8, 2019); *see also Qualls v. State Farm Lloyds*, 226 F.R.D. 551, 555 (N.D. Tex. 2005) (expert testimony required to establish breach of the standard of care because "the conduct at issue involve[d] the use of specialized equipment and techniques [to determine whether rust on a tractor trailer coupler assembly] . . . create[d] a danger").

**III. The Plaintiffs cannot prove that any of their alleged damages was proximately caused by mold.**

All of the Plaintiffs' claims require them to establish causation. If they cannot, their claims fail as a matter of law. *Haley v. Ellis*, 414 F. Supp. 2d 613, 617–18 (S.D. Miss. 2005) ("All three of plaintiff's causes of action, breach of implied warranty of habitability, breach of contract, and negligence, require plaintiff to prove harm and proximate causation."); *see Mays v. Shoemaker Prop. Mgmt., LLC*, 246 So. 3d 72, 76 (Miss. Ct. App. 2018) (holding that plaintiff "was unable to make a *prima facie* case of breach of the implied warranty of habitability" because she was "[w]ithout expert testimony as to the causation of fire"); *Sample v. Haga*, 824 So. 2d 627, 632 (Miss. Ct. App. 2001) (affirming summary judgment on breach of implied warranty of habitability claim because the plaintiffs could not establish proximate causation). Here, the Plaintiffs lack the requisite expert testimony.

**A. The Plaintiffs cannot establish that any of their alleged personal injuries was caused by mold.**

The Plaintiffs allege a panoply of personal injuries were caused by exposure to mold. However, their own testimony of those injuries is not enough to show that mold actually caused these injuries. In *Shed v. Johnny Coleman Builders, Inc.*, the Fifth Circuit recently explained claims "for physical injury arising from the presence of mold in [a] leased premises . . . [are claims] for a toxic tort." No. 17-60640, — F. App'x —, 2019 WL 994032, at *2 (5th Cir. Feb. 28, 2019). In such cases, expert testimony is almost always required to establish causation. *See Savage,* 464 F. App'x at 290 ("Under Mississippi law, actions involving "medically complicated" injuries require expert testimony on causation."); *Berry*, 2008 WL 3874368, at *2 ("While in less complex cases where causation may be understood with only common sense, causation may be proved by lay testimony alone; however, with injuries that are medically complicated, as is the

case here, expert testimony is required to prove causation."); *see also Cole v. Superior Coach Corp.*, 234 Miss. 287, 291 (1958) ("In all but the simple and routine cases (and this is not in that category), it is necessary to establish medical causation by expert testimony.").

No medical doctor has ever told the Plaintiffs that any medical symptoms they experienced were caused by mold. No medical doctor will testify or can testify that any of their symptoms were caused by mold. There is no medical record from any treating physician establishing that any condition or symptom of the Plaintiffs was caused by mold. In fact, the only medical doctor who has examined the Plaintiffs and who will offer opinions in this case is Dr. Dexter Winn Walcott, board certified in Pediatrics and Asthma, Allergy and Immunology. Authorized by this Court under Rule 35 to examine each member of the Foster family, Dr. Walcott opined, as to each of them, "I do not believe to a reasonable degree of medical certainty that [Plaintiffs'] symptoms were caused by or exacerbated by exposure to mold in [their] home." (Ex. 7, Dr. Dexter Winn Walcott Rule 35 Reports).

Even assuming that the Plaintiffs could establish the fact of exposure, they still cannot establish specific causation—*i.e.*, the alleged mold in their home proximately caused their symptoms. By his own admission, Dr. Goldstein is not going to testify that mold actually caused any of the Plaintiffs' alleged personal injuries. Dr. Goldstein testified that he never considered whether an individual Plaintiff's particular symptoms were caused by mold.[7] In fact, Dr. Goldstein summarized the extent of his causation opinions as follows:

> Q.     In all of the nine cases, the most you can say is that some of these symptoms can be caused by some exposure to some molds, and that some people in those households had some of those symptoms; true?
>
> A.     I would say that's pretty close.

---

[7] (Ex. 8, Goldstein Dep. (Vol. I) at 242:12–16 ("Q: [Y]ou didn't make personalized decisions on a plaintiff-by-plaintiff basis as to who was exposed to what and whether that caused a particular symptom; true? A: Correct.").)

(Ex. 9, Goldstein Dep. (Vol. II) at 331:23–332:2; *id.* at 330:3–10.) The fact that some of the Plaintiffs' symptoms could have been caused by mold is simply not enough to create a genuine issue of material fact on the issue of specific causation.

The Fifth Circuit's *Shed* decision illustrates this point. The plaintiff in *Shed* pointed to statements from his doctor that his "injuries were consistent with mold exposure." *Id.* Those statements were not enough to establish specific causation—*i.e.*, that mold "in [his] rental home [had actually] caused his specific injuries." *Id.* The same is true here. Even if Dr. Goldstein's opinions were admitted, all he could say is that the some of the Plaintiffs' symptoms "could" have been caused by mold. According to the Fifth Circuit, this testimony would not create a genuine issue of material fact. [8]

In short, the Plaintiffs' lack evidence connecting their claimed personal injuries to mold exposure in their home. In contrast, Defendants have set forth undisputed evidence demonstrating that the Plaintiffs' claimed personal injuries were not caused by mold exposure in their home, but by other disease sources or environmental factors. Thus, the Plaintiffs' claims fail as a matter of law, making summary judgment appropriate on their claims for personal injury, whether arising in tort or contract.

**B.      Because the Plaintiffs have no expert testimony regarding causation, they cannot establish proximate causation for any of their other alleged injuries.**

Like their claims for personal injury, the Plaintiffs cannot show any of their other alleged damages were proximately caused by mold. *See Shed*, 2017 WL 3624240, at *3 (N.D. Miss.

---

[8] *See also Martin v. St. Dominic-Jackson Mem'l Hosp.*, 90 So. 3d 43, 48 (Miss. 2012) ("[M]edical testimony is not probative unless it speaks in terms of probabilities rather than possibilities."); *Savage*, 464 F. App'x at 291 (affirming summary judgment when the plaintiff's doctor was "unable to state to a reasonable degree of medical probability whether [the plaintiff's] injuries were [caused by chemical exposure];" the best the doctor could say was that the exposure "was a possible cause").

Aug. 23, 2017), aff'd, — F. App'x —, 2019 WL 994032, at *2 (5th Cir. Feb. 28, 2019); *Haley*, 414 F. Supp. 2d at 617–18; *Sample*, 824 So. 2d at 632. In the *Shed* case, the Northern District of Mississippi analyzed the plaintiff's claims for physical injury and property damage separately but concluded they both failed for the same reason—*i.e.*, the lack of expert testimony on causation. 2017 WL 3624240, at *3. The court explained that "the plaintiff in the present case has failed to provide expert opinion as to the presence of mold in his home, the specific cause of the mold growth, or whether the mold in the rental home ***caused [his] alleged injuries***—much less expert opinion attributing the mold growth to any of the defendants' negligence. As the requisite causation elements of his physical injury and property damage claims are completely lacking, these claims must be dismissed." *Id*. (emphasis added).

The *Shed* court is not alone in requiring expert causation testimony for all types of damages. Several other courts have held such testimony is required to establish causation in a toxic tort case. *See, e.g.*, *Gringauz v. Sherwin-Williams Co*., No. 09-60197-CIV, 2010 WL 11530661, at *4 (S.D. Fla. July 23, 2010) (granting summary judgment because the plaintiff's expert could not testify that allegedly toxic paint had caused any of the plaintiffs' injuries); *Cerny v. Marathon Oil Corp*., 480 S.W.3d 612, 622 (Tex. App. 2015) (granting summary judgment in negligence and nuisance case because the plaintiff failed "to present more than a scintilla of expert evidence that emissions from a Marathon and/or Plains facility caused their . . . property damage"); *Arias v. DynCorp*, 928 F. Supp. 2d 1, 7 (D.D.C. 2013) (granting summary judgment on property damage claims in toxic exposure case because plaintiff lacked expert testimony).

In this case, the Plaintiffs seek to recover for property damage, lost income, and relocation expenses in addition to their alleged personal injuries. *See* Amended Complaint ¶ 69.

As property damage, the Plaintiffs claim approximately $200 for a camera bag, a laptop bag, and a carry-on suitcase, all of which they threw away without taking any pictures. (Ex. 3 at 244:1-21.) The Plaintiffs also seek relocation expenses, amounting to about $1,426. Finally, the Plaintiffs claim in their amended complaint "lost income" but admit that neither of them took any unpaid leave as a result of mold exposure.

Even assuming the Plaintiffs could prove they suffered these damages, they have no expert testimony showing those damages were proximately caused by mold. No expert has testified or will testify that the mold in the Plaintiffs' home was "dangerous," "unsafe," or that the home was "uninhabitable." Likewise, no expert has testified that the camera bag, laptop bag, or suitcase were actually damaged by mold or had to be thrown away (as opposed to cleaned). No one has testified that Mr. or Mrs. Foster was unable to work because of mold.

While the Plaintiffs' have also proffered a "construction expert," Joe E. Morgan, who opined that there were certain construction defects in all Keesler residences and the Moisture Remediation Project should have been completed more quickly, those opinions are subject to a separate *Daubert* motion. Once again, even if Morgan's opinions are admitted, Defendants are entitled to summary judgment as Morgan could not provide a causative opinion linking any construction defect to the creation of moisture in any home. (Ex. 10, Morgan Dep. 128:3-21; 141:24-15.) Without expert testimony, every tenant would and could claim property damage for any personal property (whether damaged or not) based on the tenant's own subjective feelings about mold (whether verified or not). Put simply, the Plaintiffs' non-personal-injury claims fail due to the same absence of expert causation testimony.

IV.     **Under Mississippi law, the Plaintiffs' cannot recover damages for emotional distress.**

Finally, it is clear the Plaintiffs' claims for emotional distress must fail as a matter of law. Because the Plaintiffs cannot show that mold caused a physical injury, they "must offer 'substantial proof' of emotional harm." *Edmonds v. Beneficial Mississippi, Inc.*, 212 F. App'x 334, 337–38 (5th Cir. 2007); *Morrison v. Means*, 680 So. 2d 803, 806 (Miss. 1996) ("If the conduct is not malicious, intentional or outrageous, there must be some sort of demonstrative harm, and said harm must have been reasonably foreseeable to the defendant."). Generalized allegations of stress, anxiety, or even a few visits to a psychiatrist are insufficient. *Id.* (holding that "sleeplessness, nightmares and even multiple visits to a medical doctor were insufficient"); *Adams v. U.S. Homecrafters, Inc.*, 744 So. 2d 736, 744 (Miss. 1999) (evidence that the "plaintiffs complained of worry or emotional upset and loss of sleep" was not enough to recover for emotional harm); *Morrison*, 680 So. 2d at 807 (testimony that plaintiff had been "affected . . . emotionally in that [he had] not been able to sleep many nights because [he felt] like [he had] been done wrong" and "been cheated out of money that [he needed] to help support [his] family" was insufficient); *Strickland v. Rossini*, 589 So. 2d 1268, 1275 (Miss. 1991) (testimony that the plaintiff had "been very depressed" and that "[h]er kids have been very upset over all this and emotional" and "gone through a lot of stress and worry" was insufficient).

Neither Mr. nor Mrs. Foster has seen a mental health professional regarding mold exposure, or the stress they contend they suffered from dealing with it. (Ex. 2 at 276:5-8.) They worked through the stress by talking to one another (and for Mr. Foster, with other family members) about the situation. (Ex. 2 at 276:9-15; Ex. 3 at 245:6-247:11.) The mold that was allegedly found in the Fosters' house at McNarney has had no effect on Mr. Foster's quality of life. (Ex. 3 at 253:22-24.) Mrs. Foster testified that she did not feel well enough to do things while she lived at 145 McNarney Drive. (Ex. 2 at 310:23-311:13.) She acknowledges, though,

20

that she has no medical evidence that her mental and emotional well-being have been adversely affected by mold exposure or suffered from anxiety, anguish, or upset as a result of mold exposure, or that she has mental health issues as a result of mold exposure. (*Id.* at 312:6-313:3.)

**V.    For the reasons set forth above and other reasons, the Plaintiffs cannot prove the essential elements of the causes of action alleged in their Amended Complaint.**

Each of the Plaintiffs' claims fails for the reasons outlined above. This section applies the reasoning of the foregoing sections to the specific causes of action alleged in the Plaintiffs' Amended Complaint. This section also sets forth additional reasons that certain causes of action fail as a matter of law.

**A.    The Plaintiffs cannot establish a negligence (Count I), gross negligence (Count II) claim, or a tort claim based on the Implied Warranty of Habitability (contained within Count I).**

As demonstrated above, the Plaintiffs cannot establish any of the essential elements of their negligence case. They have no proof of any "dangerous" or "unsafe" level of mold in their home. The Plaintiffs have no proof that Hunt Southern breached any standard of care in response to the alleged mold. And finally, the Plaintiffs have no proof that their damages were proximately caused by mold. As discussed above in greater detail, all three of these elements are essential to their negligence claim and are not met here. The Plaintiffs' gross negligence claim suffers the same fate as their simple negligence claim. *See White v. Nelson*, 196 So. 3d 1039, 1049 (Miss. Ct. App. 2016) ("[I]t is well established that "gross negligence" and "reckless disregard" are simply higher degrees of negligence."). Mississippi courts have treated the implied warranty of habitability as an extension of negligence. *See Houston v. York*, 755 So. 2d 495, 501 (Miss. Ct. App. 1999) (explaining that breach of the implied warranty of habitability involves the "failure to use 'reasonable care to provide safe premises'" and that the warranty merely requires a landlord "to act as a reasonable landlord under the circumstances of the case").

To succeed on an implied warranty claim, a tenant must show "duty, breach, causation, and damages, and the landlord [is] entitled to raise the standard tort defenses, such as contributory negligence, unforeseeability or intervening cause." *Id.* (quoting *O'Cain v. Harvey Freeman & Sons, Inc. of Mississippi*, 603 So. 2d 824, 833 (Miss. 1991)). Thus, to the extent the Plaintiffs' implied warranty of habitability claim arises in tort, it fails for the same reasons that their negligence claim fails.

### B. The Plaintiffs cannot establish a breach of the Lease Agreement (Count III).

#### 1. There has been no breach of the Lease Agreement or the Implied Warranty of Habitability.

Plaintiffs' Amended Complaint alleges "Defendants breached the Military Lease Agreement entered into with Plaintiffs on January 12, 2012." (Doc. 186, Am. Compl., at ¶ 38.) To establish breach of contract, the Plaintiffs must show (1) the existence of a valid contract and (2) a breach by Defendants. *Smith v. Antier Insanity, LLC*, 58 F.Supp. 3d 723 (S.D. Miss. 2014). Here, the Plaintiffs have failed to show a breach of the Lease Agreement or the Warranty of Habitability implied in the Lease Agreement.

The Plaintiffs claim their home was not suitable for habitation at the inception of the lease. But the Lease Agreement provides the Plaintiffs will inspect the premises before moving in and that they are accepting it "as is."

> 6. **Condition of Premises Upon Commencement Date**. Resident has examined the Premises and is satisfied with its physical condition, order, and repair. **Resident accepts the Premises "as is" as of the Lease Commencement Date** . . . Owner has inspected and inventoried the Premises and provided Resident with a Move-In/Move-Out Unit Inspection and Inventory Report (the "Inspection Report") Within five (5) days of Lease Commencement Date, or upon occupancy by Residence, Resident shall complete and return to Owner the Inspection Report detailing any deficiencies noted with the Premises. Owner and Resident will sign the Inspection Report and Owner will provide a copy to

> Resident. If Resident does not return the Inspection Report to Owner,
> Resident accepts the Premises without exception. . .

(Ex. 11, Foster Military Lease Agreement at Foster-Hunt-Gen01-00113) (emphasis added). The Plaintiffs completed that inspection, found no mold in the premises, and executed a Move-In/Move-Out Inspection form. (Ex. 12, Move-In Move-Out Inspection Report, Foster-Hunt-Gen01-00031 through 00042.) Mr. Foster signed the form and the Lease Agreement, acknowledging that Resident accepts the premises "as is." Thus, the Plaintiffs accepted the premises "as is," and acknowledged that there was no mold present at move-in. (Ex. 11 at 3.) Accordingly, the Plaintiffs cannot claim their house that "was not fit for human habitation" at the inception of their lease.

Even if they could, they still could not show a breach at the inception of the Lease Agreement or any time thereafter. As explained above, the Plaintiffs cannot show that there was a "dangerous" level of mold in their home or that it was "uninhabitable." Such proof, if it existed, would require specialized knowledge and training and must be expert in nature.[9] Here, the Plaintiffs have no such testimony. This is true whether or not one or both of the Plaintiffs' expert witnesses is excluded under *Daubert*.

The Plaintiffs claim "Defendants failed to honor the lease provision which allows for relocation of the relocation of the tenant in the event the housing becomes uninhabitable." Amended Complaint ¶ 38(G) (emphasis added). The lease is clear. The relocation provision is only triggered when the house "becomes uninhabitable," (Ex. 11, Foster Military Lease Agreement at Foster-Hunt-Gen01-00113 ¶ 18.6) and Hunt MH offered to relocate them and the

---

[9] *Compare Joiner v. Haley*, 777 So.2d 50, 52 (Miss.Ct.App.2000) (question "whether the existence of a second-floor door opening into thin air over a ground-level concrete patio was an unreasonably dangerous condition affecting the habitability of the premises" was legitimate jury question) *with Savage v. Pilot Travel Centers, L.L.C.*, 464 F. App'x 288, 290 (5th Cir. 2012) (expert testimony required in cases involving medically complicated injuries); *Berry v. SW. Airlines Co.*, No. CIVA 307CV305TSL-JCS, 2008 WL 3874368, at *2 (S.D. Miss. Aug. 15, 2008) (same).

260585.2

Fosters refused. Because the Plaintiffs cannot show their house was uninhabitable, they cannot show a breach of this lease provision.

Third, the Plaintiffs claim Hunt Southern breached the Implied Covenant of Good Faith and Fair Dealing. (Amended Complaint, ¶ 30.A.) "The covenant of good faith and fair dealing holds that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Wiemer v. Rubino*, No. 1:16CV99-LG-RHW, 2019 WL 187873, at *8 (S.D. Miss. Jan. 14, 2019) (citing *Ferrara v. Walters*, 919 So. 2d 876, 883 (Miss. 2005)). A breach of this covenant—*i.e.*, bad faith—is "characterized by some conduct which violates standards of decency, fairness or reasonableness." *Cenac v. Murry*, 609 So. 2d 1257, 1272 (Miss. 1992). "Stated differently, the covenant holds that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Wiemer*, 2019 WL 187873, at *8 (internal quotation marks and alterations omitted). Moreover, "[a] party which acts in accordance with the express terms of a contract generally cannot be found to have violated the covenant of good faith and fair dealing. . . . [A party is] not required to do more than the contract required to escape liability for breach of the covenant of good faith and fair dealing." *Baldwin v. Laurel Ford Lincoln-Mercury, Inc.*, 32 F. Supp. 2d 894, 898–99 (S.D. Miss. 1998).

Here, the Plaintiffs have no evidence that Hunt Southern acted unreasonably in performing their duties under the Lease Agreement. In fact, the evidence in this case shows that Hunt Southern and the Plaintiffs both inspected the home at lease signing, and found no evidence of mold. Then, the undisputed evidence is that for each report of mold, there was a timely and appropriate response to that complaint. (Ex. 2 at 274:23-275:4, 337:1-13.)

### 2. The Plaintiffs cannot prove that any breach proximately caused damages.

Like their negligence and breach of warranty of habitability claims, the Plaintiffs' breach of contract claim requires them "to prove [both] harm and proximate causation." *Haley v. Ellis*,

24

414 F. Supp. 2d 613, 617–18 (S.D. Miss. 2005). As explained above, the Plaintiffs have no

expert testimony on causation, whether for personal injury or property damage. Because the

Plaintiffs cannot prove that mold proximately caused their injuries, their breach of contract claim

fails as a matter of law.

### 3. Hunt MH Property Management was not a party to the Lease Agreement, and cannot be liable for any alleged breach of the lease or implied warranty of habitability.

The Plaintiffs claim that both Hunt Southern and Hunt MH breached the Lease

Agreement. (Amended Complaint, ¶ 38.) However, it is undisputed that Hunt MH Property

Management LLC is not a party to the lease.

The Plaintiffs cannot maintain a breach of contract causes of action against a party who

was not a party to that contact. *Mitchell v. Atlas Roofing Mfg. Co*., 246 Miss. 280, 293 (1963)

(quoting 17 C.J.S. *Contracts* § 520 at 1143). Rather, "[t]he obligation of contracts is in general

limited to the parties making them. Only those who are parties are liable for breach of a contract.

Parties to a contract cannot impose any liability upon a stranger to the contract under its terms."

*Id*. (quoting 12 Am. Jur., *Contracts*, § 265 at 812). Here, the Plaintiffs claim that both Hunt

Southern and Hunt MH breached the Lease Agreement. (Amended Complaint, ¶ 38) It is

undisputed, however, that Hunt MH Property Management, LLC is not (and never was) a party

to the Lease Agreement. For these that reason alone, even if the Breach of Contract claim can

proceed against Hunt Southern, Hunt MH is entitled to dismissal of that the breach of contract

and Implied Warranty of Habitability Claim claim against it even if both claims can proceed

against Hunt Southern.

### C. The Plaintiffs cannot establish a civil conspiracy (Count IV).

The Plaintiffs' civil conspiracy claims must be dismissed for several additional reasons. First, civil conspiracy claims are subject to a one-year statute of limitations. *See Harris v. Jackson Cty.*, Miss., No. 1:14-CV-435-LG-JCG, 2015 WL 5918196, at *4 (S.D. Miss. Oct. 9, 2015)(citing *Jones v. Flour Daniel Servs. Corp.*, 32 So. 3d 417, 422-423 (Miss. 2010)). "In the conspiracy context, the cause of action accrues as soon as the plaintiff knew or should have known of the overt acts involved in the alleged conspiracy." *Shabazz v. Franklin*, 24 F.3d 239, 239 (5th Cir. 1994)(citations omitted). Here, the Plaintiffs constructively knew about their alleged civil conspiracy claim no later than the summer of 2016, when they decided to retain counsel for a lawsuit. They filed suit more than a year later on December 22, 2017, and accordingly, the statute of limitations has run.

Second, a claim for civil conspiracy "cannot stand alone, but must be based on an underlying tort." *See Midwest Feeders, Inc. v. Bank of Franklin*, 114 F. Supp. 3d 419, 429 (S.D. Miss. 2015) (citation omitted). Moreover, that underlying tort must be an intentional tort. *See Ruth v. A.O. Smith Corp.,* 2005 U.S. Dist. LEXIS 23235, *11 (N.D. Ohio, Oct. 11, 2005) (applying Mississippi law and agreeing that conspiracy requires actionable underlying ***intentional*** tort). The Amended Complaint alleges no recognizable intentional tort, but merely claims that there was an "unlawful purpose of concealing dangerous conditions." (Amended Complaint, ¶41.) As discussed below, the Plaintiffs' claims for "fraudulent concealment" are not a cause of action at all and any fraud claim would be dismissed for failure to plead that claim with particularity.

Finally, Plaintiffs' conspiracy claim is deficient as the allegations of conspiracy must be pled with particularity. *Vinson v. Vinson*, Case No. 3:99cv054-B-A, 2000 U.S. Dist. LEXIS 2458, *6-7 (N.D. Miss. Feb. 24, 2000) (specific facts of the conspiracy must be pled with

particularity not simply alleged in broad, vague assertions."). Plaintiffs' civil conspiracy claim consists of two generic sentences as to an "agreement" and "overt acts in furtherance of the conspiracy." Plaintiffs do not make any allegations specific to the Hunt Defendants or any "overt act" that would support this claim. *See Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 459 (5th Cir. 2005). In this case, there is no evidence, whatsoever, that Defendants took part in any conspiracy or aided or abetted another Defendant in conduct resulting in injury to Plaintiffs.

**D. There is no cause of action for either "alter ego" (Count V), "fraudulent concealment" (Count VI) or "intentional endangerment" (Count VII); therefore, the Plaintiffs cannot establish those claims.**

The Plaintiffs' Amended Complaint contains a number of "causes of action" which are not substantive counts but merely theories of liability or tolling doctrines. Because the Plaintiffs' substantive counts fail, Defendants are entitled to summary judgment on these various theories.

In Count V, the Plaintiffs allege a "cause of action" for "Alter Ego." "'[A]lter ego' is not a substantive claim but merely a procedural argument that, if successful, allows a plaintiff to pierce the corporate veil and recover from a corporation's shareholders." *EDW Invs., LLC v. Barnett*, 149 So. 3d 489, 492 (Miss. 2014). "Alter-ego liability can be extended only to a corporation's shareholders . . ." *Id.* Here, neither Hunt Southern nor Hunt MH nor Forest City Residential Management are shareholders of the other, and this theory of establishing liability simply does not apply.

In Count VI, the Plaintiffs purport to state a claim for "fraudulent concealment" pursuant to Miss. Code § 15-1-67. (Am. Complaint, ¶ 45.) Of course, Miss. Code § 15-1-67 does not create or confer a claim for "fraudulent concealment," but rather tolls the statute of limitations on other claims when and if those claims were fraudulently concealed. Courts construing this statute and Mississippi law have refused to establish a separate claim for fraudulent concealment.

*Coleman v. Conseco, Inc.*, 238 F. Supp. 2d 804, 814 (S.D. Miss. 2002) (did not recognize a cause of action for fraudulent concealment under Mississippi law, holding that any such cause of action falls under the "purview" of a fraud claim.)

But here, the Plaintiffs do not allege with particularity (or at all) any of the elements of a fraud claim.[10] Even if they had, the Plaintiffs' lease included an "as-is" clause. (Foster Lease at page 3.) Mississippi courts have held that "an 'as-is' clause . . . constitute[s] a transfer of property without any warranties." *Stribling Inv., LLC v. Mike Rozier Const. Co.*, 189 So. 3d 1216, 1222 (Miss. 2016); *see Shed*, 2017 WL 3624240, at *3 (concluding "as-is" clause in residential lease barred fraud claim). Accordingly, the Plaintiffs cannot establish the reasonable reliance needed to prove a fraud claim. *See Shed*, 2017 WL 3624240, at *3. Nor can the Plaintiffs point to any affirmative misrepresentations regarding the state of the property at the time they signed the lease.[11] *See Joy v. H & M Builders, Inc.*, No. 3:08CV329-DCB-JMR, 2009 WL 812259, at *5 (S.D. Miss. Mar. 27, 2009) (finding that affirmative misrepresentations precluded application of an "as is" clause).

The last three representations alleged in Plaintiffs' Amended Complaint concern Hunt Southern's knowledge that ***other houses*** at Keesler Air Force Base and elsewhere had "toxic mold." (*See* Am. Compl. ¶ 36.C–E.) This Court has already held the only relevant inquiries in this case are whether the Plaintiffs were exposed to mold at their residence, and, if so, whether such mold exposure caused their claimed injuries. [Doc. 175] Even assuming these extraneous

---

[10] Those elements are: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) intent that it should be acted on by the hearer; (6) the hearer's ignorance of its falsity; (7) reliance on its truth; (8) a right to rely thereon; and (9) consequent and proximate injury. *McCord v. Healthcare Recoveries, Inc.*, 960 So. 2d 399, 406 (Miss. 2007).
[11] (no affirmative representations regarding mold were made during the pre-move in walk through).

facts are true (and they are not), the fact that other houses on Keesler (or anywhere else) had problems with mold has nothing to do with the Plaintiffs' claims.

Finally, Count VII asserts a claim for "intentional endangerment." Defendants are unaware of any Mississippi case recognizing a cause of action for "intentional endangerment" and the Plaintiffs' Complaint does not set forth the elements of this cause of action. Further, it appears this claim is identical to the Plaintiffs' negligence and gross negligence causes of action except that they allege the Defendants acted intentionally. Because the Plaintiffs cannot establish negligence or gross negligence, they cannot establish that Defendants acted intentionally.

**E. Because there was no eviction at all, much less a constructive eviction, the Plaintiffs cannot establish the elements of their constructive eviction claim (Count VIII) or their claim under the SCRA (Count IX).**

### 1. The Plaintiffs cannot state a claim for constructive eviction.

The Mississippi Supreme Court has described a constructive eviction as involving at least: (1) "an intentional act or omission of the landlord" that (2) works a "permanent deprivation of the use and beneficial enjoyment of the demised premises." *See Perkins v. Blackledge*, 285 So. 2d 761, 764 (Miss. 1973). Plaintiffs must prove that the interference with their use and enjoyment must be "substantial, serious, effectual, material, fundamental, permanent, of a grave nature, and intentional." 52A C.J.S. *Landlord & Tenant* § 1052 (2019 & supp.). Here, the Plaintiffs have pled Hunt Southern "intentionally failed to exercise reasonable care to repair dangerous defective conditions." (Doc. 186, ¶ 41.) The Plaintiffs have no evidence of negligent conduct, much less intentional conduct.

In this case, the evidence reflects that Maintenance reasonably responded to the Plaintiffs' reports of mold. (Ex. 2 at 120:16-122:12, 274:23-275:2.) The Plaintiffs also agree that maintenance personnel cleaned their home on several occasions and made other repairs.

At most, the Plaintiffs contend that Hunt Southern, through its management group, did not remedy the mold in their home fast enough. But the Plaintiffs have no expert testimony even suggesting that Hunt Southern's response was unreasonable, especially when they cannot even show that a dangerous condition ever existed in their home in the first place. Moreover, the undisputed proof is that every request for a mold repair was completed, and the Plaintiffs left their home voluntarily after refusing to move to a hospitality home so repairs could take place in their home. (Ex. 2 at 170:18-171:1; Ex. 3 at 43:15-25.) There certainly is no proof of "substantial, serious, effectual, material, fundamental, permanent, of a grave nature, and intentional" conduct which could be construed as constructive eviction.

Finally, it is axiomatic that for a tenant to be constructively evicted, they must move out in a reasonable time after the purported breach. *Infinity Broad Corp. of Ill. V. Prudential Ins. Co. of Am.*, 869 F.2d 1073, 1077-78 (7th Cir. 1989). If a tenant fails to vacate within a reasonable time then the constructive eviction claim is waived. *Bloch v. Rischholz*, 587 F.3d 771, 778 (7th Cir. 2009). In this case, the Fosters consulted an attorney in August 2016, conducted a mold test in January, 2017, filed suit regarding mold in their house on December 22, 2017, and continued to live in their home until June 2018.

### 2. The Plaintiffs cannot state a claim for breach of § 3951 of the SCRA.

The Service Members Civil Relief Act ("SCRA") provides, in relevant part, that "[e]xcept by court order, a landlord (or another person with paramount title) may not (A) evict a servicemember, or the dependents of a servicemember, during a period of military service . . . ." 50 U.S.C. § 3951. If there is no eviction, then there can be no SCRA violation. Here, there is no dispute that the Hunt Defendants never initiated legal proceedings to evict the Plaintiffs. As explained above, the Plaintiffs left voluntarily after unilaterally concluding they could not

continue to live in their house. In fact, the Plaintiffs were offered a permanent or temporary move in order to undertake further repair efforts, but the Plaintiffs made the decision to move out. Because there was no eviction or constructive eviction, this claim fails.

**F.   There is no claim for "breach of agreement to repair" (Count X) under Mississippi law, and if there is, it must suffer the same fate as the Plaintiffs' breach of contract claim.**

The Plaintiffs' Amended Complaint asserts a new count for a "breach of agreement to repair" and cites *Kiernan v. Germain*, 61 Miss. 498 (1884). (Am. Compl., ¶ 48.) But Kiernan does not establish a duty to repair separate from the express terms of a lease agreement. *See id.* at 503–04. In fact, *Kiernan* holds that any such duty must arise from a promise by the landlord. *See id.* Thus, this claim fails to the extent it is not based on the Lease Agreement. In that regard, the Plaintiffs have not identified any act or omission by Hunt Southern that amounts to a breach of a repair provision in the Lease Agreement. Accordingly, this claim fails.

**G.   The Plaintiffs' third-party beneficiary claim (Count XI) is barred by an express disclaimer.**

Count XI of the Amended Complaint alleges Hunt Southern entered into a contract with the Air Force and that they are third-party beneficiaries of that contract. But this argument falters right out of the gate. To succeed on a third-party beneficiary theory, the Plaintiffs must show, among other things, that they were "within the intent of the terms . . . used" in the original agreement. *Mississippi High Sch. Activities Ass'n, Inc. v. Farris By & Through Farris*, 501 So. 2d 393, 396 (Miss. 1987). When a contract expressly disclaims any intent to create a third-party beneficiary, that term "must be accepted as the intention of the parties and enforce as written." *Garrett Enters. Consol., Inc. v. Allen Utilities, LLC*, 176 So. 3d 800, 805–06 (Miss. Ct. App. 2015). In other words, if the contract between Hunt Southern and the Air Force disclaims any intent to create third-party beneficiaries, then that is the end of the matter.

Here, the Plaintiffs allege Hunt Southern breached the terms of the Environmental Management Plan ("EMP"). The EMP, however, is not a standalone agreement; instead, it is part of the Master Development and Management Agreement ("MDMA") between the Air Force and Forest City Southern Group, LLC (predecessor to Hunt Southern). The MDMA expressly provides: "[T]here shall be no third party beneficiaries of this Agreement." (*See* Ex. 13, MDMA at § 10.15.) Because Forest City Southern Group, LLC (now Hunt Southern) and the Air Force expressly disclaimed their intent to create third-party beneficiaries, Count XI fails as a matter of law.[12] *See Garrett*, 176 So. 3d at 805–06.

## CONCLUSION

For the foregoing reasons, the Hunt Defendants request that the Court grant their Motion for Summary Judgment.

WHEREFORE, PREMISES CONSIDERED, the Hunt Defendants pray that the Court grant their Motion for Summary Judgment, and award all appropriate relief.

---

[12] To the extent that the Plaintiffs rely on the Property Management Agreement ("PMA") entered into between Forest City Southern Group, LLC (as Owner) and Forest City Residential Management, Inc. (as Manager), their claim would also fail because the PMA incorporates the AF Project Documents listed at exhibit B to the MDMA, which includes the express disclaimer of third-party beneficiaries.

260585.2

Respectfully submitted, this the 10th day of May 2019.

**Balch & Bingham, LLP**

*/s/ Walter H. Boone*

Walter H. Boone, MSB#8651
Jennifer J. Skipper, MSB#100808
**BALCH & BINGHAM LLP**
188 East Capitol Street, Suite 1400
Jackson, MS 39201
Telephone: (601) 961-9900
Facsimile: (601) 961-4466
Email:  wboone@balch.com
        jskipper@balch.com

*Attorneys for Hunt Southern Group, LLC and*
*Hunt MH Property Management, LLC*

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on the 10th day of May 2019, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all known counsel of record by operation of the court's electronic filing system.

*/s/ Walter H. Boone*

Walter H. Boone

260585.2