IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**JOSHUA FOSTER, ET AL.**                                                                            **PLAINTIFFS**

**V.**                                                       **CIVIL ACTION NO.1:18CV50-HSO-JCG**

**HUNT SOUTHERN GROUP, LLC FKA**
**FOREST CITY SOUTHERN GROUP, LLC, ET AL.**                   **DEFENDANTS**

## DEFENDANTS' JOINT MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE THE OPINIONS AND TESTIMONY OF DR. WALCOTT OR, IN THE ALTERNATIVE, FOR *DAUBERT* HEARING [DOC. 249]

Hunt Southern Group, LLC, Hunt MH Property Management, LLC, and Forest City Residential Management, LLC (collectively "Defendants") hereby oppose Plaintiffs' Motion to Strike the testimony of Dr. Winn Walcott, Rule 35 examiner [Doc. # 249] as follows:

## INTRODUCTION

Plaintiffs claim that a medical doctor who is board certified in Pediatrics and Asthma, Allergy & Immunology cannot offer a medical diagnosis regarding the cause of their alleged medical symptoms. Plaintiffs' argument misapprehends *Daubert*'s purpose. According to both the Supreme Court and the Fifth Circuit, *Daubert* seeks to ensure that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Roman v. Western Mfg., Inc.*, 691 F.3d 686, 693 (5th Cir. 2012). Here, that is exactly what Dr. Walcott did.

Every single day, tens of thousands of doctors diagnose the cause of a patient's symptoms based on a review of the medical history, their self-reported symptoms, a physical

1

examination, and medical testing, if any. In this case, Dr. Walcott reviewed Plaintiffs' medical records and deposition testimony, along with conducting a physical examination.[1] After reviewing records and conducting examinations, he applied his education, training, and experience—like every other doctor in America—and concluded, to a "reasonable degree of medical certainty," that (1) Plaintiffs' "symptoms were not caused by exposure to mold in the home;" and (2) he further concluded that "none of [Plaintiffs'] prior or ongoing medical treatment is attributable to mold exposure in the Keesler Air Force Base home." Collective Ex. A. There is nothing unreliable about this methodology. It is what doctors do. Moreover, Dr. Walcott is the only expert in this case to have conducted both a physical examination and document review.

The Court will note that Plaintiffs' motion is devoid of any citation to the deposition testimony of Dr. Walcott. That is because Plaintiffs did not even bother to take his deposition. Plaintiffs are left attempting to critique Dr. Walcott's opinion based solely on his written report. Plaintiffs' motion amounts to complaints about the conclusions Dr. Walcott reached, not his methodology. For example, Plaintiffs argue that "none of Plaintiff's prior or ongoing medical treatment *is attributable* to mold exposure in the home, instead blaming symptoms and resulting treatment on other medical issues *rather than* the clear, documented mold exposure which Dr. Walcott either chooses to ignore or dismisses as insignificant." [Docs. 342, 344, 346,348,350 ¶ 16] (emphasis added). However, the *Daubert* inquiry addresses only the expert's methodology, not his conclusions. Plaintiffs may not like those conclusions, but that is no basis for excluding Dr. Walcott under *Daubert* or Rule 702. Ultimately, Plaintiffs admit that there is a dearth of

---

[1]Pursuant to this Court's order, Dr. Walcott was prohibited from conducting any invasive medical testing—such as skin testing for allergic responses—but he reviewed any existing skin or allergy tests. [Doc. 81]

information about the mold they claim exposure to and whether that mold may have caused their medical symptoms. That alone confirms Dr. Walcott's opinions and also confirms that Defendants are entitled to summary judgment.

## **STANDARD OF REVIEW**

Under Federal Rule of Evidence 702, an expert "who is qualified by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." *See* Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court established the analytical framework for deciding whether expert testimony is admissible under the above rule. This analysis is a "flexible" one, and "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co.*, 526 U.S. at 150; *Roman.*, 691 F.3d at 692("The reliability inquiry under *Daubert* is a flexible one, permitting the district court to identify the most germane considerations.")(internal quotation marks and citations omitted); *see also Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002). A "proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

In *Williams v. Manitowoc Cranes, LLC*, this Court described in detail the Fifth Circuit's standard for admitting expert testimony. No. 1:14CV383-HSO-JCG, 2016 WL 7670061, at *3–4

(S.D. Miss. Sept. 21, 2016), *aff'd*, 898 F.3d 607 (5th Cir. 2018). "District courts are to make a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.' " *Id.* (quoting *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016)). "In short, expert testimony is admissible only if it is both relevant and reliable." *Pipitone*, 288 F.3d at 244. "The party seeking to have the district court admit expert testimony bears the burden of proof [on these issues]." *Williams*, 2016 WL 7670061, at *3.

## ARGUMENT

*Daubert* ensures an expert applies "in [the] courtroom . . . the same level of intellectual rigor that characterizes the practice of [the] expert in the relevant field." *Roman*, 691 F.3d at 693 (quotation omitted). Here, the "relevant field" is medical evaluation, assessment, and diagnosis. Rule 35 physicians are certainly qualified in this area.

Rule 35 requires a written report setting forth the examiners' "findings, diagnoses, conclusions, and the results of any tests." *See* Fed. R. Civ. P. 35(b)(2). Courts routinely order Rule 35 examination *for the express purpose* of evaluating and diagnosing the cause of a plaintiff's medical symptoms. *See Pyle v. Trustees of Purdue Univ.*, No. 4:16-CV-98-RL-JEM, 2018 WL 1737511, at *2 (N.D. Ind. Apr. 11, 2018) (ordering Rule 35 examination "to determine which symptoms are attributable to Defendant's alleged actions" because "[t]here is no other apparent method of obtaining the information"); *Hill v. Fairfield Police Dep't*, No. 2:15-CV-1820-MCE-KJN, 2017 WL 1198510, at *2 (E.D. Cal. Mar. 31, 2017) (ordering Rule 35 examination to determine whether the defendants conduct had caused or exacerbated the plaintiff's alleged medical symptoms); *Mitchell v. Home Depot U.S.A., Inc.*, No. 3:11-CV-332,

4

2012 WL 1366599, at *2 (W.D. Ky. Apr. 19, 2012) (ordering a Rule 35 examination "to determine the existence and the extent of [the plaintiff's] asserted injuries").

I. **In Granting Defendants' Motion to Compel a Rule 35 examination, This Court Already Determined That Dr. Walcott Can Testify Regarding His Assessment and Diagnoses of the Plaintiffs' Physical Condition.**

Under Rule 35, a court may "order a party whose mental or physical condition . . . is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner." Fed. R. Civ. P. 35(a). In the case management order, Plaintiffs agreed that a Rule 35 examination was appropriate. [Doc. 16] Plaintiffs subsequently attempted to impose unreasonable conditions on the examinations which required a motion to compel. In October 2018, this Court ordered Plaintiffs to appear before Dr. Winn Walcott, of Mississippi Asthma and Allergy Clinic, P.A. [Doc. 81 at ¶4] In that order, this Court expressly "approve[d]" Dr. Walcott and, consistent with the requirements of Rule 35, directed him to "provide a report which sets out in detail his findings, *including diagnoses and conclusions*." [Doc. 81 at ¶7] (emphasis added). Further, this Court stated: "The examiner may be deposed or called as a witness at trial by either party . . . ." *Id.* Accordingly, this Court has already determined that Dr. Walcott may testify regarding the findings of his examination. This Court can summarily deny Plaintiffs' motion on that basis alone.

II. **Dr. Walcott's Opinions Are Admissible Under *Daubert* and Federal Rule of Civil Procedure 702.**

Dr. Walcott's opinions exceedingly qualify under *Daubert*. To be admissible under Federal Rule of Evidence 702, an expert must be qualified, and his opinions must be both reliable and helpful. *See* Fed. R. Evid. 702. The opinions of Dr. Walcott meet each of these requirements.

A. *Dr. Walcott Is Qualified to Evaluate, Assess, and Diagnose the Cause of Plaintiffs' Medical Symptoms.*

5

"Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).

Dr. Walcott is highly qualified to opine on the cause of Plaintiffs' medical symptoms. He is a partner at the Mississippi Asthma and Allergy Clinic in Jackson, Mississippi, practicing as an allergist and immunologist. He received his medical degree from the University of Mississippi in 1982 and completed an Asthma, Allergy, and Immunology fellowship at Louisiana State University in 1993. He is board certified in Asthma, Allergy, and Immunology, having been recertified at least twice in over thirty years of practice. He is a member of The American College of Asthma, Allergy, and Immunology. He has over "25 plus year history of experience in the evaluation, diagnosis, treatment and follow-up of patients with allergic dysfunction, including allergic rhinitis, asthma and fungal mediated disorders." Ex. A at 1.

Dr. Walcott regularly diagnoses and treats patients with all types of allergies, including allergies related to mold. *Id.* Dr. Walcott "routinely care[s] for and treat[s] patients with allergic rhinitis and asthma . . . including patients with mold as a trigger for their asthma and/or asthma and allergic rhinitis." *Id.* He also "treat[s] patients with a pulmonary disease related to mold, including Allergic Bronchopulmonary, Aspergillosis and patients with a severe sinus disease stimulated by mold exposure, known as Allergic Fungal Sinusitis." *Id.* Based on this training, knowledge, and experience, Dr. Walcott is certainly qualified to examine, assess, and diagnose the cause of Plaintiff's medical symptoms. *Huss*, 571 F.3d at 455 (explaining that a doctor "did not need to be board-certified in cardiology or toxicology" to opine that Plaintiff's medical condition was not caused by a particular drug).

Moreover, one of Plaintiffs' own treating physicians, Dr. James Holland, knows Dr. Walcott and would not disagree with his diagnosis in another case finding no causation.

> Q. Do you know Dr. Dexter Winn Walcott?
> A. Yes.
> Q. Do you find him to be a ***reputable allergist***?
> A. ***Yes.***
> Q. He has done a report in this case for the specific purpose of determining whether any of the Cookseys have a mold-related illness. He did a physical examination and reviewed all the medical records. Am I correct that you personally have not reviewed all of the Cookseys' medical records?
> A. Yes, I have not reviewed all of their records.
> Q. Okay. In Dr. Walcott's opinion, after his review of the medical records and a physical presentation of Mrs. Cooksey to his office, he opined that the "did not believe to a reasonable degree of medical certainty that Heidi Cooksey's symptoms were caused by exposure to mold in her home. In addition, none of Mrs. Cookseys' prior ongoing medical treatment is attributable to mold exposure in her home."
> Q. As we sit here today ***would you be able to give a specific disagreement with Dr. Walcott's opinion***?
> A. ***No.***
> Q. Okay. And I–he held the same opinion with regard to Sadie, Sarah, and Sydney. Am I correct that as we sit here today you couldn't offer any disagreement with that opinion from Dr. Walcott for any of those patients?
> A. ***I would not disagree with that opinion.***

Ex. B, 148:2-149:12. Like the Cooksey matter, Dr. Walcott is the only doctor to have both comprehensive medical records and a physical examination.

Dr. Walcott thoroughly explained his methodology in his report when he stated that "[t]he history of exposure and symptoms with exposure is the basis of the allergic evaluation. Based on the history, further supportive workup includes allergy testing to see if the patient truly is allergic to the possibly offending allergen. This may involve aeroallergen skin testing, which is the most accurate testing method, or in certain patients, blood work can be obtained, known as RAST testing…." Ex. A, pp. 1-3.

Plaintiffs attack Dr. Walcott for not being a toxicologist. Courts have recognized that claims of harm from mold exposure lie squarely in the realm of an allergist's expertise. *See Jenkins v. Slidella LLC*, 2008 WL 2649510, at *4 (E.D. La. 2006)("As suggested by *Roche v. Lincoln Property Co.*, this lack of board certification as an allergist is problematic, particularly since the symptoms of which the instant Plaintiffs complain lie more in the field of allergic medicine. 278 F. Supp. 2d 744.")

Plaintiffs cite one case supposedly in support of their argument that defendants needed to hire a toxicologist instead of an allergist. However, their reliance on *Zellars v. NexTech Ne., LLC*, 895 F. Supp. 2d 734, 734-44 (E.D. Va. 2012), is misplaced. In that case, the expert had to perform an internet search to familiarize herself with the relevant field of refrigerant toxicity. *Id.* The Court found that "Dr. Gallagher is not a toxicologist and has no training in methodologies used for diagnosed refrigerant toxicity." *Id.* at 743. Contrarily, an allergist's practice consists of assessment of allergens, including mold, and determining whether the patient is having an adverse reaction due to that allergen.[2]

Finally, Plaintiffs' treating physician agrees with Dr. Walcott. Although Plaintiffs argue that Dr. Walcott "attempt[s] to dismiss [Plaintiffs'] health problems as unrelated to mold exposure [] lack sufficient scientific or medical basis," they do so with the knowledge that all of Plaintiff's' treating physicians came to the same conclusion as there is not one treating physician who diagnosed any Plaintiff with a mold-related condition. **Dr. Walcott used reliable methodology in reaching his medical conclusions.**

---

[2] The scientific and medical literature confirms that it is Dr. Walcott's specialty which deals with the precise issue involved in this case. The American Academy of Allergy, Asthma and Immunology produced a position paper on the medical effects of mold exposure which supports Dr. Walcott's opinions in totality. Ex. C.

266793.2

Instead, every one of Plaintiffs' treating physicians support Dr. Walcott and his opinions as they each came to the same conclusion – no injury related to mold. Dr. Walcott followed standard methodology any allergist would to diagnose a problem. There is no causal link between the claimed indoor mold exposure and Plaintiffs' alleged symptoms. Plaintiffs object to the conclusions but that is not enough to exclude Dr. Walcott or to even hold a *Daubert* hearing.

As discussed above, Dr. Walcott routinely treats and diagnoses patients with allergy symptoms, including mold-related allergies. In his report, Dr. Walcott explained the methodology he uses in his practice. He first examines a patient's exposure history and symptoms. He then conducts follow-up tests, such as skin test, x-rays, CT scans, and blood work known as RAST testing. Ex. A at 2-3. Dr. Walcott employed this same methodology in this case. He examined Joshua, Jessica, Makayla, and Gabriella Foster on December 5, 2018. He also reviewed their deposition testimony and medical records. While this Court's order prohibited Dr. Walcott from performing any invasive medical tests, such as skin testing for mold allergies, he did study the results of any skin tests previously conducted. During the examination Joshua Foster's pulmonary function test was reviewed and found to be normal. Ex. A, at 21.

Based on his application of the above methodology, Dr. Walcott concluded, to a reasonable degree of medical certainty, that none of Plaintiffs' "prior or ongoing medical treatment is attributable to mold exposure in the Keesler Air Force Base home." Ex. A, Gabriella Foster Report at 5; *id.*, Jessica Foster Report at 5; *id.*, Joshua Foster Report at 5; *id.*, Makayla Foster Report at 5. Dr. Walcott concluded that none of the Fosters' symptoms were caused by mold from their Keesler home. While Joshua Foster "reported symptoms that can be associated with exposure to mold, those same symptoms can be caused by other common aeroallergens, such as trees, grasses, weeds, and dust mites, which the patient was also allergic to and by other

9

disease conditions." Ex. A, at 5[3]. Ms. Foster was only allergic to dust mites. *Id.* at 4.[4] Likewise, Gabriella and Makayla Foster's medical records do not have a history of abnormal childhood illnesses.[5] In general all of Plaintiffs' claimed symptoms could have been caused by other

---

[3] Dr. Walcott recorded that Mr. Foster "reported complaints of chronic nasal symptoms, especially postnasal drip and throat clearing along with headaches while living on Keesler Air Force Base." After a "thorough review of" Mr. foster's records, Dr. Walcott found that Mr. Foster "was not seen for recurrent respiratory infections, headaches, lethargy, or flares of allergic rhinitis except when he presented for allergy testing after a mold test was done in his home." Mr. Foster requested allergy testing in January 2017 which "was negative" but he had subsequent skin tests that were positive for "dust mites, grasses, weeds, cats" and "Alternaria, Cladosporium, Curvularia, and Fusarium." After review of the mod test Dr. Walcott noted "[o]nly one of those molds which Foster has positive skin tests for, Cladosporium, was detected inside the home, and the test revealed only one spore counted. With the insignificant numbers of indoor molds as compared to outside, along with the patient's lack of medical history supporting significant nasal symptoms, infection, headaches, and lethargy, and his history of allergic rhinitis to dust mites, which would be present in high humidity areas such as the Mississippi Gulf Coast which responded very well to immunotherapy, it is my opinion that the patient did not suffer significant medical issues from excessive mold exposures within the home." Dr. Walcott explained that the symptoms Mr. Foster complained of "can be caused by other common aeroallergens, such as trees, grasses, weeds, and dust mites, which the patient was also allergic to and by other disease conditions." Ex. A.

[4] "In August 2017, [Ms. Foster] presented requesting an allergy referral after she had received a mold report … At the point when she presented for an allergy referral she had not had any documented visits for chronic nasal symptoms, headaches, fatigue, or lethargy." Dr. Walcott noted that Ms. Foster was given a skin prick test that was negative for molds, including "Cladosporium, Curvularia, Penicillium, and Alternaria… Two weeks later intradermal testing was done to the pertinent allergens to which she previously was prick skin negative, and those remained negative, including pollen, animal dander, and molds. Only dust mites were positive…" Dr. Walcott found that "[b]ased on the lack of marked inside mold exposure and her lack of medical documentation of persistent symptoms, including congestion, infections, headaches, lethargy, or dizziness, it is my opinion that Ms. Foster did not suffer medical issues secondary to mold exposure within her home."

[5] As to Gabriella Foster, Dr. Walcott notes that she "does not have a history of atopic dermatitis and has hot had an allergy evaluation. She has been in daycare extensively throughout her life… Gabriella has had normal childhood illnesses, especially normal illnesses for a child in daycare. At this time, she does not have a documented allergic dysfunction." As to Makayla Foster, Dr. Walcott opined that "In January 2017, Makayla presented for allergy testing secondary to the mold testing done at the Fosters' home on Keesler Air Force Base. On January 13, 2017, RAST testing was performed that was negative to pollens, animal dander, dust mites, and molds, including Alternaria, Aspergillus, and Cladosporium. She eventually was seen by Dr. Holland where a negative allergy evaluation was obtained, including for molds. This child has been in daycare frequently throughout her life, which will definitely increase the frequency of infections." Dr. Walcott summarized that Makayla "has a history of normal childhood rashes which were treated successfully. Based on her history of usual childhood illnesses both before living at Keesler and while living at Keesler, along with her negative allergy testing , and the mold testing which did not reveal elevated mold levels within the home as compared to the outside, I do not believe that the patient has experienced any mold-related medical issues." Ex. A.

10

common aeroallergens and by other disease conditions. Additionally, he explained that, even if their symptoms could be connected to mold exposure, they still could not be connected to mold exposure inside their home because (1) Jessica, Makayla, and Gabriella Foster never had any allergy testing done, and (2) there was more mold outdoors than inside the home. *See id.* These are the kind of medical diagnoses and evaluations contemplated by Rule 35. *See Hill*, 2017 WL 1198510, at *2 (ordering Rule 35 examination to evaluate whether the plaintiff's symptoms were caused or exacerbated by the defendants' conduct or "other unrelated causes") There is nothing unreliable about Dr. Walcott's methodology.

Dr. Walcott's opinions are based on medical and scientific literature. To demonstrate the shaky ground upon which Plaintiffs' argument is based, Plaintiffs attack Dr. Walcott's report for not providing a citation to the CDC website. [Doc. 250 at ¶17] A simple Google search returned the very quote cited by Dr. Walcott under the CDC's "Facts about Stachybotrys chartarum and Other Molds" at https://www.cdc.gov/mold/stachy.htm.[6] The quote provided in the Rule 35 report is word-for-word what appears on the CDC's website and was easily verified. Dr. Walcott's report, although not cited as an attorney would, provides all the information necessary to locate the quote and verify "the accuracy of the quote" and "context." The CDC website provides:

> The term 'toxic mold' is not accurate. While certain molds are toxigenic, meaning they can produce toxins (specifically mycotoxins), the molds themselves are not toxic, or poisonous. Hazards presented by molds that may produce mycotoxins should be considered the same as other common molds which can grow in your house. There is always a little mold everywhere – in the air and on many surfaces. There are very few reports that toxigenic molds found inside homes can cause unique or rare health conditions such as pulmonary hemorrhage or memory loss. These

---

[6] Last visited May 16, 2019 and printed as Ex. D for reference from the Court.

> case reports are rare, and a causal link between the presence of the toxigenic mold and these conditions has not been proven.

*Id.* It is astounding to claim a lack of "basic identifying information."

### B. Dr. Walcott's Opinions Are Relevant and Will Help the Jury Determine a Central Fact at Issue—Whether the Plaintiffs' Alleged Personal Injuries (to the extent there are any) Were Caused by Mold.

This Court has already determined that "the relevant inquiry in this case is whether the Plaintiffs were exposed to mold at their residence and whether mold exposure caused their injuries." [Doc. 182 at 3](citing decisions in *Cooksey et al v. Hunt Southern Group*, LLC (ECF Nos. 144, 165)) Dr. Walcott's opinion will certainly help this Court and the jury in answering the second question. As described above, Dr. Walcott concludes that, for several reasons, it is impossible to determine whether mold caused Plaintiffs' medical symptoms. He further explains that, based on his examination and a review of the medical records, he does not believe that mold caused their medical symptoms. While Plaintiffs lack admissible expert testimony on specific causation, Dr. Walcott's opinions would counter Plaintiffs' testimonial link between mold and their symptoms. According to the Fifth Circuit, expert testimony intended "to act as a counterpoint" to the plaintiff's expert will be helpful to the trier of fact. *See Huss*, 571 F.3d at 455 (explaining that doctor's training and knowledge allowed him "to tell the jury that [the plaintiff's expert's] inferential leap was unsupported by medical literature, and that in his judgment, [the plaintiff's] peripartum cardiomyopathy was idiopathic"). Thus, Dr. Walcott's opinions are certainly relevant to the inquiry in this case.

### III. Plaintiffs Argue With Dr. Walcott's Conclusions Rather Than His Methodology.

"The inquiry envisioned by Rule 702 is . . . a flexible one. Its overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and

12

266793.2

methodology, ***not on the conclusions*** that they generate." *Daubert*, 509 U.S. at 594–95 (emphasis added).

Plaintiffs attack Dr. Walcott's report as "minimiz[ing] the health hazards posed by mold exposure…" [Doc. 250 at ¶11] However, various research groups have come to the same conclusion. "A comprehensive review of available literature relating to the health effects of mold … showed through several population-based studies an 'association' between respiratory symptoms and home dampness and mold growth, but *causality could not be established*." Pamela J. Davis, Molds, *Toxic Molds, and Indoor Air Quality*, California Research Board Note Vol. 8, No 1 at 5-6 (March 2001) (stating it is impossible to set exposure limits for molds that can be applied generally because of variance in individual sensitivities and the vast array of molds – more than 100,000); N. Carlson, *Mycological Aspects of Indoor Air Quality*, *available at* http://www.dehs.umn.edu/iaq/fungus/mycoglos.html *1-*2 (Dept. of Env. Health & Safety, Univ. of Minn. Apr. 29, 1996) (finding there are no strict numerical guidelines for assessing whether an area is contaminated by mold, and no standards in establishing a link between environmental exposure and the results of an allergy test because "the antigenic material produced by a fungus or a particular genus will vary according to species or a strain within the species and vary with the source of nutrition for the organism"); The American Industrial Hygiene Association, *The Facts About Mold: For the Professional* at *2-*3, *available at* http://www.aiha.org/GovernmentAffairs-PR/html/mold-professional.htm (May 28, 2002) (stating that although building dampness has been associated with respiratory problems, the extent to which mold contributes to this problem is unknown; explaining that there is an almost complete lack of information on specific human responses to well-defined exposures to mold; and concluding that until microbiological methods for demonstrating mold concentrations in the

environment are standardized and reproducible, epidemiological studies necessary to determine dose-response can suggest only association, not cause and effect, with respect to mold exposure and health effects); Berlin D. Nelson, *Stachybotrys chartarum: The Toxic Indoor Mold* at *7, *available at* http://www.aspsnet.org/online/feature/stachybotrys (American Phytopathological Society Nov. 2001) (scientists lack information about the relationship between exposure to bioaerosols of Stachybotrys and effects on human health).

Plaintiffs argue that Dr. Walcott did not put enough information in his report as to the mold test. Plaintiff argue that "[w]ithout giving recognition to the true results of the testing, the information upon which his causation opinions should be based, Dr. Walcott's opinions with regard to Plaintiffs' mold exposure are cursory, lack appropriate scientific foundation and are unreliable."[7] [Doc. 250 at ¶9] Here, Plaintiffs concede that Dr. Walcott's opinion "should be based" on mold testing, but they criticize Dr. Walcott on not expanding more on the mold report.[8] Curiously, in the same paragraph, Plaintiff argue that "Dr. Walcott apparently bases his opinion on that single mold test, for a single point in time in January 2017, despite the fact that the Fosters lived in the residence in question from July 2013 to June 2018." [Doc. 250 at ¶10] Plaintiffs conclude that "[a]s a result, [Dr. Walcott's] attempts to dismiss Plaintiff's health problems, discussed below, as unrelated to mold exposure from the Keesler residence are lacking sufficient scientific or medical basis." *Id*. But this argument is not directed to Dr. Walcott's methodology. Rather, it attacks the conclusion that Dr. Walcott reached—namely, that it cannot

---

[7] Plaintiffs make this argument knowing the the Lab representative testified that this testing does not indicate any increased risk to anyone inside and indicate a spore concentration and genera essentially the same as the outdoors. Ex. __, 5:25-60:9.

[8] In other motions, Plaintiffs' counsel seeks to exclude Dr. Walcott and/or Dr. Wilhelm based on their reliance on the mold test and for commenting too much on the mold test. Taken together, the alternating arguments provided for exclusion demonstrate the lack of true foundation for exclusion of these qualified doctors.

14

be said with any degree of medical certainty that mold caused any of Plaintiffs' medical symptoms. Because Plaintiffs focus on Dr. Walcott's conclusions rather than his methodology, this Court should reject their *Daubert* challenge.

All these contradictory arguments miss the mark. It is Plaintiffs' burden to show that mold caused their medical symptoms. Dr. Walcott opined that, based on the evidence available, it was more likely than not that Plaintiffs' medical symptoms were caused by factors, other than mold. This is precisely the type of "counterpoint" evidence that the Fifth Circuit approved in *Huss*, 571 F.3d at 452.

Plaintiffs further argue that Dr. Walcott improperly "minimize[s] the health hazards posed by mold exposure." [Doc. 250 at ¶11] But Dr. Walcott does no such thing. Instead, he offers a thorough explanation of how molds cause allergic reactions in people and further explains that exposure to mold is not necessarily dangerous because "all homes have mold." Ex. A at 3. Further, the fact that Dr. Walcott is not a toxicologist does not make him unqualified to offer this opinion. Indeed, the Fifth Circuit has expressly rejected an almost identical argument. *Huss*, 571 F.3d at 455.

Finally, Plaintiffs contend that Dr. Walcott's opinion is impermissible *ipse dixit* because he offers no methodology, references, or testable scientific basis for his opinions. [Doc. 250 at 21] This statement is simply false. As described above, Dr. Walcott's report describes his methodology for diagnosing the cause of medical symptoms, including those caused by mold. He also describes how he applied that methodology to the Plaintiffs specifically and explains why he believes their symptoms cannot be attributed to mold. Doctors make medical diagnoses like these every single day. Indeed, this Court's order expressly directed Dr. Walcott to report his medical diagnoses. This is not the *ipse dixit* prohibited by *Daubert*.

15

## IV. Plaintiffs Have No Proof Of Elevated Exposure And The Case Should Be Dismissed.

As demonstrated in Defendants' Motion for Summary Judgment, there is no reliable evidence in this case that the level of mold in Plaintiffs' Keesler residence was "dangerous" or "harmful," making their home "uninhabitable." And now, in seeking to discredit Dr. Walcott, Plaintiffs throw out possibilities and fake "evidence."

Plaintiffs' sole evidence of "harmful" exposure is from the mold test done in the home which showed a total spore count of 7 inside and 15 outside – or double the spore count outside. There is no proof of any dangerous exposure. Because their testing does not show elevated exposure, Plaintiffs downplay the testing as a "single mold test" which does not cover their entire residency. The mold test was conducted in January 2017. Plaintiffs did not move out until June 2018. Plaintiffs had exclusive use of the premises for a year and six months after the first mold test and could have, if they chose to, conducted a mold test every single month, every week, or every day. They did not. Dr. Walcott based his opinion on the only evidence presented by Plaintiffs as to what they were breathing in their home and outside. That air was not dangerous or even elevated.[9] There are no studies or cases cited by Plaintiffs in criticism of Dr. Walcott or his opinions. Instead, they attack him on hypothetical possibilities. This kind of argument demonstrates the lack of evidence on which Plaintiffs' case is built.

Ultimately, there is an inherent logical fallacy in Plaintiffs' motion. It assumes any evidence of mold in Plaintiffs' home is causational. That is not scientific, but it is exactly how their expert reached his conclusions. That kind of opinion is not supported in the literature, and courts have recognized the notion that indoor mold growth can lead to significant toxicity in

---

[9] *See* Ex. E, testimony of Michael Martin, corporate representative of Newton Microbial Laboratory.

16

266793.2

occupants has been controversial in the scientific literature and unsettled at best. *Young v. Burton*, 567 F. Supp. 2d 121, 139 (D.D.C. 2008) (discussing the absence of a consensus in the medical community about the health effects of exposure to mold); *Jenkins*, 2008 WL 2649510 at *6 (E.D. La. June 27, 2008) (finding that there are no medical or scientific authorities that establish a general causal relationship between exposure to mold and injurious consequences to human health).

Defendants' materials are consistent with, and not contrary to, Dr. Walcott's opinions. Without a safe harbor in science or medical literature to provide to the Court as to why Dr. Walcott's opinions are unreliable, Plaintiffs attempt to cross examine Dr. Walcott with non-medical flyers created by Forest City Southern for housing purposes. Plaintiffs claim that "Dr. Walcott's opinions minimizing the dangers of mold are directly contradicted by materials disseminated by Defendants to its own staff or to military housing residents, including Plaintiffs." [Doc. 216 at ¶17] Plaintiffs then cite to three documents that are not in any way contradictory to Dr. Walcott's report.[10] What all three exhibits demonstrate is information relative to a discussion of cleaning and reporting mold, not evaluating whether someone who claims to be have been exposed to mold actually suffered any harm.

When a plaintiff suffers from well-documented, pre-existing medical problems, it cannot be assumed that an allergen caused or exacerbated those medical problems, especially when there is no allergy testing revealing an allergy to the type of mold found on the property. *See Pratt v. Landings at Barksdale,* 2013 WL 5376021 at *7 (W.D. La. Sept. 24, 2013).[11] Plaintiffs

---

[10] Plaintiffs cite to Hunt-Gen05-00812 which is a document for Joint Base Charleston and not Keesler. [Doc. 249-4]

[11] The *Pratt* court explained that in a case alleging injuries from mold exposure plaintiffs must establish causation on five different levels: (1) the presence of mold; (2) the cause of the mold and

17

266793.2

cannot connect their alleged mold exposure with their purported health symptoms merely because of a perceived temporal relationship between the symptoms and the exposure. That is the heart of Plaintiffs' "problem" with Dr. Walcott's opinion. He does not find any correlation, but Plaintiffs themselves do.

## CONCLUSION

For the foregoing reasons, Defendants ask this Court to deny the Motion to Strike the Opinions and Testimony of Dr. Walcot [Doc. 249]. Expert testimony is appropriate when the factual issue is one the trier of fact would not ordinarily be able to resolve without specialized assistance. *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992). Plaintiffs' brief does not actually attack Dr. Walcott's methodology, qualifications, relevance, or reliability. Instead, Plaintiffs' criticisms, at most, go to the weight of the evidence as they dispute the accuracy and results. Dr. Walcott is a leading allergist in this state and should be allowed to testify.

Moreover, a *Daubert* hearing is not necessary based on the Plaintiffs' perfunctory arguments before this court.

---

relationship of that cause to a specific defendant; (3) actual exposure to the mold; (4) exposure was a dose sufficient to cause health effects (general causation); and (5) a sufficient causative link between the alleged health problems and the specific type of mold found (specific causation). 2013 WL 5376021 at *3. The Court continued that "'[i]n the absence of an established scientific connection between exposure an illness, or compelling circumstances…the temporal connection between exposure to chemicals and an onset of symptoms, standing alone, is entitled to little weight in determining causation.'" *Id.* (quoting *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278 (5th Cir. 1998)). The *Pratt* court examined each plaintiffs prior medical history such as prior diagnosis of asthma, positive reactions to other allergens, ongoing respiratory problems, and the non-avoidance of other allergens that are ubiquitous in nature and unable to be avoided. *Id.* at *6. The Court found that "[t]he medical evaluations and records submitted to this Court do not establish that Plaintiffs' exposure to mold caused their symptoms, as [plaintiffs] all suffered respiratory problems prior to the tree falling on the property…Moreover, Plaintiffs' own medical expert [] explained that Plaintiffs are allergic to many ubiquitous allergens….[and] allergy testing revealed that neither [plaintiff] were allergic to Curvularia, the only type of airborne mold found in the property." *Id.* at *7. The plaintiffs' temporality argument fails as plaintiffs "all had well-documented, pre-existing respiratory problems. Such problems were never well controlled. Thus, Plaintiffs are unable to show that they were in good health prior to the tree falling on the property…" *Id.*

WHEREFORE, PREMISES CONSIDERED, Defendants pray that the Court will DENY Plaintiffs' Motion to Strike the Opinions and Testimony of Dexter Winn Walcott, MD and DENY Plaintiffs' alternative relief of a *Daubert* hearing.

Respectfully submitted, this the 14th day of June, 2019.

*/s/ Jennifer J. Skipper*
Jennifer J. Skipper, MSB#100808
Walter H. Boone, MSB#8651
**BALCH & BINGHAM LLP**
188 East Capitol Street, Suite 1400
Jackson, MS 39201
Telephone: (601) 961-9900
Facsimile: (601) 961-4466
Email: jskipper@balch.com
wboone@balch.com

***Attorneys for Hunt Southern Group, LLC and Hunt MH Property Management, LLC***

/s/ Alison O'Neal McMinn
Joshua J. Metcalf, MSB#100340
Alison O'Neal McMinn, MSB#101232
FORMAN WATKINS & KAUTZ LLP
210 East Capitol Street
Suite 200
Jackson, MS 39201
Telephone: (601) 960-8600
Facsimile: (601) 960-8613
Joshua.Metcalf@formanwatkins.com
Alison.McMinn@fortnanwatkins.com

-and-

*/s/ William J. Hubbard*
William J. Hubbard (admitted *pro hac vice*)
Gregory P. Feldkamp (admitted *pro hac vice*)
THOMPSON HINE LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114-1291
Telephone: (216) 566-5500
Facsimile: (216) 566-5800
bill.hubbard@thompsonhine.com
gregory.feldkamp@thompsonhine.com

19

266793.2

*Attorneys for Forest City Residential Management, LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 14th day of June 2019, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all known counsel of record by operation of the court's electronic filing system.

*/s/ Jennifer J. Skipper*
Jennifer J. Skipper