IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**JOSHUA FOSTER, et al.**                                                                 **PLAINTIFFS**

**V.**                                         **CIVIL ACTION NO. 1:18-cv-00050-HSO-JCG**

**HUNT SOUTHERN GROUP, LLC, et al.**                                        **DEFENDANTS**

**DEFENDANTS' JOINT MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON HIDDEN DEFECT CLAIM**

Defendants Hunt Southern Group, LLC, Hunt MH Property Management, LLC ("Hunt MH"), and Forest City Residential Management, LLC ("FCRM") oppose the Rule 56 motion [Doc. # 217] filed by Plaintiffs, which alleges a "dangerous hidden defect" or "failure to warn of dangerous condition" as regards the residence that Plaintiffs leased at Keesler Air Force Base ("Keesler AFB"). The motion should be denied against FCRM and Hunt MH because neither was Plaintiffs' landlord, and therefore, Plaintiffs' duty-to-warn claim fails as a matter of law. Moreover, as to all Defendants, Plaintiffs' motion should be denied because the federal-enclave doctrine precludes a claim for implied warranty of habitability. Yet, even as to the elements on which they seek judgment, Plaintiffs fail to establish that Plaintiffs are entitled to judgment as a matter of law. To the contrary, the evidence actually establishes that it is Defendants who are entitled to summary judgment.

**I.       RULE 56 STANDARD.**

Because it is Plaintiffs who have the burden of proof for their claims, they cannot obtain summary judgment on any particular claim by showing the absence of a factual issue as to only one element of their claim. Rather, the rule is that they "must establish beyond peradventure *all* of the essential elements of the claim" in order to obtain a favorable judgment on that claim. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986), *quoted in DAK Americas Miss.,*

*Inc. v. Jedson Eng'g, Inc.*, 2019 WL 1413753, at *4 (S.D. Miss. Mar. 28, 2019). "Where the movant has the burden, its own submissions in support of the motion must entitle it to judgment as a matter of law." *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998) (citing *Calderone v. United States*, 799 F.2d 254, 258 (6th Cir. 1986)); *accord*, *Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir. 2011); *Whitney Nat'l Bank v. Air Ambulance by B & C Flight Mgmt., Inc.*, 516 F. Supp. 2d 802, 810 (S.D. Tex. 2007). "Pleadings are not summary judgment evidence." *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).

Here, Plaintiffs have not even moved for, let alone established that they are entitled to, summary judgment on every element of any of their claims. In fact, it is not even clear on which claim they are seeking summary judgment. Neither in their motion nor in their memorandum in support do Plaintiffs ever identify which of their eleven claims they seek partial judgment on. Defendants and the Court are left to guess. This by itself should be sufficient for the Court to deny Plaintiffs' motion.

**II.    PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT AS TO THE IMPLIED WARRANTY OF HABITABILITY.**

Although Plaintiffs fail to identify any particular claim on which they seek judgment, Plaintiffs' request for relief is that the Court "find that a latent defect existed as a matter of law and that Defendants breached their duty to disclose that latent defect to Plaintiffs." (Memorandum in Support, Doc. # 218, at 10.)  Therefore, it appears that Plaintiffs seek a ruling on some portion of a claim based on an implied warranty of habitability.

2
266859.3

### A. The Implied Warranty of Habitability, If Any, Does Not Apply to FCRM or Hunt MH Based on Their Capacity as Agents.

In the first instance, any implied warranty of habitability that would even arguably apply would run solely between Plaintiffs and the owner or landlord of the privatized military housing at Keesler AFB. *See Sample v. Haga*, 824 So. 2d 627, 631 (Miss. Ct. App. 2001) ("The implied warranty of habitability requires the *landlord* to provide 'reasonably safe premises,' " etc.) (emphasis added). *Accord*, 49 Am. Jur. 2d *Landlord and Tenant* § 442 ("The implied warranty of habitability creates for residential *landlords* a continuing duty during the lease term.") (emphasis added).

Neither FCRM nor Hunt MH was the owner or landlord of the leased property. FCRM was the agent of Southern Group, and Hunt MH was assigned the rights of FCRM as agent. *See* Ex. 1 (Foster-Hunt-Gen01-00005) (execution by "Forest City Residential Management, Inc., Agent for Owner, Forest City Southern Group, LLC"); Ex. 2 (Property Mgmt. Agreement).

This is a sufficient basis by itself to defeat Plaintiffs' Motion for Partial Summary Judgment and instead to entitle FCRM and Hunt MH to judgment in their favor on this claim. (See FCRM's Rule 56 memo. [Doc. # 236] at 8–12, 31–32.) While the issue has not squarely presented itself to the Mississippi appellate courts,[1] the cases discussing the implied warranty of

---

[1] No Mississippi authority was located that expressly analyzes whether mere property managers have an independent duty under a warranty-of-habitability theory. For instance, in the most recent case in which the state court of appeals considered the warranty, it affirmed the grant of summary judgment to both the landlord and property manager in a wrongful-death case arising from an apartment fire. *Mays v. Shoemaker Prop. Mgmt., LLC*, 246 So. 3d 72 (Miss. Ct. Ap. 2018). The court held that both defendants were entitled to judgment as a matter of law because the plaintiff was unable to prove proximate causation with the required expert-opinion evidence (a lack that also infects Plaintiffs' case here). *Id*. at 76. The court did not separately analyze whether the property manager, as a mere agent, had any independent duty under a warranty-of-habitability theory—but it did cite and quote the state supreme court's 1999 ruling that the implied warranty of habitability "requires a *landlord* to provide reasonably safe premises at the inception of a lease, and to exercise reasonable care to repair dangerous defective conditions upon notice of their existence by the tenant …." 246 So. 3d at 76 (quoting *Sweatt v. Murphy*, 733 So. 2d 207, 210 (Miss. 1999)) (emphasis added). Similarly, in *Serrano v. Laurel Housing Authority*, 151 So. 3d 256 (Miss. Ct. App. 2014), in a case involving a fallen ceiling fixture, the court held that a

habitability address it as a duty applying to the landlord. And an agent of a disclosed principal ordinarily cannot be liable for acts of the principal. *Flagstar Bank, FSB v. Danos*, 46 So. 3d 298, 308 (Miss. 2010). Courts in other states have held that because the duty belongs to the landlord, "the implied warranty of habitability may not be enforced against an agent who lawfully entered into the lease on behalf of a disclosed principal." *Carlie v. Morgan*, 92 P.2d 1, 6 (Utah 1996) (citing cases). Straightforward agency law indicates that Mississippi would follow the same approach. The Motion should be denied.

### B. The Federal Enclave Doctrine Defeats Plaintiffs' Request for Partial Summary Judgment.

As to all Defendants, Plaintiffs' motion fails for an additional reason. Keesler AFB was established as a federal enclave under the U.S. Constitution when the federal government acquired the base property from the State of Mississippi by condemnation between 1941 and 1950. *United States v. State Tax Comm'n*, 412 U.S. 363, 371–72 (1973). Under this cession, for nearly eighty years, Keesler AFB has "constituted [a] federal island[] which no longer constitute[s] any part of Mississippi nor functions under its control." *Id.* at 376. This federal-enclave doctrine—which Plaintiffs fail to address in their Motion for Partial Summary Judgment—is an additional basis that defeats Plaintiffs' Motion.

When "the United States acquires with the 'consent' of the state legislature land within the borders of that State … the jurisdiction of the Federal Government becomes 'exclusive.' " *Paul v. United States*, 371 U.S. 245, 264 (1963). The significance of exclusive federal

---

housing authority authorized to manage subsidized housing projects under state statute had a statutory duty to provide safe housing for residents—but without any analysis of whether the implied warranty of habitability applied to the agents of landlords. Cases such as these cannot be said to establish an independent duty under Mississippi law for property managers who are acting as mere agents of their principals, the owners.

jurisdiction is that the power of Congress over federal enclaves "by its own weight bars *state regulation without specific congressional action.*" *Id.* at 263 (emphasis added). Thus, "the laws and statutes applied to these locations must be supplied by the federal government, not the states." *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1237 (10th Cir. 2012) (citing *Pac. Coast Dairy v. Dep't of Ag. of Cal.*, 318 U.S. 285, 294 (1943)).

As the central principle of the federal-enclave doctrine is that "Congress has exclusive legislative authority over these enclaves," *Allison*, 689 F.3d at 1237, what is the effect on areas of law that are traditionally the responsibility of states—such as landlord-tenant law? The answer is that "state laws that existed at the time that the enclave was ceded to the federal government remain in force." *Id*. But since a state "may not legislate with respect to a federal enclave unless it reserved the right to do so when it gave its consent to the purchase by the United States, *only state law existing at the time of the acquisition remains enforceable, **not subsequent laws**.*" *Id*. (emphasis added; quoting *Paul*, 371 U.S. at 268).

There is no apparent indication that the State of Mississippi reserved the right to legislate with respect to Keesler AFB when it ceded the property to the federal government in the 1940s and 1950s. Thus, state law existing at that time remains enforceable, but not subsequent law. Significantly, as Plaintiffs recognize, the warranty of habitability became part of Mississippi's common law only in 1991, when it was adopted by the state supreme court in *O'Cain v. Harvey Freeman & Sons*, 603 So. 2d 824 (Miss. 1991) (cited in Mot. for Part. Summ. J. at 2). Before that decision, Mississippi "unquestioningly applied *caveat emptor* to landlord-tenant relationships." *Moorman v. Tower Mgmt. Co.*, 451 F. Supp. 2d 846, 849 (S.D. Miss. 2006) (quoting *O'Cain*, 603 So. 2d at 832 (Sullivan, J., concurring)).

5

There are three exceptions to the general rule that only state law existing at the time of cession can apply within the federal enclave, and they are (1) where Congress provides a different rule; or (2) where the state explicitly retains the right to legislate over specific matters at the time of cession; or (3) where minor regulatory changes modify laws existing at the time of cession. *See Allison*, 689 F.3d at 1236 (explaining three exceptions).

None of the exceptions apply here. *First*, Congress has not provided for a statutory warranty of habitability in the Service Members Civil Relief Act, codified at 50 U.S.C. §§ 3901–4043. Nor is there a federal common-law warranty of habitability. *See, e.g., Alexander v. U.S. Dep't of Housing & Urban Dev*., 555 F.2d 166, 170–71 (7th Cir. 1977) (although recognizing that various state jurisdictions have "revolutionized the law of landlord-tenant relationships" by adopting the implied warranty of habitability, "we decline plaintiffs' invitation to follow these state court decisions implying a warranty of habitability in urban residential leases" as to "dwelling units constructed and operated as public housing projects" under federal statute). Therefore, Congress has not provided a "different rule." *Second*, there is no indication that Mississippi retained the right to legislate over landlord-tenant issues at the time it ceded the Keesler AFB property to the United States. *Third*, there is no suggestion that Mississippi's adoption of the warranty-of-habitability doctrine in 1991 was a minor regulatory change to any landlord-tenant law existing at the time of cession in the 1940s and 1950s.

The federal-enclave doctrine signifies that the implied warranty of habitability does not apply. This would hold true as to Hunt Southern Group, and equally to FCRM and Hunt MH even if they could be deemed to have any independent duties as mere agents of the owner as to the habitability of the leasehold (which they cannot). Construing Plaintiffs' motion as directed at

6

the implied warranty of habitability, these additional grounds defeat Plaintiffs' request for partial judgment in their favor.

## III. DEFENDANTS ARE NOT LIABLE FOR ANY BREACH OF A DUTY TO WARN OF A DANGEROUS CONDITION

Even if an implied warranty of habitability existed here, Plaintiffs have not established that they are entitled to summary judgment on any of its elements. The leading Mississippi case on a landlord's duty to warn a tenant of dangerous conditions (the "implied warranty of habitability") is *Sweatt v. Murphy*, 733 So. 2d 207 (Miss. 1999), which agreed with Justice Sullivan's concurrence in *O'Cain v. Harvey Freeman & Sons*, 603 So. 2d 824 (Miss. 1991), to the extent that a landlord's duty is "to provide reasonably safe premises" upon move-in and to use reasonable care in repairing any "dangerous defective conditions upon notice of their existence by the tenant, unless expressly waived by the tenant." *Sweatt*, 733 So. 2d at 210 (quoting *O'Cain*, 603 So. 2d at 833 (Sullivan, J., concurring)). *See also Shed v. Johnny Coleman Builders, Inc.*, 761 F. App'x 404, 406 (5th Cir. 2019) (recognizing *Sweatt* as controlling case on warranty of habitability); *Moorman*, 451 F. Supp. 2d at 850 (same). The *Sweatt* court expressly rejected any "negligence *per se*" theory such that mere housing-code violations, for instance, would support recovery in the absence of any proof of "dangerous conditions." *Sweatt*, 733 So. 2d at 209–11.

Under the authorities that Plaintiffs cite, there is likewise no duty to warn of defects that are not dangerous. In the pre-*Sweatt* case of *Loflin v. Thornton*, 394 So. 2d 905 (Miss. 1981), the Mississippi Supreme Court held that a landlord could be held "liable for injuries incurred as a result of *dangers*, which usually are latent, which he knows about or conceals, or, being aware of same, does not inform the tenant." *Loflin*, 394 So. 2d at 906 (emphasis added). The case of *Williams v. Briggs Co.*, 62 F.3d 703 (5th Cir. 1995), likewise decided before *Sweatt*, speaks of

"hidden defects," *Williams*, 62 F.3d at 709, but the issue before the Fifth Circuit in that case was not whether a landlord had any duty to disclose "hidden defects" known only to the landlord. Rather, the plaintiff was arguing for "essentially, a duty to inspect" on the part of the landlord, who would be held liable for failing to *discover* a "hidden defect," and the *Williams* court squarely rejected any such inference from *O'Cain*. *Id*. Therefore, Williams does not support any duty to disclose "defects" in general. In any event, any uncertainty as to "defects" versus "dangers" was clarified by *Sweatt*: mere "defects" such as technical housing-code violations will not support recovery, if they are not actually dangerous to the tenant.

Therefore, the key concepts here are "safe" and "dangerous." For Plaintiffs to prevail on their claim, they must show that Plaintiffs' residence was "unsafe" or "dangerous," that Defendants knew of that defect and failed to warn them, *and* that the defect caused them injury as a result. *See Sweatt*, 733 So. 2d at 211–12 ("an action for personal injuries resulting from the allegedly unsafe condition of leasehold property *is, in essence, a negligence action* governed by the familiar elements of that cause of action," including the element of damages) (emphasis added). Plaintiffs cannot meet their burden of proof on this Motion. But more importantly, they can offer, and have offered no evidence of any unsafe defect.

### A. *There Is No Proof of Any Danger or Unsafe Condition at Plaintiffs' Residence.*

First, there is no evidence of any condition at Plaintiffs' residence that was dangerous or unsafe. Plaintiffs' memorandum [Doc. # 218] cites various evidence that Defendants were aware that there were construction issues manifesting in some instances as excessive moisture at some of the Keesler properties and that, with additional moisture, mold could grow. However, there is no proof of any danger or unsafe condition at Plaintiffs' residence—and there is absolutely no
8

evidence of any "toxic mold" at their home that created a dangerous condition. In fact, the evidence is to the contrary.

First, Plaintiffs' own construction expert, Joe Morgan, testified that he could not provide an opinion that any construction defect at Plaintiffs' residence *actually caused* any moisture problem in Plaintiffs' residence:

> Q. Okay. So in your—in response to that—in your explanation of that, you're looking at these documents from a construction defect issue, not necessarily a causative issue linking whatever it is that you made notes on to an actual moisture issue; is that fair?
>
> A. We're claiming to be a construction expert.
>
> Q. Okay. You're not necessarily linking the construction with the moisture issue?
>
> A. I know that there is a connection there, but I am looking at the construction.
>
> Q. Okay. So if we took out any individual one of the things you made notes on, you can't testify today that that would or would not have fixed any moisture issue that may have been in these homes?
>
> A. I can't say they could have done one thing and fixed it. All I can pretty much say is you build a house according to the plans and the engineers and all the people that do all of these pages and that's what you're supposed to do, and that's not what I saw.

Depo. of Joe Morgan, at 128; *see also* 130 (relevant pages attached as Ex. 3). Morgan concedes that he is *not* a mold expert, *id.* at 130, and that the documents he reviewed throughout his work in this case do not establish that a construction defect caused a moisture problem that resulted in mold growth in any Plaintiffs' residences. *Id*. at 142.

Second, the fact that all nine sets of Plaintiffs here filed substantively identical motions in all nine cases establishes that there is no danger or unsafe condition at any of the Plaintiffs' residences. Plaintiffs are attempting to establish that there was a "danger" or "unsafe condition" at their residences merely because there was general knowledge of construction issues at Keesler

residences, there was an ongoing Moisture Remediation Project to deal with those issues, and there may supposedly have been a "danger" or "unsafe condition" somewhere else at Keesler. Plaintiffs simply assume, without citation to evidence, that each of their residences "contained a dangerous latent defect," Memo. at ¶ 6, which was "a plethora of construction defects leading to moisture and mold growth," *id*. at ¶ 7, that Defendants "knew to be a hidden and dangerous defect." *Id*. at ¶ 13.

Plaintiffs offer no proof that there was anything unsafe or dangerous about construction issues that *could* result in moisture that *could* result in mold growth. Their mere assertion in their Amended Complaint about "toxic mold," Memo. at ¶ 3, cannot entitle them to judgment as a matter of law. Rather, the testing conducted by Plaintiffs' own consultant establishes that there is no evidence of exposure to "toxic mold" in Plaintiffs' residence. As it relates to "toxic mold," Plaintiffs' toxicologist, Paul Goldstein, conceded that no testing has been done to establish that any mold at Plaintiffs' residence is of the type that can even produce mycotoxins. Depo. of Paul Goldstein, at 214 (relevant pages att. as Ex. 4). He also conceded that none of Plaintiffs have been tested to determine whether they have been exposed to any mycotoxins. *Id.* at 165. Thus, as Goldstein conceded, there is absolutely no evidence of Plaintiffs' ever being exposed to any alleged "toxic mold:"

> Q   In all of the nine cases, the most you can say is that some of these symptoms can be caused by some exposure to some molds, and that some people in those households had some of those symptoms; true?
>
> A   I would say that's pretty close.

*Id.* at 331:23–332:2; see also *id.* at 330:1–10.

The only "evidence" Plaintiffs present in support is Exhibit L, which is the prior maintenance history of Plaintiffs' residence from the time that the USAF entered into a lease

10

with Forest City Southern Group (Sept. 30, 2011). However, Exhibit L provides no relevant evidence whatsoever. Plaintiffs fail to point to any prior complaints of mold, for the good reason that the prior maintenance records include no such complaints.

In fact, as demonstrated in Defendants' motions for summary judgment, the undisputed evidence is that there were no "dangerous" or "unsafe" conditions at Plaintiffs' residence. See Hunt Defs. Rule 56 Memo. [Doc. # 238] at 13–16; FCRM Rule 56 Memo. [Doc. # 236] at 18–19. To the contrary, Plaintiffs have no evidence of any dangerous or unsafe condition. They have no expert who can, or will, testify on that subject. And the uncontroverted expert testimony from Allison L. Stock, Ph.D, MPH, MS, and Jeff T. Cook, CIH, who examined the scientific literature and case documents, is that the Fosters' residence "did not pose an unreasonable risk of exposure to indoor mold relative to the outside environment." Ex. 5 at 3 (Rimkus report).

### B. *Plaintiffs' Citations to Keesler Documents Do Not Prove Any Dangerous Condition at Plaintiffs' Home, but Demonstrate Defendants' Efforts to Identify, Assess, and Resolve Moisture-Related Issues at Keesler as a Whole.*

Plaintiffs attach and reference a number of documents that relate to Defendants' identification, assessment, and approach regarding construction-related issues within certain residences at Keesler. None of those documents deals with, or relates to, Plaintiffs' residence in particular.

Moreover, Plaintiffs' own attached exhibits demonstrate Defendants' consistent efforts to identify, assess, and resolve construction-related issues at Keesler. For example, the AMEC report, Exhibit A to Plaintiffs' Motion, was a due-diligence report generated before Southern Group acquired the Keesler housing stock, based on AMEC's inspection of approximately 19 percent of the main base housing stock. Ex. A, at 8. AMEC concluded that the housing stock was in generally good condition, but identified visually suspect mold in some of the inspected units

(which were only a fraction of the 1,028 units at Keesler). Ex. A, at 2. As a result, AMEC recommended that Southern Group make additional assessments of potential moisture intrusion and mold issues in the housing stock. *Id*.

AMEC's recommendation was accepted and adopted through Southern Group's specific request to set aside operating funds for the assessment and remediation of moisture-related issues, and its request for, and Air Force approval of, the retention of experts to carry out the assessment and remediation. See § 3.5.9 of Master Development Agreement, attached to Plaintiffs' Motion as Ex. V, at 16. As a result of Southern Group's request and the Air Force's approval, Southern Group then retained experts in the field to study the construction-related issues and provide recommendations on how to solve those problems. Those experts included Liberty Building Forensics (see Exs. B, C, D att. to Plfs' Mot.), Building Science Corporation (see *id*., Exs. E, K), and Rimkus Consulting Group (*id*., Ex. F). Based on those experts' recommendations, a pilot study of 32 residences at Keesler (none of which were Plaintiffs') was undertaken by two different contractors, J.O. Collins (*id*. at Ex. G) and Kimbel Mechanical (*id*. at Ex. H), and the conclusions of those experts were synthesized by Southern Group and its contractors (*id*. at Exs. I and J). Following the synthesis of findings, Southern Group filed suit against the original contractor, seeking contribution to Southern Group's efforts to address and solve the moisture-related problems. (*Id*. at Ex. M.)[2] Based on the results of the pilot study and

---

[2] Plaintiffs' suggestion that Southern Group's complaint against the contractor amounts to judicial estoppel is misplaced. (Memo. at ¶ 12.) The complaint does not pertain to Plaintiffs' residence but to Keesler AFB as a whole; it does not allege toxic or harmful mold; and it does not claim or reference the potential for any personal or other injuries due to mold. But even if it did, Defendants would not be judicially estopped based on this complaint alone. As Plaintiffs' own cited authority states, a finding of judicial estoppel generally requires not only that a party has asserted a certain position in litigation, but that its position has been accepted by the court, *i.e.*, yielded the party some advantage. *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001) ("Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity.") (citation and internal quotation marks omitted); *see In re Superior Crewboats, Inc.*, 374 F.3d

266859.3

all of the experts' opinions gathered, Southern Group then embarked on the Moisture Remediation Project, which ultimately assessed and resolved construction issues at Keesler AFB.

Thus, **all** of Plaintiffs' citations are connected to construction-related issues at Keesler AFB in general, and not unique to each specific property. And **none** of them deal with Plaintiffs' residence in particular. They do not constitute evidence or knowledge of any "unsafe" or "dangerous" condition at Plaintiffs' residence, but rather, the recognition of construction issues and the sustained and reasonable efforts by Defendants to address those issues. During the entire time that those issues were being evaluated, any and all reports from Plaintiffs of mold at their residence were addressed in a timely manner. As this Court has already observed, the relevant inquiry in this case is "whether [Plaintiffs] were exposed to mold at their residence and whether the mold exposure caused them injuries." *Cooksey v. Hunt So. Group, LLC et al.*, No. 1:18-cv-00049-LG-RHW, Order Granting Motion for Protective Order [Doc. # 144] at 2 (S.D. Miss. Nov. 7, 2018). What was happening elsewhere at Keesler was not and is not relevant. "The construction and remediation of other properties has little, if any, relevance to [Plaintiffs'] claims." *Id.* In a subsequent discovery order in *Cooksey*, this Court again recognized that what happened at Keesler as a whole, or at other properties within Keesler, was (and is) not relevant:

> This is not a class action lawsuit and the Court finds overly broad and disproportional to the needs of the case the Plaintiffs request for other similar situated housing units at or near Keesler Air Force Base (KAFB) simply because they were built by the same contractor, owned by the same entities, became part of a common moisture remediation plan or were remediated by the same subcontractors.

Order Granting in Part Denying in Part Motion to Compel, dated April 3, 2019 [Doc. # 293], at 1-2.

---

330, 335 (5th Cir. 2004) ("the court must have accepted the previous position"). There was never any judicial finding, one way or the other, on Southern Group's complaint. Thus, Plaintiffs' invocation of judicial estoppel is unsuccessful and irrelevant.

For the same reasons, Plaintiffs cannot bootstrap a base-wide analysis of construction and moisture-related issues into specific knowledge of a "dangerous" or "unsafe" condition at Plaintiffs' specific residence. Defendants' knowledge of construction issues at Keesler AFB cannot be construed to be knowledge of a dangerous or unsafe condition at Plaintiffs' residence. And even knowledge of construction issues that may lead to excessive moisture, that in turn may lead to mold at another unit at Keesler, does not mean that Defendants had knowledge of a "dangerous" or "unsafe" condition at Plaintiffs' residence.

In sum, the citation to these exhibits referencing base-wide analyses and efforts does not prove any specific condition at Plaintiffs' residence.

### C. There Is No Proof That Defendants Knew of a "Dangerous" or "Unsafe" Condition at Plaintiffs' Residence, and the Undisputed Evidence Is Just the Opposite.

There is no proof that Defendants knew of a "dangerous" condition and failed to warn. In fact, the undisputed evidence is just the opposite.

There was no indication in the prior maintenance history of Plaintiffs' residence of any "dangerous" or "unsafe" condition. As discussed, the prior maintenance records (Plfs' Mot. at Ex. L) show no previous complaints of any mold, let alone any harmful mold.

Defendants' and Plaintiffs' own inspection prior to move-in disclosed no problems with mold. Ex. 6 (move-in/move-out form); Ex. 7 (Jessica Foster depo.) at 72:19–73:4, 73:5–21. A few days prior, Defendants performed routine move-in maintenance, and no moisture or mold issue was noted. Ex. 8 (Foster Hunt Gen02 00014).

While Plaintiffs have submitted a self-serving affidavit, the affidavit provides no evidence of an actual "dangerous" or "unsafe" condition at Plaintiffs' residence. Motion at Ex. S. Instead, Plaintiffs submit that "my move-in inspection did not consist of an inspection of the

14

Subject Property's attic or HVAC system," as if indicating where they didn't look is sufficient to prove what was there, although they failed to see it. However, it is undisputed that the standard "turn" maintenance review by Defendants does include an inspection of the attic and a "hundred percent" of the house, "all occupiable and nonoccupiable spaces," for any problems, including mold. Ex. 9 (Eitutis depo.) at 60:1–61:9.

Defendants timely responded to each and every subsequent complaint of a moisture-related issue. Ex. 7 at 337:1–13 ("No, every time we called, they would come out and address whatever we had.").

Plaintiffs have thus failed to offer proof on any essential element of their claim, when they were required to prove **each** element. They have produced no evidence of duty (because Defendants knew of no *dangerous* defect) and therefore no evidence of breach. Summary judgment for Plaintiffs would be improper.

## IV. DEFENDANTS, NOT PLAINTIFFS, ARE ENTITLED TO SUMMARY JUDGMENT.

In fact, as all Defendants have shown in their Rule 56 motions, because Plaintiffs have no proof that there was a "dangerous" or "unsafe" condition, no proof that Defendants breached any standard of care, and no proof (through expert testimony or otherwise) that any such condition proximately caused their damages, it is Defendants, not Plaintiffs, who are entitled to summary judgment. *See Shed*, 761 F. App'x at 407 (expert testimony needed to prove claims involving toxic mold). Without expert testimony, a jury would be left to guess about how much mold was in Plaintiffs' residence (if any), what species of mold it was, and whether that speculative amount was, in fact, dangerous. Mississippi law does not authorize such speculation. *See, e.g.*, *Mildemont, Inc. v. Ford Motor Co.*, 2017 WL 151400, at *3 (S.D. Miss. Jan. 13, 2017) (expert testimony required to show defect); *Crocker v. Sears, Roebuck & Co.*, 346 So. 2d 921, 924

15
266859.3

(Miss. 1977) ("it [is] improper to allow the jury to guess" about possible causes of plaintiffs' injuries).

For the reasons set forth in Defendants' own motions, partial summary judgment should be denied to Plaintiffs, and granted to Defendants on this issue.

WHEREFORE, PREMISES CONSIDERED, Defendants ask that this Court DENY Plaintiffs' motion for partial summary judgment.

Respectfully submitted, this the 14th day of June, 2019.

*/s/ Walter H. Boone*
Walter H. Boone, MSB#8651
Jennifer J. Skipper, MSB#100808
BALCH & BINGHAM LLP
188 East Capitol Street, Suite 1400
Jackson, MS 39201
Telephone: (601) 961-9900
Facsimile: (601) 961-4466
Email: wboone@balch.com
      jskipper@balch.com

**Attorneys for Hunt Southern Group, LLC and Hunt MH Property Management, LLC**

*/s/ Alison O' Neal McMinn*
Joshua J. Metcalf, MSB#100340
Alison O' Neal McMinn, MSB#101232
FORMAN WATKINS & KAUTZ LLP
210 East Capitol Street
Suite 200
Jackson, MS 39201
Telephone: (601) 960-8600
Facsimile: (601) 960-8613
Joshua.Metcalf@formanwatkins.com
Alison.McMinn@fortnanwatkins.com

-and-

*/s/ William J. Hubbard*
William J. Hubbard (admitted *pro hac vice*)
Gregory P. Feldkamp (admitted *pro hac vice*)

16

THOMPSON HINE LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114-1291
Telephone: (216) 566-5500
Facsimile: (216) 566-5800
bill.hubbard@thompsonhine.com
gregory.feldkamp@thompsonhine.com

*Attorneys for Forest City Residential Management, LLC*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on the 14th day of June, 2019, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all known counsel of record by operation of the court's electronic filing system.

*/s/ Walter H. Boone*
Walter H. Boone